IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )      CR No. 13-131-1, 2
                                     )
                                     )      Washington, D.C.
        vs.                          )      May 24, 2017
                                     )      11:30 a.m.
AARON THORPE,                        )
MELVIN KNIGHT,                       )
                                     )
            Defendants.              )
_____)

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:          Pamela Stever Satterfield
                             U.S. ATTORNEYS OFFICE
                             FOR THE DISTRICT OF COLUMBIA
                             Special Proceedings Division
                             555 4th Street, NW
                             Washington, D.C. 20530
                             (202) 252-7578
                             pamela.satterfield@usdoj.gov


For Defendant Thorpe:        Howard B. Katzoff
                             LAW OFFICES OF HOWARD KATZOFF
                             717 D Street, NW
                             Suite 310
                             Washington, D.C. 20004
                             (202) 783-6414
                             katzoffh@aol.com


For Defendant Knight:        Christopher Michael Davis
                             DAVIS & DAVIS
                             1350 Connecticut Avenue, NW
                             Suite 202
                             Washington, D.C. 20036
                             (202) 234-7300
                             cmdavisdc@gmail.com

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   U.S. Courthouse
                                   333 Constitution Avenue, NW
                                   Room 6511
                                   Washington, D.C. 20001
                                   (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

3

– – –

WITNESS INDEX

– – –

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DEFENDANT'S: | | | | |
| MELVIN KNIGHT | 15 | 40 | | |
| JENNIFER POSTELL | 71 | 75 | | |

– – –

WITNESS INDEX

– – –

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GOVERNMENT'S: | | | | |
| FREDERICK IVERSON | 79 | 116 | 135 | |

4

P R O C E E D I N G S

DEPUTY CLERK:  All rise.  The United States District Court for the District of Columbia is now in session, the Honorable Richard J. Leon presiding.  God save the United States and this Honorable Court.  Please be seated and come to order.

Your Honor, this is Criminal Case 13-131, United States of America versus Aaron Thorpe, Defendant 1, Melvin Knight, Defendant 2.

I'm going to ask counsel to please approach the podium, identify yourselves for the record, and state who you're representing.

MS. SATTERFIELD:  Good morning, Your Honor. Pamela Satterfield on behalf of the government.

THE COURT:  Welcome back.

MR. DAVIS:  Good morning, Your Honor. Christopher Davis on behalf of Melvin Knight.

THE COURT:  Welcome back.

MR. KATZOFF:  Good morning, Your Honor. Howard Katzoff on behalf of Aaron Thorpe.

THE COURT:  Welcome back.

MR. KATZOFF:  Your Honor, I have some preliminary representations to make on behalf of Mr. Thorpe when the Court is prepared to hear them.  May I address the Court now?

THE COURT:  Before you address the Court, I wanted to know what you have in mind as to what witnesses you want to call, who they are, how many there are, what their relevant testimony is.  Hopefully, none of them are in the courtroom right now.

MR. KATZOFF:  There is a potential witness in the courtroom, who I will ask to leave.

THE COURT:  They need to leave.

Mr. Davis, is there anyone in the courtroom that you might call as a witness?

MR. DAVIS:  There is no one in the courtroom.

MR. KATZOFF:  Your Honor, I don't think it's likely that I will call that person as a witness, but I'll address that and make sure before I have the person come back in.

Your Honor, really the main witness would be Mr. Thorpe.  And the reason for my representations is I feel compelled to ask to continue Mr. Thorpe's portion of the hearing and his testimony based on the condition he's in today.

When I met with him this morning --

THE COURT:  Physically you mean or mentally or both?

MR. KATZOFF:  Sort of mentally and emotionally.

I got a phone call, two phone calls last Friday

sort of frantic from family.  His mental and emotional state was fragile, very upset.  He has not been sleeping for days.  He's having a hard time in the facility.  He's apparently -- and that has continued through today.

I sent a letter --

THE COURT:  Does he have doctor's treatment?

MR. KATZOFF:  He has not been getting treatment is the problem.

I sent a letter to the facility on Friday.  He hasn't been seen since then.

I contacted Craig Shelton of prison coordination today.  I had been asked to do that earlier, but the bottom line is, I had been out for about five weeks with a back injury.  I just came back last week.  And so I didn't get an opportunity to talk to Mr. Shelton about the possibility of moving him.

THE COURT:  Can you say on the record what facility it is?

MR. KATZOFF:  He's in Rappahannock Regional Jail right now.  It is not an easy one because they don't have telephone conference.

It's also, my understanding, not an easy place for people to be for a long time.  They have a lot of short-term local kind of cases down there, I think.

But --

7

THE COURT:  Do they have facilities -- do they have doctors on the staff?

MR. KATZOFF:  I'm not sure, Your Honor.

And that's why I went to Mr. Shelton, because I know from past experience that he's instructed me, if there's a problem, to come to him, and he's pretty good at trying to help resolve it.

Unfortunately, he's unavailable all day today and won't be able to get back to me until either the end of the day -- he texted me from wherever he was that he wouldn't be able to check into the ability to try to get him moved, try to get him some treatment, a consult.

But I don't feel comfortable.  He does have a mental health history.  And I believe when he was in the BOP, you know, he was getting treatment.  And so I'm very uncomfortable in the state he was in this morning.

And I haven't seen him that much because my back was out so I saw him last week, I knew that he was having problems, but I don't realize the extent of it.

I think other people might be in a position to go forward today.  But, for him, it's a serious matter, it's important to him, and I felt I needed to ask the Court if it could accommodate our portion of the hearing.

THE COURT:  Well, I'm not going to do them separately.  So we're going to do it.  If I'm postponing

one, I'm postponing the other.

MR. KATZOFF:  Well, I have no choice, Your Honor.

THE COURT:  I'm not doing separate hearings.

MR. KATZOFF:  I hear you.  I just -- I have an obligation to my client to --

THE COURT:  I understand.

MR. KATZOFF:  -- do what I have to.  And I've informed everybody else.  I thought, perhaps, I wouldn't --

THE COURT:  How long did you anticipate his testimony taking, assuming he was in good condition?

MR. KATZOFF:  Testimony, is that what you're asking?

THE COURT:  Yeah.  You said he was going to take the stand.

MR. KATZOFF:  Yeah.  Half hour.

THE COURT:  Half hour?

MR. KATZOFF:  Yeah.  I mean, I'm not talking about long, but I think it's relatively short, Your Honor.

THE COURT:  And he was the only witness you were planning on calling?

MR. KATZOFF:  Yes.

THE COURT:  Mr. Davis, what were your plans?

MR. DAVIS:  Your Honor, I'm ready to go.  I have Mr. Knight as a witness.  I have an exhibit sheet on the exhibits I intend to enter are a bar complaint, a portion of

a bar complaint filed by Mr. Knight. I have a computerized printout of professional visits by attorneys with Mr. Knight at the jail. That is being stipulated to by the United States. I have a typed stipulation on that.

At 1:00, in lieu of having a guard come up and explain the entries on the computerized printout, the guard is going to be available in the custodian's office at the jail and Ms. Satterfield and I are going to speak to the guard. If she's satisfied that the fact representations and the stipulation are accurate, then we'll just be able to enter the stipulation and not need to call the guard. If not, I'll bring the guard up.

And then, finally, I have Mr. Iverson's CJA voucher, complete with itemizations.

I expect Mr. Knight will take 15 to 30 minutes max with cross and direct.

I imagine Mr. Iverson will probably be about the same.

And I think other than that, I think the only other witness -- and I'm speaking on behalf of the government now. I think the only other witness they'd call would be Mr. Thorpe's attorney, Mr. Knight.

THE COURT: Mr. Iverson is being called for what reason again?

MR. DAVIS: Well, I think the United States is

10

calling him to rebut the claim that Mr. Knight was not properly advised of the plea agreement that was extended to him in the Superior Court.

Oh, I did forget.  The United States is also introducing a copy of the first appearance in court where the plea offer was put on record in Superior Court, and then they're introducing the preliminary hearing transcript, the portion that reflects that the plea offer has been taken off the table.

THE COURT:  Is there any prejudice that you believe you would inure to your client if you were to proceed today and not have the benefit of hearing whatever testimony Mr. Thorpe had?

MR. KATZOFF:  I don't believe it will influence us at all.

THE COURT:  Okay.

I'd ask you the same question.  Is there any potential prejudice to your client to our proceeding with Mr. Knight alone today?  Your client can sit and listen. Obviously, you can sit and listen.

MR. KATZOFF:  No, I don't think there's any prejudice, Your Honor.  I think they're sort of discrete, in some respects.

THE COURT:  Say that again.

MR. KATZOFF:  They're discrete in some respects.

11

THE COURT:  Okay.

Ms. Satterfield, what's the government's thinking on proceeding with Knight and doing Thorpe on a day when his mental stability is better?

MS. SATTERFIELD:  That's fine.  I can defer to the Court on that.

My issue is, I have two witnesses, the lawyers, the Superior Court lawyers.

Mr. Iverson, who goes with Mr. Knight, is picking a jury today in Superior Court.  And so as many times as I've told him about this hearing, I met with him last week, he's picking a jury.  And so I do not know what his availability is.  I don't know if it's going to go.  I've asked him at the end of the day possibly if he could free himself at 4:00.

THE COURT:  4:00.  5:00 even.

MS. SATTERFIELD:  I don't even know.

Well, maybe 5:00.

So that's my situation with him.

I have Mr. Thorpe's attorney, who actually is a Mr. Knight, he's available, but I would prefer to call him after Mr. Thorpe testifies.

THE COURT:  Mr. Thorpe's attorney is named Knight?

MS. SATTERFIELD:  Yes.  So it's very confusing.

THE COURT:  You can't make this up.

12

MS. SATTERFIELD: And, actually -- and I agree with counsel. I think that each of these witnesses, really, 30 minutes or so.

THE COURT: Does the order matter to you? I mean, if Iverson were, say, at the end of the day, would it be of any prejudicial effect to you all?

MS. SATTERFIELD: No. But I guess Mr. Knight goes first. And then we're going to have a lull. Then I get Mr. Iverson over here. And then we come back another day for Mr. Thorpe.

THE COURT: How about tomorrow?

MS. SATTERFIELD: Well, I don't know about Mr. Thorpe.

THE COURT: Oh. Well.

MS. SATTERFIELD: You see.

And then I want Mr. Knight to come after Mr. Thorpe. Mr. Knight, Attorney.

THE COURT: I see. Yes, I see your point. Okay.

All right. So maybe we can do the Defendant Knight portion of this today even.

MS. SATTERFIELD: Right.

THE COURT: And then if we set a new date for when Mr. Thorpe's feeling better, on that day, we would have the Attorney Mr. Knight testify after him. Make sense?

MS. SATTERFIELD: Right.

And the only unknown now is Mr. Iverson's availability.  So I'm going to just --

THE COURT:  Well, the Court -- you can feel free to represent to him, if you reach him on the break, like the lunch break or whatever --

MS. SATTERFIELD:  Right.

THE COURT:  -- that the Court would be willing to have him come over at 5:00.  Usually they're done in the Superior Court at 5:00.

MS. SATTERFIELD:  I know.  So...

THE COURT:  And if he wants to come over here at 5:00, his testimony being relatively short, right?

MS. SATTERFIELD:  Right.

THE COURT:  Yeah.  We could do it at 5:00.

MS. SATTERFIELD:  Okay.  That sounds perfect.

THE COURT:  That way, there won't be a conflict with a Superior Court Judge --

MS. SATTERFIELD:  Right.

THE COURT:  -- and jury.

MS. SATTERFIELD:  I know the Court has scheduled tomorrow at 2:00, but that probably doesn't make sense, we'll just vacate that.

THE COURT:  Well, I wanted to give, obviously, at some point, both you and Mr. Davis -- and then, of course, when Mr. Katzoff's ready, wouldn't be today, because of his

14

client's condition -- a chance to sort of sum up, so to speak.

MS. SATTERFIELD:  Right.  So we can do that later.

Okay.  So that's where we stand.

THE COURT:  Okay.

All right, Mr. Davis, then, if that's the status of things and that's agreeable to you and your client, then why don't you have Mr. Knight come up and be sworn, and he can take the stand.

MR. DAVIS:  Certainly, Your Honor.

MS. SATTERFIELD:  Your Honor, can I talk to Mr. Davis?

THE COURT:  Yeah.  Go ahead.

MR. DAVIS:  Certainly, Your Honor, we can call Mr. Knight right now.

THE COURT:  Marshal, there's a chair over here you can sit in.

MR. DAVIS:  All right.  Just for the record, Mr. Knight was concerned that Mr. Iverson would have several hours to prepare for his testimony after hearing his testimony.  But I explained to him that he's in trial and there's really not much of a concern.

THE COURT:  He's busy.  I don't think he's going to have any free time.

MR. DAVIS:  I don't think so either.

15

MR. KATZOFF:  Your Honor, may I just go out and get the potential witness?  Because there's really no chance that the person will be a witness.  I was just being overcautious.

THE COURT:  Okay.

(Witness is placed under oath.)

THE DEFENDANT:  Yes.

DEPUTY CLERK:  Thank you, sir.  You may be seated.

MR. DAVIS:  The Court's indulgence for one moment.

THE COURT:  Sure.  Take your time.

- - -

MELVIN KNIGHT, WITNESS FOR THE DEFENDANT, SWORN

DIRECT EXAMINATION

- - -

BY MR. DAVIS:

Q    Good morning, sir.  Could you state your name for the record, spelling your last name.

A    Melvin Knight, K-n-i-g-h-t.

Q    And, Mr. Knight, where are you currently living?

A    In prison.

Q    And have you been in prison ever since you were arrested?

A    Yes.

Q    And when were you arrested?

A    January 28th, 2013.

Q    And out of what courthouse were you detained?

A    D.C. Superior Court.

Q    And were you represented by an attorney back then?

A    Yes.

Q    And was the attorney appointed or did you hire that attorney?

A    He was court appointed.

Q    Now, directing your attention back to January 31st of 2013, could you tell us if you had an occasion to see your attorney?

A    Yes, I did.

Q    Now, had you ever seen him before, other than the appearance in court when you were arrested on the 28th?

A    No.

Q    Where were you when you saw the attorney?

A    D.C. jail.

Q    And was this the first time you had seen the attorney at the D.C. jail?

A    Yes.

Q    When did the attorney come, approximately?  Was it in the morning, the afternoon, or the evening?

A    It was late that evening, around 11:00 or a little bit after.

Q    And how long did you meet with this attorney?

A    I would say close to 20 minutes.

17

Q     And could you tell us the attorney's name?

A     Frederick Iverson.

Q     And is this the attorney that was appointed to represent you in Superior Court?

A     Yes, it was.

Q     Did you have discussions with Mr. Iverson?

A     On the 31st?

Q     On the 31st at the jail in the evening?

A     Yes, we talked.

Q     And what did you talk about?

A     He informed me that we were having a preliminary hearing the next day on February 1st.

We talked about me getting some type of release. That was my whole focus.  I asked him about a halfway house, some type of bond or ankle bracelet, even PR possibly on the charges that I was facing.  That's all we talked about.

Q     Did you talk about anything else with him?

A     No.  That's the only thing we spoke about.

Q     Did he show any documents to you?

A     No.

Q     When's the next time you saw Mr. Iverson?

A     I seen him the next day, February 1st.

Q     And where did you see him?

A     D.C. Superior Court.

Q     And what happens at court?

18

A    I came out the back, he was at the table.

Q    When you say he's at the table, what table are you referring to?

A    I guess the defense table.

Q    Okay.  Go ahead.

A    I came out the back, he was at the table.  My co-defendant's attorney is at the table.  The prosecutors was at another table.

I just came out, they started stating things for the record, names and stuff.  And he told me the case was going to be postponed.  I got upset with him, "You didn't tell me that yesterday."

And I'm trying to, you know, get some type of release, some type of -- I'm trying to get released.  I'm trying to really see my wife.  My wife's about to have my son.  I'm trying to get home to see that any way that I possibly can.

So I was upset about that, and I kept telling him to push forward.  And we were talking about that, and I'm telling him push forward, push forward.  And he didn't.

Q    And what happens while you're out at the defense's desk speaking to the attorney?  Did you have any other discussions with him?

A    Yes, I did.  He told me, well, just hold up, calm down, he got a plea for me.  I asked him what?  He said,

"I got a plea to ADW."  I asked him what was that?  He said, "Assault with a deadly weapon," "assault with a dangerous weapon," I can't remember, but it was along them lines.

And I asked him, "Well, how much time do they want for that?"  He told me, "Ten years."  I returned and said, "I've been locked up for three days, I'm not copping to that shit."  He turned around and said, "Well, just hold up, I'm going to come over to the jail and talk to you."  I said "okay."  And that was the end of our discussion.

Q    And that occurred at where, exactly where did that occur?

A    In the courtroom at the defense table.

Q    And was that the extent of the discussion of the plea that he was talking about with him at the defense table?

A    That was the only time he told me about a plea deal.

Q    Did he discuss with you the maximum penalties for ADW?

A    No.

Q    Did he discuss with you the minimum penalties for ADW?

A    No.

Q    Did he discuss with you the Voluntary Superior Court Sentencing Guidelines that apply to ADW?

A    No.

Q    Did he discuss the impact your criminal history would have on the Voluntary Superior Court Guidelines on a plea to ADW?

A    No.

Q    Did he discuss what other potential charges could be lodged against you if you were not -- if you decided not to take this plea?

A    No.

Q    Did he identify the additional charges that could be lodged against you if you decided not to take this plea?

A    No.

Q    So it's fair to say there was no question -- there was no discussion of any mandatory penalties that may be applicable if you were to be convicted?

A    No.

Q    And there was no discussion of any potential Voluntary Superior Court Guidelines that would be applicable if you were convicted?

A    No.

Q    Was there any discussion at all, when you had this discussion about this plea with Mr. Iverson, about what your potential exposure was if you were convicted?

A    I asked him how much time did they want for it. He told me ten years.  That was the only discussion.  That

21

was the only thing he said.

Q    And could you tell us how long that conversation took at the defense table in open court?

A    It wasn't that long.  We were just -- we just came out and they set the case back.  So however long that took.  And it wasn't the whole time.

Q    Now, after that took place, what happened in the courtroom next?

A    A lot more talking.

Q    Do you recall exactly what was said?

A    I can't say I remember exactly what was said.

Q    Would a copy of the transcript of the hearing that was held on February 1st of 2013 refresh your recollection?

A    Yes.

MR. DAVIS:  Your Honor, if I may approach the witness?

THE COURT:  You may.

MR. DAVIS:  And if Your Honor would like a copy, I'm showing him page 3 of the transcript.

THE COURT:  Thank you.

MR. DAVIS:  And, for the record, Your Honor, the government intends to introduce this transcript as a Government's Exhibit No. 1 during their case.

THE COURT:  Okay.  Any objection?

MS. SATTERFIELD:  No.

22

THE COURT:  It will be admitted.

BY MR. DAVIS:

Q    Does that refresh your recollection as to what was said in the courtroom?

A    Are you referring to this about a plea?

Q    That's correct.

And what happened?  What was said concerning a plea in the courtroom?

A    You don't want me to read this?

Q    Well, I mean, after reading that -- I guess if it's --

THE COURT:  I don't want him to read it.

BY MR. DAVIS:

Q    Sorry.

No, you don't have to read it.

Can you tell us what was basically said in the courtroom?  What was referenced, without reading it?

A    That a plea was offered.

Q    All right.  And were offenses mentioned in open court?

A    Yes.

Q    Assault with a deadly weapon was mentioned, correct?

A    Yes.

Q    Two counts of armed kidnapping was mentioned,

correct?

A    Yes.

Q    Possession of a firearm during a crime of violence was mentioned, correct?

A    Yes.

Q    And obstruction counts were mentioned, correct?

A    Yes.

Q    Now, during -- and who put that on record?  Who was making those representations?

A    It was someone from the government, a prosecutor, I believe.

Q    Now, did anyone talk about mandatory penalties?

A    You mean my attorney?

Q    I'm talking about on the record in court when you were there, did anyone reference mandatory penalties?

A    No.

Q    Did anyone reference Guidelines?

A    No.

Q    So essentially, the same thing your attorney told you, with the addition of reference to other charges that could be lodged, correct?

MS. SATTERFIELD:  Objection.

THE COURT:  What's your basis?

MS. SATTERFIELD:  Leading.

THE COURT:  All right.  Sustained.  Go ahead.

24

Rephrase your question.

MR. DAVIS:  Certainly.

BY MR. DAVIS:

Q    Were you provided any additional information above and beyond what your attorney had provided you by the United States in open court?

A    I mean, it was different from what my attorney told me.

Q    And different in what sense?

A    A lot more charges.

Q    And did you have any idea what penalties were associated with these charges?

A    No.

Q    And did your attorney tell you what penalties were associated with these charges?

A    No.

Q    When was the next time you saw your attorney?

A    February 19th.

Q    And where did you see him?

A    D.C. Superior Court.

Q    And what happens when you see -- were you referring to the same attorney you had when you were in court on the 1st?

A    Frederick Iverson, yes, I am.

Q    And what happens when you see your attorney in

25

court on the 19th?

A    Well, the next time I actually seen my attorney, he came into the back, I was behind -- right behind the courtroom in the holding cell.  He came back there and he asked me, will I agree to another postponement.  I returned and told him I didn't agree to the first one and that he didn't come up to the jail to see me during the last postponement.  No, I don't agree to it, we going to move forward today.  And he turned around and walked away.

Q    Could you describe how you felt at that point in time?

A    I was very upset.

Q    And why were you upset?

A    Well, like I said, the only thing I wanted to do was see my wife have my son.

Q    And when was your wife due?

A    She was due any day, but she had my son on February 10th.

Q    Now, was there any discussion -- was there any other discussion with Mr. Iverson other than what you have described at this point?

A    No.

Q    Do you recall what was said in court that day?

A    On the 19th?

Q    On the 19th.

26

A    Bits and pieces.

Q    Would a copy of the transcript from February 19th, the relevant pages, would that refresh your recollection as to what was said?

A    Yes.

MR. DAVIS:  Your Honor, if I may approach the witness, this is Government's Exhibit No. 2, which I believe is coming into evidence, and I'll proffer it to the Court.

THE COURT:  Government's Exhibit or Defendant's Exhibit?

MR. DAVIS:  It's Government's Exhibit.  They've already marked it.  So they said I could use them.

THE COURT:  Okay.

MR. DAVIS:  And only the relevant pages are in this transcript, because this was of the full preliminary hearing.

THE COURT:  Thank you.

BY MR. DAVIS:

Q    If you could take a moment to review that, Mr. Knight.

A    (Witness complies.)

Okay.

Q    Have you had a chance to review that?

A    Yes.

Q    What happens with the plea that you had heard

about on February 1st when you're in court on February 19th? What happens to that plea?

A    What happens to the plea on February 1st?

Q    On February 19th, what happens to the plea, is it still open or is it closed?

A    Oh, the plea was taken off the table.

Q    And was that represented in open court?

A    Yes.  It says the plea was taken off the table.

Q    Now, was any reference to U.S. District Court transfer mentioned during the February 1st proceeding in open court?

A    No.

Q    Did Mr. Iverson ever mention a potential transfer to U.S. District Court to you at that hearing on February 1st?

A    No.

Q    Did he ever mention that to you on January 31st?

A    No.

Q    And it's your testimony he did not reference a plea on January 31st?

A    We didn't even talk about the case.  We just talked about the release, trying to get me some type of a change in custody.

Q    So is it your testimony the first time you heard about a potential District Court case is on February 19th

28

when the plea is withdrawn on record?

A    Yes, that's correct.

Q    And, again, when that plea was taken off the table in open court, it's your testimony you've never discussed potential charges, potential penalties, potential Guidelines, potential federal transfer of anything with Mr. Iverson?

A    I've never discussed anything to Mr. Iverson, except the conversation we had at the table in D.C. Superior Court.

Q    How did this make you feel when all this was going on?

MS. SATTERFIELD:  Objection; irrelevant.

BY MR. DAVIS:

Q    Did you take any action -- I'll withdraw it.

Did you take any action?

A    Yes.

Q    What action did you take?

A    I wrote a letter.

Q    And who did you write the letter to?

A    I can't remember the lady's name, but I was looking for help.  So I started going to the law library at the D.C. jail.  A gentleman over there, I was asking him to help me with my case, and I had to let him know that I wasn't happy with my attorney, and he told me, well, write

this lady at the Bar Association.  At the time, I just took her information down, went back to my cell and wrote the lady.

BY MR. KATZOFF:

Q    Mr. Knight, I'm going to show you Defendant's Exhibit No. 1.  Could you identify that document?

A    It's part of a letter that I wrote to the lady at the Bar Counsel.

Q    And directing your attention -- and, Your Honor, at the time -- and this is the letter that you wrote to the Bar Counsel, correct?

A    I wrote this, yes.

MR. DAVIS:  Your Honor, at this time, I would move a copy of Defendant's Exhibit No. 1 into evidence, and I'll provide a copy to the Court.

THE COURT:  Any objection?

MS. SATTERFIELD:  No objection.

THE COURT:  It will be admitted.

MS. SATTERFIELD:  Your Honor, I would object. There's more to the letter than actually just the first page of the letter.

THE COURT:  Yeah.  Why don't we have the whole letter here?

MR. DAVIS:  I have the whole letter.  I was trying

30

to simplify things.  I'm not hiding anything.  I have to move the whole letter into evidence.  I have to make copies, though.

I had sent these exhibits -- I thought I sent these exhibits out yesterday.

THE COURT:  How long is the whole letter?

MR. DAVIS:  It's like four pages.  I have it, Your Honor, if you want to take a look at it while we're doing this.

THE COURT:  Well, I think just to be complete, though, we should have the whole letter.

MR. DAVIS:  I'll find it when we -- I'm just addressing the one portion.  I'll find it for Ms. Satterfield for purposes of cross-examination.

BY MR. DAVIS:

Q    Now, Mr. Knight, in paragraph 2 under the facts section of the letter you wrote, do you reference any discussions you've had with your attorney about a plea deal?

A    Yes, I do.

Q    And what do you reference in that letter?

A    How Mr. Iverson tried to fast-talk me on a plea deal in D.C. Superior Court, in open court.

Q    And did you reference how many times you had seen him between February 1st and February 19th?

A    Yes.

31

Q    And how many times did you tell Bar Counsel that you saw Mr. Iverson between February 1st, when the plea was extended in open court, until February 19th?

A    I said that I didn't see him at all.  I seen him on the 1st during court when he told me about the plea in open court.  And then I seen him again on February 19th.  Then he did not come see me at all after getting the preliminary hearing postponed.

Q    And when did you write this letter to Bar Counsel?

A    I wrote this in May of 2013.

THE COURT:  Please approach.

MR. DAVIS:  Certainly, Your Honor.

(Bench conference)

THE COURT:  Maybe I'm just confused.  And I appreciate that asking this man questions and expecting him to give complete answers is not going to be necessarily easy to do.

I'm looking briefly at this transcript, which is albeit an excerpt of the transcript on February 19th, Ms. Shaw, who I believe is an Assistant United States Attorney, represented to the Court that a plea offer had been offered -- a plea agreement had been offered to both defendants, Thorpe and Knight, and it was her understanding that both defendants had rejected the plea.

MR. DAVIS:  (Nodding head.)

32

THE COURT:  The excerpt I have has -- and then she says there will be no further pleas offered at this time.

The Court then says, to the lawyer Mr. Knight --

MR. DAVIS:  Right.

THE COURT:  -- is that correct?

Mr. Knight represents Mr. Thorpe.

MR. DAVIS:  (Nodding head.)

THE COURT:  And he basically says that Thorpe neither said he was taking it or not taking it.

MR. DAVIS:  As Ms. --

THE COURT:  And he says the co-defendant spoke first and said he was not.

And they're wired.

Now, you want to translate that for me?

MR. DAVIS:  Well, that's the reason the case was remanded, because the Court of Appeals did not feel comfortable with crediting the co-defendant's lawyer's statement to Mr. Knight.

There is nothing from Mr. Knight.  It was all coming from the co-defendant, and they remanded it so that we could develop a record on this.  They were uncomfortable with the fact that it was a co-defendant's lawyer making these representations.

THE COURT:  So this transcript doesn't go on to have the Court confront the attorney for Mr. Knight --

33

MR. DAVIS:  No.

THE COURT:  -- and ask him -- was Mr. Iverson at the time --

MR. DAVIS:  No.

THE COURT:  -- whether or not his client had rejected this plea offer?

MR. DAVIS:  No.

Actually, the Court went on and told him that he was not getting involved in plea agreements; that's between the parties and the attorneys.  Mr. Iverson said nothing.

THE COURT:  He wasn't asked any questions, Mr. Iverson, by the Judge?

MR. DAVIS:  More importantly, he didn't say anything.

The only one that spoke was Mr. Thorpe's attorney.

THE COURT:  So where Mr. Knight, the attorney for Mr. Thorpe says, "I believe the co-defendant spoke first and said he was not."

MR. DAVIS:  It's a mys- --

THE COURT:  Meaning, not taking.  That's a reference to Mr. Knight?

MR. DAVIS:  But it's a mystery as to how he arrived at that.

And I think Mr. Katzoff can -- I mean, he's going to testify, but I don't think he can --

34

THE COURT: If Mr. Knight here is -- if Attorney Knight here is representing that the co-defendant, Mr. Thorpe, Mr. Knight --

MR. DAVIS: It's confusing.

THE COURT: -- said in open court --

MR. DAVIS: He didn't say, in open court, Your Honor.

I have the whole transcript. That's the United States's exhibit. If Your Honor wants to read it.

MR. KATZOFF: Your Honor, just to be clear, this is the whole transcript of the preliminary as we received it, and it then goes right into the preliminary hearing testimony, and then that is transcribed separately, and it just starts like new.

But I think this is the complete transcript, as we understand it, of those preliminary representations. So there's nothing more that we're aware of from the inquiry after the Judge's statement that, I'm not getting involved, and then they just started the preliminary hearing.

Perhaps the government knows something different, but I don't.

MS. SATTERFIELD: This Government's Exhibit 1, it consists of --

THE COURT: This is Exhibit 2.

MS. SATTERFIELD: 2. Is 30-some pages. After

these first three pages, it goes into the preliminary hearing.

And I certainly have it.  So it can be substituted, the whole preliminary hearing.

THE COURT:  Well, this needs to be cleaned up, because the record is very unclear on this issue right now.

MS. SATTERFIELD:  Right.

But, Your Honor, wait for Mr. Iverson.

In other words, Mr. Iverson is going to clear all of this up.

THE COURT:  All right.

MS. SATTERFIELD:  I'm confident.

THE COURT:  Well, that will certainly help, because the impression I get -- this is my first look at this, obviously -- is that Attorney Knight is representing that the Co-defendant Knight, "spoke first," and I don't interpret that to mean, to his lawyer, but to the Court.

MR. KATZOFF:  That's the way it read to me too.

THE COURT:  And said "he," meaning Mr. Knight, Defendant Knight, was not accepting the plea.

That's how I read that transcript right there.

MR. DAVIS:  Well, I think what we ought to do, given Your Honor's concern about it, the United States, all of us have a full copy of the transcript.  So I think what we'll do is we will insert the full transcript in lieu of

the excerpt.

Would that be agreeable, Ms. Satterfield?

MS. SATTERFIELD:  Yes.

MR. DAVIS:  And that way, that'll answer Your Honor's question.

Now, my concern with Mr. Knight, just so Your Honor knows --

THE COURT:  Speak in terms of Attorney Knight and Defendant Knight.  The record is already too screwed up on this.

MR. DAVIS:  Melvin knight.  My concern is with Mr. Melvin Knight is that he hasn't spoken to his attorney and been properly advised.

He never rejected anything.  He really -- the gist of his testimony here today is that he was not properly advised of the pros and cons of accepting a plea, not accepting a plea.  He didn't have any information.

THE COURT:  Well, he just testified that when the attorney came behind the courtroom and spoke to him --

MR. DAVIS:  But he didn't tell him.

THE COURT:  -- the attorney said, "We're going to ask for a continuance."  And that he said, "No, we're not, we're going forward today."  That's what I wrote down.

MR. DAVIS:  But what he hasn't heard from the attorney is, he hasn't heard what the penalties involved are

37

if he gets convicted; he hasn't heard what the penalties for the offenses are?

And if Your Honor recalls, these are very complex charges. I mean, it took us a while to get through sentencing. I think we did three J&Cs on this. I mean, it was complex the way these Guidelines worked out and these mandatory minimums.

His testimony today and his letter to Bar Counsel is that he did not discuss this with this attorney other than for two minutes in open court. That's his testimony.

There may be a difference. But I mean, just so Your Honor knows where I'm coming from with Mr. Knight, that's his core complaint here.

MR. KATZOFF: Your Honor, I hate to say it, I don't think any of this -- and perhaps listen if there's a tape -- but I read it that way as well. But there is nothing hidden -- there are no other -- there's no other transcription of an excerpt where there's representations.

So I understand the Court's confusion, but...

MR. DAVIS: I listened to the tape.

MR. KATZOFF: There's nothing we've seen that clears it up.

MR. DAVIS: I had the Chief Judge make the audiotapes available to me to listen to these, because I was interested in what was being whispered at defense table on

February 1st.  And I was also interested in what was going on here, if there was anything on the sidelines, and the transcript reflects, which you can hear.

MS. SATTERFIELD:  Your Honor, I expect it all to be cleared up after Attorney Knight and Attorney Iverson testify.  So right now we're just --

THE COURT:  Yeah.  Well, I just figured Mr. Davis was getting close to the end of his direct and I thought maybe if this could be clarified further, it might be helpful.  But, apparently, it can't be clarified further, at least by this particular witness.

MS. SATTERFIELD:  That's correct.  It can be clarified later.

THE COURT:  Okay.  All right.

MR. DAVIS:  I could ask him a question about whether he talked to the co-defendant's attorney.

THE COURT:  No, I don't think -- well, you do what you want to do.  That's up to you.

(Open court)

THE COURT:  You may proceed.

BY MR. DAVIS:

Q    Mr. Knight, did you ever speak to the co-defendant's attorney, Mr. Knight, on February 19th about your case?

A    No.

39

Q    Did you ever speak to him on February 1st, 2013 --

A    No.

Q    -- about your case?

MR. DAVIS:  The Court's indulgence.

BY MR. DAVIS:

Q    All right.

Mr. Knight, between the date you were arrested and February 19th when the plea offer was withdrawn, did you have the opportunity to review the evidence the United States was in possession of that they intended to use against you for trial?

A    No.

Q    Did you see anything relevant to the case other than what was read in court on the day you were arrested?

A    No.

MR. DAVIS:  I have no further questions of Mr. Knight, Your Honor.  Thank you.

THE COURT:  All right.  Cross-examination.

Do you have any questions?

MR. KATZOFF:  I don't, but can I speak to Mr. Davis for a second?

THE COURT:  Yeah.  Go ahead.

MS. SATTERFIELD:  Your Honor, I'm going to substitute --

MR. DAVIS:  Your Honor --

40

MS. SATTERFIELD:  -- Government's Exhibit 2.

MR. DAVIS:  I'm sorry.  Mr. Katzoff reminded me of something I should ask, and I would like to ask one more question, if Your Honor would allow it.

THE COURT:  That's fine.

BY MR. DAVIS:

Q   Mr. Knight, knowing everything you know about the charges and the potential penalties and your exposure if you were convicted at trial, as you now have been, had you known all of this and had you been properly advised, in your opinion, would you have taken the plea offer that was extended to you in Superior Court?

A   Yes, I would have.

MR. DAVIS:  Thank you.  I have no further questions, Your Honor.

THE COURT:  All right.  Cross-examination.

- - -

CROSS-EXAMINATION

BY MS. SATTERFIELD:

Q   Good morning, Mr. Knight.

A   Good morning.

Q   I want to bring you back to January 28th, 2013, that's the day you got arrested in the District of Columbia.

A   Okay.

Q   You do remember that day, right?

41

A    Yes.

Q    And before that day, you'd come to D.C. from Illinois; isn't that right?

A    Yes.

Q    And you were actually living in Illinois with your family, correct?

A    That's correct.

Q    So when did you come to the District?

A    Before my arrest.

THE COURT:  Sir, you've got to speak up and into the microphone.

THE WITNESS:  Before my arrest.

BY MS. SATTERFIELD:

Q    How much before?

A    A few days.

Q    A few days before.

And how did you get here?

A    I believe I got on a plane.

Q    You don't remember?

A    No.  I'm almost positive I got on a plane.

Q    And at the time you came to D.C., you were actually on supervised release in a federal case where you were being supervised out in Illinois; isn't that right?

A    That's correct.

Q    And your previous case was a D.C. Federal Court

42

case; isn't that correct?

A    Yes.

Q    It happened in this courthouse?

A    Yes, that's correct.

Q    And --

A    The one I'm on supervision for that you're speaking of.

Q    Right.  So at the time you came to D.C. from Illinois, you were on supervised release?

A    That's correct.

Q    And you needed to get permission to come to the District to leave Illinois?

A    If I wanted to do it the proper way, I would have needed permission, but I just got on a plane and left.

Q    Right.  So you didn't get permission from your supervision officer, right?

A    No, I didn't.

Q    And when you got here, you connected up with Mr. Thorpe, right?

A    Yes.

Q    And Mr. Thorpe had just gotten out of federal prison himself; isn't that right?

A    I don't know where Mr. Thorpe was.  I mean, he -- possibly, yes.  I believe -- I don't -- yeah.

Q    In fact, he just had gotten out of federal prison

back on December 31st, just about 28 days before the two of you got arrested; isn't that right?

A    I really don't know exactly when Mr. Thorpe --

THE COURT:  Sir, please lean forward and speak into the microphone.  I cannot hear you.

THE WITNESS:  Okay.

THE COURT:  Please don't have me go through this again.  You know how to speak up.  Speak up, please.

THE WITNESS:  I can't exactly tell you when Mr. Thorpe was released.  I don't know exactly what date Mr. Thorpe was released.

BY MS. SATTERFIELD:

Q    And you knew Mr. Thorpe before you connected up in D.C., right?

A    Correct.

Q    Did you know him before you got arrested in your old case?

A    My old case?

Q    Your old -- your drug case, did you know him before that?

A    Somewhat.

Q    But, in fact, you knew him better because you were both incarcerated in federal prison together; isn't that right?

A    Yes.  We did time together, yes.

Q    And you spent some time in Cumberland; isn't that right?

A    That is correct.

Q    And if I gave you the dates, you were together in Cumberland from about June 2007 to December 2008, about a year and a half, does that sound about right?

A    We were in Cumberland together, yes.

Q    And then you were also there again in 2009 from about March to October, does that sound about right?

A    Yes.

Q    And so you became friendly in federal prison, correct?

A    We got to know each other.  Yeah, I guess.

Q    So when you came to D.C. -- well, what was your purpose in coming to D.C. in January?

MR. DAVIS:  Objection, Your Honor, as to relevance.  The issue is whether he was properly advised of the plea agreement.  We're going far afield and it does not seem to be relevant.

THE COURT:  Is there a relevance in time here?

MS. SATTERFIELD:  I'll move along.

THE COURT:  All right.

BY MS. SATTERFIELD:

Q    So you and Mr. Thorpe ended up together on January 28th, right?

A    Correct.

Q    And you went over to see your old friend Edmond Peters?

MR. DAVIS:  Your Honor, I'm going to object again. This has nothing to do with the issue that has been raised here, unless it's for background and context.  But...

MS. SATTERFIELD:  The victim in this case --

THE COURT:  Go ahead.  Go ahead.

What's the relevancy?

MS. SATTERFIELD:  The relevance is he knew the victim, and I'm going to ask him questions about that, and that will dispute what counsel is asserting here.

THE COURT:  I'll give you a little more leeway. Go ahead.

MS. SATTERFIELD:  Okay.

BY MS. SATTERFIELD:

Q    So you and Mr. Thorpe, on January 28th, go to see Edmond Peters?

A    Correct.

MS. SATTERFIELD:  And Edmond Peters -- may I approach the witness?

THE COURT:  You may.

BY MS. SATTERFIELD:

Q    I'm showing you what's been marked for identification as Government's Exhibits 4 and 5.

Do you recognize these photographs?

        A    They were used at trial.

        Q    But those are photographs of Mr. Peters, right?

        A    Yes.

        MS. SATTERFIELD:  At this time, I move Government's Exhibits 4 and 5 into evidence.

        MR. DAVIS:  Your Honor, I'm going to object pending it being tied up -- till I see the relevance to the issue at hand, I'm going to lodge an objection.

        THE COURT:  Yeah.

        MS. SATTERFIELD:  Just to identify the victim and that he knew him.

        THE COURT:  Okay.  I'm still trying to see how this ties into the plea offer.

        MS. SATTERFIELD:  I'm getting there.

BY MS. SATTERFIELD:

        Q    And you had known Mr. Peters since you were kids; isn't that right?

        A    Yeah, we'd known each other for a while.

        Q    In fact, you went to school with one of his sisters?

        A    I can't even say that.  I don't know.

        Q    And you knew Mr. Peters to be a drug dealer, didn't you?

        MR. DAVIS:  Your Honor, I'm going to -- I'm not

47

going to -- I hate to keep continuing to object, but I don't see this going any place relevant.

THE COURT: You can approach.

(Bench conference)

MS. SATTERFIELD: Your Honor, this goes to the heart of the government's theory that the Defendant Knight knew the Victim Peters, knew he was a drug dealer, knew he would not cooperate and testify in this case, and that's why he wasn't ever going to take a plea.

It's tied to the heart of the issue. He was never going to take a plea in this case because he knew the victim, Mr. Peters, was not going to testify against him. That was what was going through his head.

THE COURT: How are you -- are you planning on establishing how he knew this, how he knew that Peters was never going to testify against him?

MS. SATTERFIELD: Well, that's what was in his mind. I'm not sure that he knew he was going to testify or not.

But that's why he didn't take the plea. He knew this guy wasn't going to come in and testify against him.

THE COURT: Now, hold on now. I'm trying to figure something out here.

Do you have any evidence, other than your own deduction, that Peters informed or gave a signal of some

something connected to this defendant that he wasn't going to cooperate and testify against him?  Do you have any evidence of that?

MS. SATTERFIELD:  No.

THE COURT:  All right.

You want to argue this.  This is a deduction you're going to argue?

MS. SATTERFIELD:  No.  It goes further than that.

Mr. Iverson will come in and say that Mr. Knight, my client, said, "This guy is not going to fucking testify." I'm going to tie it up.

THE COURT:  All right.  I'll give you a little more leeway.

MR. DAVIS:  And I'll just lodge my objection and state that the complaint Mr. Knight has is he was never properly advised as to the -- his exposure, the potential penalties, the potential mandatories, the repercussions of being convicted at trial.  So though that may be marginally related to the topic, it doesn't address the core topic that he's raised in his petition:  Had he been properly advised, he would have taken the plea.

THE COURT:  But it might account for -- at least in theory, it might account for why he has no recollection of being told that which Mr. Iverson apparently is going to testify under oath he was told.

MS. SATTERFIELD: Right.

And, Your Honor --

THE COURT: I don't know what Iverson is going to say, but I'm assuming, perhaps mis-assuming, Iverson is going to come in here and say, under oath, I told him all this stuff, he said you don't have to worry about it, or words to that effect, this guy is not going to testify against you.

MR. DAVIS: He may. That's why I lodge my objection pending it being tied up.

If it's not tied up, I'll renew my objection and Your Honor can take whatever action you want to.

THE COURT: Okay.

MS. SATTERFIELD: And, Your Honor, under the case law, *Lafler v. Cooper*, one prong is the deficient performance prong. That's the failure to advise on the plea.

But the second part is prejudice. This defendant has to show he was prejudiced, which means he needs to show that he would have taken the deal.

And that's my main point here is that this guy was never going to take the deal. Neither defendant was ever going to take the deal, and that's where the government is heading with this.

THE COURT: I'll let you tie it in.

MR. KATZOFF:  I join in the objection, Your Honor.

THE COURT:  All right.

(Open court)

THE COURT:  You may proceed, consistent with the discussion at the bench.

MS. SATTERFIELD:  Okay.

BY MS. SATTERFIELD:

Q   So, Mr. Knight, you had told me that you knew Mr. Peters from way back?

A   I knew him for a while, yes.

Q   And you knew that he sold drugs, right?

A   I was aware of that.

Q   Right.

And you thought, on January 28th, that he might have some drugs at his place, right?

A   Yes.

Q   And you also thought, being a drug dealer, he might have some money over at his place, right?

A   It's possible, yes.

Q   And so you went over there, with Mr. Thorpe, armed with guns, and went over to Mr. Peters to rob him of drugs and money?

A   Okay.  Yes.

Q   You agree?

A   Okay.  Yeah, I agree.

51

Q    Okay.

Now, let's get to -- then you get arrested and you get appointed Mr. Iverson as your lawyer, right?

A    Correct.

Q    And your first appearance in Superior Court is what's called a presentment.  Do you remember that day?

A    The day after I got arrested?

Q    It's called a presentment in Courtroom C-10?

A    Okay.

Q    Do you remember being there?

A    Yes.

Q    And before you actually appeared in court, did Mr. Iverson come back and talk to you in the back or in the cell block?

A    I can't say I remember that.  I can't say I remember that happening.

Q    But did he come and introduce himself and say, hey, I'm going to be your lawyer?

A    I can't say he did that.

Q    Okay.  So then you're in court.  And that's a very short hearing, right, that first hearing, it's pretty short?

A    Uh-huh.

Q    You have to say "yes" or "no."

A    Oh, yes, I believe so.

I can't -- I mean, I don't -- I can't tell you how

52

long the hearing was, but I believe it was relatively short.

Q    And then the next hearing happens just two days later on February 1st; is that right?

A    Three days later, but it happened on February 1st.

Q    Oh.  Right.  I'm sorry.  So you appear in court on the 29th --

A    Right.

Q    -- the day after your arrest?  And then your next appearance is on February 1st?

A    Yes, that is correct.

Q    And before that court hearing, Mr. Iverson came to the jail to visit with you?

A    That is correct.

Q    And when you're at the jail, you're alone in a room, it's just the two of you?

A    Yes.

Q    And did you have any trouble talking to him or understanding him at all?

A    No.

Q    And did you ask questions?

A    There wasn't much of a discussion.

Q    Well, you said that you wanted to -- you wanted him to get you out, right?

A    Correct.

Q    That was your main concern, "Get me out of here"?

53

A    Right.  That was my only concern, yes.

Q    Did he show you any documents during that meeting?

A    No.

Q    Do you know what a Gerstein is?

A    I'm aware of what it is now.

Q    And that's the document where the government lays out all the facts of the case against you?

A    I believe so, yes.

Q    And did you look at that with Mr. Iverson?

A    No.  He didn't show me any documents.

Q    And he told you that the government, that very night, had sent out a plea offer, right?

A    We did not discuss a plea offer.

Q    Did he show you an email?

A    He did not show me any documents.

Q    You also talked about the fact that you were on supervised release in your prior federal case, right?

A    We did speak about that.

Q    And you knew that your new arrest was going to impact that case, right?

A    Upon a conviction, I was aware of that I was on -- yeah, probation, supervised release.

But my understanding was I had to have been found guilty in order to be -- for my supervision to be revoked. And that's what me and Mr. Iverson spoke about.  And I was

54

continuing to ask him to get me released, my wife is about to have my son, and then, you know, I wanted some type of release.

Q   So you did talk about something other than just getting you out on the Superior Court case.  In fact, you talked about the supervised release in your other federal case, right?

A   Well, all that was basically on the same wave length of getting out.

Q   Now, did you talk to Mr. Iverson about your co-defendant, Mr. Thorpe, at that meeting at the jail?

A   No.

Q   Did you talk to him about the victim in this case, Edmond Peters?

A   No.  The only thing we talked about was me getting a release.

Q   So when you go to court the next day, which is February 1st, right --

A   Correct.

Q   -- you're out in open court and you hear the prosecutor, and he reads out loud, puts on the record the plea offer.  You were standing there and you heard it, right?

A   Correct.

Q   And he said, "The plea offer is to one count of

assault with a deadly weapon to both defendants," right?

A    Correct.

Q    And he said, "They face two counts of armed kidnapping, two counts of possession of a firearm during a crime of violence, a second count of assault with a deadly weapon, and obstruction counts, if we went forward." Do you remember him saying all that?

A    Yes.

Q    And that hearing, that was supposed to be your preliminary hearing but it didn't go forward, right?

A    Correct.

Q    Because Mr. Iverson told you that you needed a little bit more time to consider the government's plea offer that they had just put on the record?

A    No.

Q    Well, that was the reason the preliminary hearing got continued, right?

A    No.

Mr. Iverson never spoke with me about a plea offer until he whispered in my ear in open court that he had a plea to ADW.  He never told me it would be postponed.  He never told me that the night before.

All we talked about was getting me some type of modification in my custody.  He never told me nothing about a postponement or a plea deal.

56

Q    So when he talked about the plea offer to you, was it before or after the prosecutor put that on the record?

A    The way I remember things, we came out, everyone said their names.  After everyone said their names, it was said, we want a continuance, Your Honor.  Me and Mr. Iverson had a conversation.

Q    And the conversation was about the plea offer?

A    The conversation was, push forward.  That was my conversation with Mr. Iverson.  I don't want it, a postponement.  I would like for you to push forward.  My wife is about to have my son.  Push forward.  I would like to see if I can get some type of release.

        And he told me to calm down, I got you a plea deal.  And that's when me and him had that brief, limited conversation, and I asked him, again, a plea to what?  And he said ADW.  I asked him what was that.  He said, assault with a dangerous or deadly weapon, something along those lines, that's what he told me.  And I asked him how much time do they want for that?  He told me ten years.  I responded, "I've been locked up for three days, I'm not copping to that shit."  He responded, "Hold up.  I'm going to come over to the jail to talk to you."  I responded, "Okay."

Q    Okay.  And when you say "I'm not copping to that shit," that means, I'm not going to take that deal.  That's

what that means?

A    That means, I'm not about to just agree to ten years.  That's what that means.  I'm not taking ten years.  I've been locked up three days.  This is the first time I seen you.  This is the first time we talk, and now you telling me ten years.  I don't want to hear that.

Q    And you said, "No, I'm not going to take that"?

A    That's what I told him, yes.

Q    And then the next time you go to court, which is February 19th, right?

A    That's correct.

Q    And that's the hearing -- that's the preliminary hearing?

A    Well, the first one was supposed to have been February 1st.  It was postponed to the 19th.

Q    Right.  And so the actual preliminary hearing when the detective testified actually took place on the 19th, right?

A    That's correct.

Q    But before the detective testified, you agreed that the prosecutor had put on the record, just like the prosecutor before, she said, "We've extended a pre-indictment plea offer in this case to each defendant on the charge of assault with a dangerous weapon, gun."  Do you remember her saying that?

58

A    Yes.

Q    And she said, in exchange for that, we would not indict or pursue greater charges, which include, but are not limited to -- and then she lists a bunch of charges: Kidnapping, possession of a firearm during a crime of violence, obstruction of justice, felony possession, as well as potential District Court charges.  Do you remember her saying all of that?

A    Yes, I do.

Q    And then she says, "It's my understanding that both defendants rejected that plea offer"?

A    Okay.

Q    Do you remember her saying that?

A    Yes, I remember.

Q    And you understand when she says "rejected," that means, no, we don't want that plea offer?

A    I remember her saying that, okay.

Q    And you didn't say to Mr. Iverson, hey, wait, I want to take that deal?

A    I don't even know, to be honest with you, if this lady's telling the truth.

Q    I didn't ask you that.

A    I'd never heard about -- but my understanding, you asked me did I say that to Iverson, no, I didn't.  I don't even know if what she's saying is truthful.  Iverson never

59

told that to me.  I don't know what she's talking about.

Q    Right.  But you never said, Mr. Iverson, I don't know what she's talking about, can I have a moment with you, I want to talk about that?

A    No, I never said that to him.

Q    You just stayed quiet.

And you didn't say to Mr. Iverson, hey, I need a little bit more time to think about this.  She's just saying I rejected a plea offer, and I'm not really sure if I have or not?

A    Like I said, I don't even know if the lady is telling the truth.  Mr. Iverson never brought a plea deal to me of that magnitude.  I don't know if -- where I sit at, the prosecution says whatever they want to get a conviction. We don't believe you all; we don't trust you all.

Q    All right.  Let me stop you there.

A    I'm just --

Q    She then says, "There will be no further plea offers at this time."  Did you understand what that meant?

A    My understanding I didn't get a plea offer any time.

Q    And the preliminary hearing went forward after that, right?

A    Correct.

Q    And your main concern during that hearing was,

again, you wanted to just get out?

A    Correct.

Q    That was your main concern at the other hearing, just get me out of here, because my wife is about to have a baby?

A    At this particular time, my son was born, he was born on the 10th, the preliminary hearing was on the 19th. So I mean, I just wanted to move forward now and see where the case was going, where my future would lie.  I just wanted to move forward on the 19th.  I mean, I already missed the birth of my son.

Q    But you understood at that point, you said earlier here today, that the plea offer then was taken off the table?

A    That's what was said in court.

Q    And that's what you understood, right?

A    Yes.

Q    And after that, your main concern with Mr. Iverson was investigating the case, right?

A    At this particular time, this is only my second time seeing Mr. Iverson.  The first time I seen him was on the 31st.

Q    Let me stop you here.

A    Okay.

Q    After February 19th, then your concern is

61

investigating the case.  Do you know what I mean by "investigating the case"?

A    No, I don't really understand the question.

Q    Okay.  You wanted Mr. Iverson to move forward, right?

A    On the 19th, is that what you mean?

Q    No.  Just generally, like move forward on your case, that's what you wanted him to do?

A    I wanted him to move forward on the 1st; I wanted him to push forward on the 1st.

Q    Well, you wrote a complaint to Bar Counsel saying you wanted him to do things in your case, right?

A    Okay.

Q    You wanted him to interview the female, right?

A    Can I -- this the complaint.  Can I take a look at it?

Q    Sure.  Take a look.

A    I don't have that -- it's not a 1, 2 and 3. I have 1, 2, and 3 on this paper that I'm looking at.

Under facts, I have, 1, 2, and 3.

MR. DAVIS:  Your Honor, Mr. Knight has the redacted version I was moving in.  Ms. Satterfield has the full version.  If she could present him with the full version so that he could review that, I don't think he's looked at that recently.

62

THE COURT:  That's fine.

MS. SATTERFIELD:  I'm going to take the redacted, the smaller version of Defendant's Exhibit 1 back.

MR. DAVIS:  Okay.

MS. SATTERFIELD:  And we'll show Mr. Knight Defendant's Exhibit 1.

BY MS. SATTERFIELD:

Q    Do you see this is the letter you wrote to Bar Counsel?

A    Okay.

Q    And it's about three and a half pages.  Have you had time to review this?

A    I reviewed the first page.

Q    Would you like to look at the other pages?

A    Yes.

Q    Why don't you go ahead and do that.

A    (Witness complies.)

Okay.  I've read it.

BY MS. SATTERFIELD:

Q    So in that letter, you tell -- you complain, because you had things you wanted Mr. Iverson to do in your case, right?

A    Correct.

Q    You wanted him to talk to the female complainant, right?

A    Correct.

Q    You wanted him to interview Mr. Peters?

A    Correct.

Q    You wanted him to do certain things, meaning you wanted to take this case to trial?

A    No.  I wanted him to do things.  I want to know things about my case.

I don't have anything.  I don't have no, like, nothing.  No discovery, no nothing.  The things brought against me, I have nothing.

Q    Right.  But you wanted him to take action, investigate?

MR. DAVIS:  Your Honor, I'm going to object on the grounds that we don't have any context of time.  The operative time period that we're concerned about here is between February 1st --

THE COURT:  Well, I think -- I'm going to overrule the objection, because I think the premise to the questions that are being asked are what he wanted him to do at the time he wrote his letter to Bar Counsel.

The letter speaks for itself, obviously, in the final analysis.  But I think what counsel for the government is trying to demonstrate is that at the time he wrote the letter, there were certain things he was requesting his counsel to do, which, in his opinion, he wasn't doing, or

hadn't done.

Is that a fair statement, sir?

THE WITNESS:  Yes.  That's why I wrote the letter. I was very unhappy with his performance.

THE COURT:  Right.  Okay.

So go ahead, you can follow up on that then.

BY MS. SATTERFIELD:

Q    And, in fact, Mr. Iverson met with you and told you he had tried to find Mr. Peters but was not able to do that, right?

A    I can't say that's -- I can't agree to that.

Q    Neither he nor his investigator were able to locate Mr. Peters and interview him?

A    I'm not -- I can't agree with that.  I can't say that that's a true statement.

Q    So then you got indicted in Federal Court in May before you wrote this letter, right?

A    I don't know.  I wrote the letter in May. I don't know exactly what day I was indicted over here.

Q    And when you got indicted over here in Federal Court, you were shocked, weren't you?

A    Of course.

Q    And you were shocked because you didn't think Mr. Peters was ever going to testify for the government, right?

A    I've known Ed for a while, I know what type of man he is.  I knew he would cooperate.

Q    What do you mean, you knew what kind of man he was?

A    I knew he would cooperate.  I knew he would cooperate with the government.  I believed that.

Q    And when you got to Federal Court, the government extended another plea offer to you, right?

A    That is correct.

Q    And at that time, you were represented by a different attorney, Shawn Moore?

A    That is correct.

MR. DAVIS:  I'm going to object to this, Your Honor.  We're not raising any allegations with respect to Mr. Moore.  Our allegations are with respect to the offer that was extended in Superior Court that was opened between January 31st and February 19th.

THE COURT:  Well, I'll wait to see where this is going.  I mean, obviously, it depends, to a certain extent, on the relevancy of the line of inquiry as it relates to the way he dealt with Mr. Iverson, or I mean --

MS. SATTERFIELD:  And I just have one or two questions.

THE COURT:  All right.  Go ahead.

BY MS. SATTERFIELD:

Q   When the government extended that other -- the plea offer over in Federal Court, you said "no" to that, right?

A   That is correct.

Q   Because you didn't think Mr. Peters was going to show up and testify, did you?

A   That's incorrect, ma'am.  I knew what type of man --

THE COURT:  Speak up.

THE WITNESS:  That's incorrect.  I knew what type of man Mr. Peters was.

MS. SATTERFIELD:  I think I'm almost done.  If I could just have one moment.

THE COURT:  All right.

MS. SATTERFIELD:  Okay.  I have no further questions.

THE COURT:  Redirect.

Mr. Davis, redirect, if you have any.

MR. DAVIS:  I have no redirect, Your Honor.

THE COURT:  Counsel, do you have any questions?

MR. KATZOFF:  No, Your Honor.

THE COURT:  You may step down, sir.

Mr. Davis, do you have any other witnesses you want to call today?

MR. DAVIS:  I'm going to question Mr. Iverson.

67

THE COURT:  Sure.

MR. DAVIS:  I have one witness from the jail that we're going to talk to at 1:00.  If the United States does not agree to my stipulation, I'm going to bring that jail person up.

THE COURT:  Okay.

MR. DAVIS:  If we're coming back in at 5:00 for Mr. Iverson, how about I contact chambers at --

THE COURT:  Well, look.  As far as -- I've blocked off the rest of the day.  So if you want to bring the -- hypothetically, if you need to bring the person from the jail over here --

MR. DAVIS:  Yes.

THE COURT:  -- then you can bring him or her here anytime between 2:00 and 5:00.

MR. DAVIS:  That's great.  I'll alert chambers.

THE COURT:  Just let my Deputy Clerk know what the situation is --

MR. DAVIS:  Certainly.

THE COURT:  -- and I'll be available for you to put on that witness or any other witness you need from the jail.

MR. DAVIS:  She would be very short.  She's a guard that works the entry booth that can explain the computerized sheet that we have a stipulation on.  And if

68

she takes ten minutes, I would be surprised.

THE COURT: Will the stipulation be in writing or will it be oral?

MR. DAVIS: It's in writing.

THE COURT: Okay.

MR. DAVIS: I did two versions. I did one that just stipulated that it was a business record in the regular course of business. The United States is happy with that. And then I had another one that had an explanation of the computerized printout. They were unhappy until they could verify that that was accurate. And that's what we're going to do at 1:00, I believe.

THE COURT: That's fine.

And then I will leave it to Ms. Satterfield to take whatever steps she can to coordinate with Iverson's availability. Like I said, the Court is more than willing to start with him sometime around 5:00. I'm sure it will take five minutes to walk over here. So maybe 5:05 or whatever.

But my guess is Superior Court, I think they usually have that jury picked before 5:00.

MS. SATTERFIELD: Right. And they need to shut down at 4:45.

THE COURT: Oh, okay.

MS. SATTERFIELD: So let me just check with him.

I might hear in the next couple minutes, but let's just see where he is.

THE COURT:  All right.  Just let my Deputy Clerk know what the situation is.

Is there anything else we need to do, Mr. Katzoff, right now?  Is there anything else we need to do for you?

MR. KATZOFF:  No.  If Mr. Iverson is available earlier, should we count on whatever time she says?

THE COURT:  Sure.  If he can come over earlier, like I said, I've blocked off the afternoon.  So just let me know.

MR. KATZOFF:  Yeah.  I don't expect to hear from Mr. Shelton until the end of the day.  So I have a little bit of uncertainty, but we can address that when we finish everything else.

THE COURT:  But now listen.  Feel free to represent to this person that as far as the Court's concerned, I want this client of yours to get medical treatment.

And the Court -- you know, I haven't issued a written order or anything, but you can say the Court's not going to be satisfied until he learns that he has gotten medical treatment.

Now, I don't know what it will consist of, because that's up to the doctors to figure that out, but...

70

MR. KATZOFF:  My experience is Mr. Shelton's very responsive when he is aware of an issue.  So he's now aware of the issue and I expect to hear from him.

THE COURT:  Very good.

Anything else for the government, Ms. Satterfield?

MS. SATTERFIELD:  No, Your Honor.

THE COURT:  We'll stand in recess.

DEPUTY CLERK:  All rise.

This Honorable Court will stand in recess until the return of court.

(Recess from 12:44 p.m. to 3:33 p.m.)

DEPUTY CLERK:  All rise.  The United States District Court for the District of Columbia is now in session, the Honorable Richard J. Leon presiding.  God save the United States and this Honorable Court.  Please be seated and come to order.

(Defendants entered.)

THE COURT:  All set?

MR. DAVIS:  We are set, Your Honor, for direct.

THE COURT:  Who do you want to call as your next witness?

MR. DAVIS:  I have Jennifer Postell, the Custodian of Records from the D.C. jail.

THE COURT:  All right.

MR. DAVIS:  At this time, I would call Ms. Postell

at this time.

At this time also, pursuant to a stipulation, which is in writing, at this time, I would move into evidence Defendant's Exhibit No. 2, which is a computerized printout.

THE COURT:  Thank you.

MR. DAVIS:  And, Your Honor, I have a copy for you also.

THE COURT:  Oh, okay.

MR. DAVIS:  And also at this time, I would enter Defendant's Exhibit No. 4, which is a signed stipulation concerning this document.

DEPUTY CLERK:  Please raise your right hand.

(Witness is placed under oath.)

DEPUTY CLERK:  You may be seated, ma'am.

THE COURT:  I'll take the other one.

All right.  Thank you.

- - -

JENNIFER POSTELL, WITNESS FOR THE DEFENDANT, SWORN

DIRECT EXAMINATION

- - -

BY MR. DAVIS:

Q    Good morning, ma'am.  Can you state your name spelling your last name for the record.

A    Jennifer Postell, P-o-s-t-e-l-l.

Q    And, Ms. Postell, where are you employed?

A    Department of Corrections.

Q    And in what capacity are you employed at the Department of Corrections?

A    I am Custodian of Records.

Q    And as a Custodian of Records at the Department of Corrections, are you familiar with the process of which records are compiled at the Department of Corrections?

A    Yes.

Q    Ms. Postell, I show you what's been marked and entered into evidence as Defendant's Exhibit No. 2.  Can you tell us what that is?

A    It looks like a copy of the log of the inmate's legal visits.

Q    And looking at Defendant's Exhibit 2, can you tell when the log of the legal visits begins and when it ends?

A    It begins on 1/31/2013.  And the last visit looks like 10/12/2013.

Q    And do the attorneys' names appear on this exhibit, Defendant's Exhibit No. 2?

A    Yes, it appears so.

Q    And what names do you see on this exhibit form?

A    Frederick Iverson, Anita Bracero, Roger Hale, Frederick Iverson again, Shawn Moore, Kevin McCants, Shawn Moore again.

73

Q    Can you explain how the data in the two columns on Defendant's Exhibit No. 2 is compiled, beginning with visits start, date and time.

A    Well, when the attorney enters the facility, they fill out a legal visit form.  That legal visit form should have that attorney's name or the investigator's name and the inmate that they're going to visit that day, and it's entered into our system with the date and time in which they came in.

Q    And when you say it's entered into the system, is there a process that that actually happens?  How does that physically happen?

A    The form has to go to the officer at staff entrance that keys it in.

Q    And you said "that keys it in."  So that officer keys the information in?

A    Correct.

Q    And when the visit ends, how is that information compiled?

A    Usually, the attorney will give the form back to the officer at staff entrance when they're leaving so that they can log the visit out.

Q    And then if they log it out, if the attorney actually gives the sheet back to the guard, and at the point of entry the guard logs them out on the computer, correct?

74

A    Correct.

Q    And that time would be reflected on Defendant's Exhibit No. 2, correct?

A    Correct.

Q    Now, what happens if the attorney does not hand the sheet back to the guard in the booth?

A    It's my understanding that the computer will automatically kick the visit out after 24 hours.

Q    So directing your attention to Defendant's Exhibit No. 2, the last entry with Frederick Iverson at 1/31/2013, entry time at 2156, does that explain your explanation which you just gave a few moments ago? Does it explain why the visit ended on 2/1/2013 at 1550 hours?

A    That would be an explanation.

Q    Now, what happens if an attorney comes in and wishes to visit with four inmates, would he fill out a sheet for each inmate?

A    Yes.

Q    And would each inmate sheet be entered into the computerized system?

A    Yes.

Q    Now, if the attorney only had time to see three of those inmates, would Defendant's Exhibit No. 2 reflect that?

A    I don't understand it.

75

Q    If the attorney comes in to see three inmates and he can only see two, he only has time to see two --

A    Okay.

Q    -- there will still be an entry in the date of entry, correct?

A    Yes.

Q    And there will be an entry for the date of exit, correct?

A    Yeah.

Q    A date and time, correct?

A    The date and time, yeah.

Q    So there would be nothing from the computerized record that would show that that attorney was unable to visit that one inmate?

A    Not unless he told the officer.

MR. DAVIS:  I have no further questions. Thank you, Ms. Postell.

THE WITNESS:  You're welcome.

THE COURT:  Ms. Satterfield, cross-examination.

MS. SATTERFIELD:  A couple questions.

- - -

CROSS-EXAMINATION

BY MS. SATTERFIELD:

Q    Good afternoon, Ms. Postell.

A    Good afternoon.

Q    How often is it that the attorneys don't hand back the sheet at the end of the visit?  Is that a frequent occurrence?

A    I don't work that area, but I would say yeah, it's a frequent occurrence that they don't give the legal visit forms back.

Q    And then the example Mr. Davis gave you -- what was this again, Defendant's Exhibit, what was the number?

THE COURT:  2.

THE WITNESS:  2.

BY MS. SATTERFIELD:

Q    Defense Exhibit 2 shows -- well, when the attorney walks in with the sheet and says, I want to visit inmate -- well, this relates to Inmate Melvin Knight; is that right?

A    Yes.

Q    So Mr. Iverson, it looks like, on January 31st handed a sheet over at the front staff --

A    Staff entrance.

Q    -- entrance saying, I would like to see Melvin Knight?

A    Correct.

Q    And then it gets entered in Frederick Iverson on January 31st for Melvin Knight?

But this doesn't necessarily prove whether or not he saw Mr. Knight on that day?

A    It only proves that he came in and asked to see him.

Q    Right.  And asked to see him.  But it doesn't --

A    He filled out a legal visit sheet.

Q    Okay.  And as with all these other entries on this same inmate, we don't know whether these attorneys actually saw Mr. Knight or not?

A    It's possible.  Possibly not.

Q    They wanted to see him, but we don't know if they did or not?

A    I mean, it's a possibility that he was seen or he wasn't.  It doesn't state for sure, if that's what you're asking me, that stamping, that he was seen.  Is that what you're asking?

MS. SATTERFIELD:  Okay.  I have no further questions.  Thank you.

THE COURT:  Very good.

You can step down, ma'am.

THE WITNESS:  Okay.

MR. DAVIS:  Thank you, Ms. Postell.

THE WITNESS:  You're welcome.

MR. DAVIS:  May she be excused?

THE COURT:  Yes, she may.

MR. DAVIS:  You may be excused.  Thank you.

THE COURT:  All right.  Have you got your next

78

witness?

MR. DAVIS:  Your Honor, that would be it as far as witnesses for the defense.

THE COURT:  All right.  Is the government ready to call its witnesses?

MS. SATTERFIELD:  Yes, Your Honor.

At this time, though, I would like to move in Government's Exhibits 4 and 5.

THE COURT:  4 and 5.  Do I have those?

MS. SATTERFIELD:  Those are the photos.

THE COURT:  Those are the what?

MS. SATTERFIELD:  The photos.

THE COURT:  Oh, okay.

MR. DAVIS:  And my objection will remain standing on those, in light of the testimony.

THE COURT:  Yeah, I'll admit them.

MS. SATTERFIELD:  And if I could have the Government's Exhibit 1 and 2 back in order to do my examination.

The Court should have the copies.

THE COURT:  Oh.

Do you want the small version of it or do you want the full version of it?

MS. SATTERFIELD:  The full version of 2.  And if there are yellow stickered 1 --

THE COURT:  There's 1.

MS. SATTERFIELD:  Does the Court have a copy of 1?

THE COURT:  No.  I have a copy of 2.

MS. SATTERFIELD:  I don't want to take his copy.
I must have another one.

THE COURT:  I don't think I have any.

MS. SATTERFIELD:  Okay.  I have one.  All right.
I'm going to get my witness.

MR. KATZOFF:  Your Honor, I was going to wait
until Ms. Satterfield is back.

For the purposes of the record, may I be permitted
to join in all of co-defendant's objections so I don't have
to continue to object?

THE COURT:  That's fine.

MR. KATZOFF:  Thank you.

DEPUTY CLERK:  Mr. Iverson, please raise your
right hand.

(Witness is placed under oath.)

DEPUTY CLERK:  You may be seated, sir.

THE WITNESS:  Thank you.

- - -

FREDERICK IVERSON, WITNESS FOR THE GOVERNMENT, SWORN

DIRECT EXAMINATION

- - -

BY MS. SATTERFIELD:

80

Q    Good afternoon.  Can you state your name, please.

A    My name is Frederick Iverson.

Q    Mr. Iverson, what do you do for a living?

A    I am a defense attorney.

Q    And how long have you been a defense attorney?

A    I was barred in 1994 in Ohio.  I worked for the Public Defender's office in Franklin County for about eight months before I relocated to D.C.  That was -- relocated in 1996.  I started working as a criminal defense attorney in D.C. in 1998.

Q    I'm sorry, what did you do between '96 and '98?

A    I was waiting to be barred here in D.C.

Q    And so where are you barred currently?

A    I'm barred in the State of Ohio, my first jurisdiction.  I'm not active there, and I haven't checked my status in a while because I probably need to register inactive or I don't know if I've done that lately, but I am currently barred in the District of Columbia.

Q    And before -- well, where did you go to law school?

A    University of Cincinnati.

Q    When did you get your JD?

A    1994.

Q    And since 1998, you said you've been a defense attorney in the District of Columbia?

81

A     Yes, ma'am.

Q     Any other states?

A     No.

Q     And exclusively in Superior Court, or Superior Court and Federal Court?

A     Exclusively in Superior Court.  I second-chaired an attorney by the name of John Beeman in one case in Federal Court, but I am not admitted in Federal Court.

Q     And the bulk of your cases in Superior Court, are those court-appointed cases?

A     Yes.  Almost exclusively.

Q     Under the Criminal Justice Act?

A     Yes, ma'am.

Q     And since 1998, can you describe what types of cases you've handled in terms of felonies, misdemeanors?

A     Mixture of felony and misdemeanor as I was moving from 1998 on.  As I gained more experience, I started obtaining more federal cases.  The only cases I don't do are rape and child offenses against children.

I've handled everything.  I've only done four homicides, I believe.  I've second-chaired a homicide, and I think I've handled maybe three or four homicides on my own, none of which went to trial.

Q     And in the last 19 years, can you estimate how many cases you would have handled in Superior Court?

82

A    I've never counted, but, on average I would say somewhere between 80 and 100-plus cases a year.  The bulk of those would be misdemeanors, down to maybe two-thirds misdemeanors, one-third felony.  I'm guessing now, but I think that's the right sort of ratio.

Q    And in terms of trials, actual trials you've conducted in Superior Court, do you have a number for that in the last 19 years?

A    The greater bulk would be misdemeanor non-jury.

And then you would be counting, I think I ended up in -- you set a lot of trials in D.C. Superior Court.  As far as jury trials, not many go.  But I would say I try three to four cases a year, jury trials, sometimes five.  But it just depends on what goes and what works out, and things are also resolved by motions hearings in many cases.

Q    And is it fair to say cases are also resolved by pleas?

A    Oh, a great -- yeah.  That's the bulk of how most of the felonies are handled.

Q    In your last 19 years, is it possible to estimate how many cases have been resolved by pleas that you've handled?

A    I'm sure that would have to be in the hundreds.  Not the high hundreds.  But if you think about felony cases, if I did, in that percentage, 25 to 30 a year, then only

83

two, three, four are going to trial, the rest are being resolved by plea.

Q    Now, I want to turn your attention -- I'm sorry.

A    Or dismissal.  I'm sorry.

Q    I want to turn your attention to January 2013, and in particular, January 29th.  On that particular day, did you come to represent the defendant here, Melvin Knight?

A    I don't recognize the exact date that I began representing him, but I do remember -- have a recollection of being appointed to represent Mr. Knight.

Q    And do you, sitting here today, recognize Mr. Knight as a former client?

A    He looks a little different to me, but I'm sure that's him.

Q    And if you have any special recollection, does the case number 2013-CF3-1476, was that the case number you represented him in?

A    I can tell you the -- I didn't try to look back and recall or memorize the case number, but I know it was in 2013.

Q    And your first court appearance with Mr. Knight, do you remember what that was?

A    That would have been presentment.

Q    And where did that occur?

A    That's in C-10 in D.C. Superior Court.

84

Q    And what does a presentment consist of?

A    It's the charging documents, presented the first charge that the defendant is -- he's not arraigned because it's a felony, he's just presented, made aware of the charge.  And then there's a decision made on whether the individual is going to be released or held, and that depends on the government's request and what type of hold is sought after.

Q    And, in general, how long does something like that last, that hearing?

A    Five minutes, six minutes.

It's usually -- I usually charge in increments of .1, .2.  You're billing a portion of an hour.  So it's usually less than six minutes.

Sometimes if you're -- there's arguments -- in this case, I believe, there was a co-defendant, pretty sure, I think both of them were presented at the same time, I'm pretty sure.  So two attorneys are making arguments on why probable cause was not -- there's not grounds for probable cause.

It can go over into .2, and then I'm just saying -- so that would represent 12 minutes.  But, really, it's like 7 minutes, 8 minutes at most.

Q    And do you have any special recollection of representing Mr. Knight at that presentment hearing?

85

A    I have no actual recollection of the presentment itself.

Q    And do you remember if you met with him before or after the presentment hearing to talk to him about your representation?

A    I don't have any actual recollection of -- you get the list of individuals that you've been appointed to. You -- they're -- the individuals are being detained in the cell block.

And before C-10 begins, you can meet the individual in a mass holding room, where there's benches on one side, they're on the other side of a -- back then I think we had glass, it's a little different now.

You can talk to them briefly.  Tell them what they have been charged with.  You're basically introducing yourself, telling them about the process, you're going to try to get them out, whether you believe, based on the charges, they'll probably be held, what the next step will be as far as them coming to court for a preliminary hearing, things of that nature, find out if they have any family in the audience, or who you're going to be contacting.  But that's pretty much what goes on at that point.

Q    Do you recall meeting Mr. Knight on that particular day?

A    I don't have any recollection of the actual events

86

of the presentment or what took place that day.

Q    And then the next court hearing, in this particular case of Mr. Knight's, do you remember what date that was scheduled for?

A    No.

Q    And if I told you it was February 1st of 2013, does that sound about right?

A    We would have had a preliminarily hearing.

The first preliminarily hearing was scheduled shortly after.  I'm almost positive he was held shortly after coming out of C-10, and I would have been seeing him within a few days after that.

MS. SATTERFIELD:  And may I approach the witness?

THE COURT:  Uh-huh.

BY MS. SATTERFIELD:

Q    Mr. Iverson, I'm showing you what's been admitted into evidence as Government's Exhibit 1.  Take a look at that.  Does that refresh --

A    Read it or...

Q    Well, just take a look at it.  Does that refresh your recollection as to when the next court date was for Mr. Knight?

A    I am listed.  You have me appearing February 1st, 2013.

Q    And that, in fact, happened?

87

A     Yes, I believe that would happen.

Q     Before that court appearance, though, did you receive any communication from the government in this case?

A     I don't know.  You'd have to refresh me. I'm sorry.

MS. SATTERFIELD:  May I approach?

BY MS. SATTERFIELD:

Q     I'm showing you what's been marked for identification as Government's Exhibit 3.  Do you recognize that document?

A     This is an email that I sent to you from my computer, yes.

Q     And is this -- and I'm sorry, it's an e-mail from what -- from whom to whom on what date?

A     This is an email that I would have received January 31st, 2013.  It's time-stamped 4 -- it came to me at 4:52 p.m.  It's from Trevor McFadden, United States Attorney at that time, and it spells out the pre-preliminary hearing plea offer that the government was making at that time.

Q     Is this a fair and accurate copy of that e-mail you received?

A     Yes.

MS. SATTERFIELD:  At this time, I move Government's Exhibit 3 into evidence.

MR. DAVIS:  No objection.

88

THE COURT:  Admitted.

BY MS. SATTERFIELD:

Q    And, Mr. Iverson, based on you receiving this email, looks like almost close to 5:00 p.m., did you then have an opportunity to meet with Mr. Knight?

A    I know I met with Mr. Knight several times.

I met with Mr. Knight several times.

Q    Did you meet with him on the 31st after receiving this email?

A    I don't know the dates that I met with him.

Q    Would anything refresh your recollection?

A    I know I had billings where I reflected that, I know that.

Q    Let me show you what's been marked for identification as Government's Exhibit 6.  If you could take a look at that and refresh your recollection as to whether you met with Mr. Knight on January 31st.

A    Yes.  This indicates that I met -- I billed for travel to the D.C. jail and for a meeting with -- and where I must have conferenced with the client, would have been sitting down with Mr. Knight at the D.C. jail.

Q    And that was on January 31st?

A    Yes, that is indicated there.

Q    And tell us about that meeting with Mr. Knight. You said it took place at the D.C. jail?

89

A     Yes, ma'am.

Q     Was anyone else present?

A     No.  It would have been just myself and Mr. Knight.

Q     And do you remember approximately how long that meeting lasted?

A     If you can show me again, I think I billed for two hours.

THE COURT:  Is that Exhibit 6?

MS. SATTERFIELD:  I was using it to refresh his recollection, but I can admit it as well.

THE COURT:  It's not marked as an exhibit?

MS. SATTERFIELD:  I'm sorry?

THE COURT:  You had an Exhibit 6 a minute ago.

MS. SATTERFIELD:  Did I?

DEPUTY CLERK:  Yes.

THE COURT:  You mentioned Government's Exhibit 6 a minute ago.

MS. SATTERFIELD:  A different exhibit?

Right.  That's Exhibit 6.

MR. DAVIS:  No objection.

MS. SATTERFIELD:  I'll move Government's Exhibit 6 into evidence.

THE COURT:  Yeah, I haven't seen it yet. I don't know what it is.

THE WITNESS:  So yes, ma'am.  That would have been two hours.

Now, it's my -- so that -- but to be exact, my practice is to just list conference time in the whole time that I'm at the jail to meet with a person.  That doesn't mean that I actually met with him for two hours, because if I'm waiting for the -- if I sign in, I go upstairs, if I'm waiting for him to be delivered to actually reach the meeting room -- so if that takes 30 minutes, that whole time that I'm sitting there, I just call it conference time.  So I don't know how long it took for him to get him -- for him to arrive at the meeting or whether that was actual meeting time.  So I'm meeting more than one person then.

I just make sure I bill for the entire time that I'm in the jail, and that's it, from the time I walk in to the time I walk out, and that's what's reflected exactly, and I break that up according to the proportion who I met.

BY MS. SATTERFIELD:

Q    So sitting here today, do you have any recollection of how long that meeting took place with Mr. Knight?

A    No.  I know the first time that we met or the first couple of times that we met, it would have been longer, as we went through, in detail, everything that we could about the case.

Q    And during that particular meeting on January 31st, did you discuss the government's evidence with Mr. Knight?

A    From the beginning, we were discussing the evidence.  I don't know -- I don't have any particular -- meaning, I have a recollection of the facts of the case, some of our discussions, but I don't know from meeting to meeting, this is what we talked about on this date, this is what we talked about on this date, this is what we talked about on this date.  I don't have that sort of recollection of the events.

Q    But when you -- did you discuss the government's evidence --

A    Yes.

Q    -- with Mr. Knight?

And when you talked about that, what was your source of the government's evidence?

A    At that point, we had a Gerstein, meaning the affidavit where the government lays out the -- it's really the arrest report.  It comes down to 163.  But they take that 163, and basically it's a cut-and-paste onto a sworn affidavit, which is a Gerstein.

Q    And during that meeting on the 31st, did you discuss this plea offer that was communicated to you back on January 31st?  Did you discuss this plea offer with

92

Mr. Knight?

A    I don't have a recollection.

I know I would have discussed the plea offer with him.  I don't have a recollection of sitting, as I told you before, sitting in the meeting, from this meeting to the next meeting to the next meeting, what I did in each meeting.  I just don't have any independent recollection.

Q    Okay.  But forget about what date it happened, did you discuss this plea offer that?

MR. DAVIS:  Objection, Your Honor.  I think we need to specify dates.  We need to put it in context.

THE COURT:  You can modify the question.

BY MS. SATTERFIELD:

Q    Well, at any point when you're meeting with Mr. Knight, did you discuss the government's plea offer memorialized in Government's Exhibit 3 with Mr. Knight?

A    We would have discussed the plea offer.

Q    And when you discussed this plea offer, did you talk about the charge, assault with a dangerous weapon, gun?

MR. KATZOFF:  Your Honor, I'm going to object again, because we do not have a time frame and that's what's at issue here.  We have to have a time frame, otherwise, it's irrelevant.

MS. SATTERFIELD:  Your Honor, I think it goes to weight.

93

THE COURT:  Well, I think we need some context here, was it on the 31st, after the 31st, whatever, to the best of his recollection.

BY MS. SATTERFIELD:

Q    Well, Mr. Iverson, to the best of your recollection -- and would your billing records help you?

A    If I can see something, if there's something in there that helps refresh me, yes, I'll look.

Q    As to when you met with Mr. Knight in this case.

A    (Witness complies.)

Q    And if I could ask you, how many times did you meet with Mr. Knight between January 31st and February 19th?

A    I don't know for sure.  I know we've discussed -- in talking to you, you indicated that there is a date that I did not bill for, however, it shows that I was at the jail, and the jail took Mr. Knight from his cell.

MR. DAVIS:  Objection, unless there's personal knowledge.

THE WITNESS:  So my answer --

MR. DAVIS:  Objection, Your Honor, unless there's personal knowledge.

THE WITNESS:  I'm sorry for talking, Your Honor. I should have waited for the objection to be answered.

THE COURT:  What's your position?

BY MS. SATTERFIELD:

Q    Well, can you answer the question:  When did you meet with him between January 31st --

THE COURT:  The objection is sustained then.  So you can rephrase the question, see if you can do it that way.

BY MS. SATTERFIELD:

Q    Does the Government's Exhibit 6 refresh your recollection as to how many times you met with Mr. Knight between January 31st and February 19th?

A    I've looked at them.

I'm not refreshed as to the exact number of times I met him.  I know I did meet with him several times.

I accept that my billing records are accurate, but I'm not refreshed as to, now I remember how many times I met with him.  I can only say that I did meet with him, and I know -- I have every reason to believe that my billing records are accurate.  So whatever's reflected in there, and I haven't counted them up, or taken the time to count how many times, but that would be the number of times I met with him.

Q    But I'm just asking you for a specific period of time, January 31st to February 19th.

A    I'd have to go through my billing records and that's what I'm basing this on.  So if I can go through them, then I'll give you an answer.

MR. DAVIS:  Objection, Your Honor.  The billing records speak for themselves.  If his answer is he doesn't recall, they don't refresh his recollection, then I think we should move on.

THE COURT:  No.  You're overruled.  You're not right about that.  They don't necessarily speak for themselves.  He needs to say what they mean.

For example, you've got right here, January 2nd, '13.  Take a look at it.

THE WITNESS:  Yes, sir.

THE COURT:  You wrote this out, right?

THE WITNESS:  January 2nd.

THE COURT:  2013.  Did you write this out?

This is your billing, right?

THE WITNESS:  Yes.  I'm looking for January 2nd, Your Honor, just one moment.  I'm sorry.

THE COURT:  It says "rev case file."

THE WITNESS:  Just one moment.

THE COURT:  Back for preliminary hearing, conference client.

THE WITNESS:  If you can --

MS. SATTERFIELD:  That must be February 2nd.

THE WITNESS:  Yes.  That's where I'm a little confused.

MS. SATTERFIELD:  That shouldn't be January 2nd.

THE COURT:  February 2nd, 2013.

THE WITNESS:  2013-02-01, is that the -- I'm sorry.

MR. DAVIS:  That's February 1st, I believe, Your Honor.

THE COURT:  February 1st, 2013.

THE WITNESS:  Yes, sir.

THE COURT:  You wrote that out there, right?

THE WITNESS:  Yes.  That is "Review case file, review Gerstein, prep for preliminary hearing, conference client, conference co-defendant attorney, conference government attorney and family."  That would have been in court at D.C. Superior Court is what that day reflects.

THE COURT:  So does that mean you met with him that day where it says "conference client"?

THE WITNESS:  When I met with him, that is the conglomeration of everyone I spoke to that day, the client, co-defendant attorney, the family members, the -- everyone that's listed there as conference time.

And I would have met with him in the back of the cell block.  It would not have been a private meeting or it's not like a jail meeting.

THE COURT:  Well, why don't you just walk through them?

THE WITNESS:  Walk through what, I'm sorry?

97

THE COURT:  If you can't do it from memory, go through them.  What days did you meet with him?

THE WITNESS:  That's what I said, Your Honor.  So the first --

BY MS. SATTERFIELD:

Q    And I guess we could just focus it to between January 31st and February 19th.  That's what I --

THE COURT:  Well, let's start with January 31st then.

THE WITNESS:  So I did meet with him on January 31st, sir.

BY MS. SATTERFIELD:

Q    Where?

A    That would have been at D.C. jail.

Q    Next date?

A    That would be February 1st.  That would have been at the courthouse.

THE COURT:  You met with him that day, right?  According to this record.

THE WITNESS:  That would have been a court hearing and I would have seen him and spoke to him behind the cell block or behind the courtroom in the cell block.

THE COURT:  What's the next one?

THE WITNESS:  I would have met with him on February 19th, 2013.  Again, that would have taken place,

98

that is at the courthouse.

BY MS. SATTERFIELD:

Q    Okay.

A    Should we keep going?

THE COURT:  No.  No.  Keep going.  I want to know every time you met with him.

THE WITNESS:  I'm sorry.  I was waiting for you, Your Honor.  Excuse me.

THE COURT:  Let's go.  What's the next one, February what or March what?

THE WITNESS:  Trip to D.C. jail.  This would have been March the 8th.

THE COURT:  All right.

THE WITNESS:  Conference client, travel D.C. jail March 22nd, conference with client.

February -- March the 26th, that would have been at the courthouse.  That is a conference that would have, again, taken place behind the courtroom.

April 5th, that would have been at the D.C. jail.

THE COURT:  Okay.

THE WITNESS:  April 13th, the D.C. jail.

THE COURT:  Okay.

THE WITNESS:  April 22nd, that would have been at the courthouse.

And travel to the D.C. jail but to meet with him

but he was no longer at the D.C. jail, that would have been the last visit.

THE COURT:  What about May 7th?

THE WITNESS:  May 7th does not indicate that I talked to him at all.

THE COURT:  It says "conference client."

THE WITNESS:  I'm sorry, May 7th, it does say that.  I missed that, Your Honor.  So that would have been a status that would have been at the courthouse.

There may have been one other date that I did not bill for, but that is where government counsel showed me where I was at the D.C. jail.  They pulled Mr. Knight, but I did not bill for that date so I can only assume that I didn't have a record of it for which I'd billed for; so I don't bill for it.

THE COURT:  So that's ten visits?

THE WITNESS:  I accept that, sir.

THE COURT:  Well, I just counted the number.

THE WITNESS:  Yes, sir, I accept it.

MR. DAVIS:  Your Honor, I think that's ten visits, including visits at the courthouse.

THE COURT:  I'm not quibbling with you about it.  I mean, it is what it says.  I'm just asking him if that's accurate.

MR. DAVIS:  Certainly.

THE WITNESS:  I believe my billing records are accurate, sir.

THE COURT:  Okay.  So now are we going to find out what you talked about with him?

THE WITNESS:  Yes, sir.

BY MS. SATTERFIELD:

Q    So at any point, did you discuss the government's plea offer that was communicated to you by Government's Exhibit 3?

A    We would have discussed the plea offer, yes, ma'am.

Q    Okay.  And the terms of the plea offer were that Mr. Knight would have to plead guilty to assault with a dangerous weapon, gun?

A    Yes.

Q    Did you discuss that charge with Mr. Knight?

A    We would have discussed that charge.

Q    And did you discuss --

THE COURT:  Wait a minute.  You said "We would have."  Did you or didn't you?

THE WITNESS:  I don't have an independent recollection from 2013 of sitting down with him.  I have some recollection of some conversations with him about the case as -- what he told me about the case, going over some of the strengths and weaknesses about the evidence, what we

expected the evidence to be at trial, talking to him about some of the weaknesses in defenses, what I thought would be the strength of the government's case, why I thought we wouldn't prevail on certain issues.

But as far as what you're asking, if I'm independently saying I remember sitting down going over -- you know, talking about the charge of ADW gun, I don't have any recollection of sitting down, going over the actual charge of ADW gun and saying this is the amount of time it carries, this is what you'll be facing, given your record, and this is how much time I would expect you to get, I don't have that recollection.

BY MS. SATTERFIELD:

Q    Well, what is your general practice when you discuss a plea offer with a client?

MR. DAVIS:  Objection.

THE COURT:  Overruled.

BY MS. SATTERFIELD:

Q    Can you just talk about when you get a plea offer from the government, what's your general practice, how do you discuss that with a client?

A    We go over what it means.

Q    Do you talk about the charge?

A    This is what you're -- this is what you're charged with, this is your record, where this places you, these are

102

the possible penalties, this is my experience, whether it's experience with the judge.

We would talk if the government has indicated its allocution, placed any limits on itself, what are the maximum penalties.

And just trying to wrap my arms around and give the client a sense of if they accept this plea, this is what you can expect.  While I cannot promise you what sort of time you'd get, but this is, in my experience, what you could expect.

Q    And part of that discussion includes a discussion of the voluntary sentence --

MR. DAVIS:  Objection to the leading nature of the question.

THE COURT:  Overruled.

BY MS. SATTERFIELD:

Q    And as part of that question, do you talk about the Voluntary Sentencing Guidelines?

A    Yes.  That's what -- because that's what we're guided by.

I don't know if we went through his Guidelines. I don't have any recollection of saying, this is where you fall, this is your point calculation; so you would fall into this box or this box.  I don't have a recollection of that.

Q    And this particular plea offer was wired.  Do you

recall having a discussion with Mr. Knight about that aspect of this plea offer?

A    We did have discussion about his co-defendant in the position about what his co-defendant would do or not do. But I can't recall.

And when I say "do or not do," as far as whether he would follow whatever decisions we were making, whether he would also go along with that or whether his decisions would be different, I don't know if we -- and I don't want to guess at anything -- I don't know if we -- I have --

And I'm trying to separate out "guess" from "what I remember."  But I seem to have a recollection that whether the co-defendant will cooperate with the government, that we had no idea what they were doing, obviously, because he was represented by another counsel, we were not working in concert.

I don't have an independent recollection of explaining to him wired; and that if he can't get the deal unless his co-defendant takes the deal, I don't have an independent recollection of that.

Q    Now, you say you do remember discussions about his co-defendant, Mr. Thorpe.  What were those discussions about?

A    As I just stated, what -- not knowing -- it's always my fear -- and I don't want to -- it's always my fear

104

whether -- in a case like this whether someone else is cooperating and whether, even though they're co-defendants, whether that person is going to end up as a witness for the government if we're going to trial.  I believe, as I just stated, that I believe I have a recollection of discussing that possibility with him.

Q    And you said earlier you have a recollection of discussing the strengths and weaknesses of the case with Mr. Knight?

A    Yes.

Q    What were those discussions about?

THE WITNESS:  Well, let me first ask, as far as -- and I'm asking of the Court, discussing the particulars --

THE COURT:  Attorney-client privilege is waived.

THE WITNESS:  There were certain evidence that I believed was incriminating and that I believed that the government -- and I'm speaking now about the jacket.

I know I have an independent recollection of the jacket that was found outside that was a very large size, double, double XL or something of that nature.

I remember the government providing photographs they found taken outside.

Mr. Knight is a very large individual.  I can remember saying if there's -- one, we don't know if there's forensic evidence in the jacket that the government might

105

produce.  But the fact that the jacket is out there and not in the house, that it created the scenario where that is where the individual who's in that jacket was laying in wait for the victims in the case, and that would be very damming evidence and did not fit in with any defense that was being proffered at the time.

BY MS. SATTERFIELD:

Q    Did you ever have discussions with Mr. Knight about the male victim in this case, Mr. Peters?

A    Yes.

Q    Did --

MR. DAVIS:  Objection, Your Honor.

And I'm not going to repeat this.

I want a standing objection, unless we have a time frame, I would ask that the time frame be confined to January 28 through February 19th, when the plea began and when the plea expired.  And if Mr. Iverson cannot do that, I don't think it's relevant to what we're looking at here.  So I would make a standing objection so I don't have to.

THE COURT:  Well, Mr. Davis, we just went over his billing records, and he had meetings with him much longer than that after that.  The billing records go up until May.

MR. DAVIS:  I realize that.

THE COURT:  He had meetings with your client up until May.

MR. DAVIS: Your Honor, may we approach so I don't speak in front of the witness?

I'm only concerned -- my concern is that I'm trying to narrow down this testimony between January 28th when Mr. Knight is first arrested, and February 19th when the plea expires. Afterwards doesn't really impact his decision not to plea, because there is no plea, and that's why I'm objecting to no time frame.

I think it's important that we have a time frame; otherwise, it appears that all these discussions could be during that time frame, they could be during another time frame. But unless they're in that time frame, they're not relevant to whether he was advised properly of the plea.

THE COURT: Ms. Satterfield --

MS. SATTERFIELD: Your Honor, I'm --

THE COURT: -- do you disagree with the objection or you agree with it?

MS. SATTERFIELD: I am trying to limit this to the time period January 31st through February 19th.

MR. DAVIS: Then I'm objecting, because that isn't what the testimony is. The testimony was he has no recollection of that. If he can confine it to that, that would be fine.

THE COURT: Say that again, what you just said.

MR. DAVIS: The testimony is that he doesn't know

when he had these conversations with Mr. Knight.  He has no independent --

THE COURT:  That was his answer in response to a particular question.

MR. DAVIS:  But it doesn't put it within the --

THE COURT:  You're going to cross-examine him in a few minutes.

MR. DAVIS:  I realize that.

THE COURT:  You'll get your chance.

MR. DAVIS:  I'm not trying to disrupt the proceedings; I'm just lodging the objection.

THE COURT:  You're doing a good job of disrupting it.

Ask your questions from the time frame in question, Ms. Satterfield, the 19th -- January 31st to the 19th of February.

BY MS. SATTERFIELD:

Q    Well, let me move a little bit procedurally.

Do you remember being in court on February 1st, 2013?

And I'm showing you what's been admitted into evidence as Government's Exhibit 1.  Do you remember being in court on that day?

A    I'm not contesting that I was in court.  I'm trying to say -- and I do have a vague recollection of

108

standing before the Court.  On that date, I don't have any recollection of standing before the Court.  I accepted the transcript as right that I was in court.  I know I appeared with Mr. Knight, how many times I haven't counted up.

Q   I'm sorry, did a preliminary hearing take place on that date?

A   I'd have to see.  Obviously, if that's the record, we didn't have a preliminary hearing.

THE COURT:  Review the record, please, and then answer questions.  Come on.  This is two pages.

THE WITNESS:  We didn't have a preliminary hearing.  This is not a transcript of a preliminary hearing. We didn't have a preliminary hearing on that date.

BY MS. SATTERFIELD:

Q   Why didn't you have a preliminary hearing on that date?

A   I don't know why we moved for the continuance on that day or who moved for it.  I'd have to look.  If it's in the transcript, I can read the transcript.

Q   Were the parties ready to proceed?

A   The Court's indulgence.

THE COURT:  Please read it.

A   (Witness complies.)

Yes, ma'am.

So the parties asked for a continuances of two

109

weeks, and it was granted.

Q   Why?

A   There's discussion of the -- the Court's indulgence again, Your Honor.

I'm sorry.  Unless I'm reading this wrong, I don't know why, whether it was to further prepare or -- I know there's a plea offer that was put on the record and there was an extension of the time for the plea and the tolling of the clocks, but I can't say whether it was solely for that, unless I'm misreading this or haven't read that portion.  If you can direct me to a portion.

Q   No.  That's fine.

So the preliminary hearing did not take place?

A   No, ma'am.

Q   Now, the next court hearing, I'm going to hand you what's been admitted into evidence as Government's Exhibit 2.  Do you recall this hearing?  You just need to look at the first two pages.

A   (Witness complies.)

Ending with page 3, ma'am, is that it, where we're --

Q   That's all I'm asking you to read.

A   It's a preliminary hearing, but go ahead.

Q   Right.  So my question is, did you see in the transcript that the prosecutor states that the defendants

110

were rejecting the plea offer?

A    If you can direct me to that portion, I'm skimming.  I'm sorry.  I'm not trying to be obtrusive.

Q    I didn't provided you copies with this in advance.

A    Yes.  Just direct me to the portion you want me to read.

Q    And when the prosecutor said the defendants were rejecting the plea offer, was that a true statement?

A    At that time, we were not accepting the plea offer, ma'am, no.

If we were accepting it, I would have spoke up and said, we don't want to go forward with a preliminary hearing, we want the plea offer.

We had decided not to, obviously, because we went on.  My silence was not silence with no meaning.

Q    And why did you acquiesce with the government's statement that the plea offers were being rejected?

A    Because that was the decision my client and I had made -- my client had made.  I don't make the decision.

Q    And tell us about that decision.

A    When you say, "tell you about it," in what way?

Q    How is it that you knew that he was rejecting the government's plea offer?

A    Again, I don't have an independent recollection of exactly what was spoken.  I have a recollection of the

111

framework.

So I know we would have discussed the plea offer. And we decided or my client decided not to take it. And that was communicated. It wasn't -- I wasn't speaking for him. I had met with him, we had discussed his options, he didn't take the plea offer, we went forward.

Q   And did you communicate that to the prosecutor, this prosecutor who said the defendants were rejecting the plea offer?

A   Meaning before the hearing or at the hearing during -- on the record, I don't know if I said, "No, he's not taking it." And I don't recall whether I walked up to her before the hearing and said, "Let's go forward, he's not taking it," but we went forward.

Q   And why did Mr. Knight tell you he didn't want to take the plea offer?

MR. DAVIS:  Objection.

THE COURT:  What's your objection?

MR. DAVIS:  It calls for speculation.

Did he say why Mr. Knight is saying what?  He can explain what Mr. Knight said at the time, but he can't disclose what Mr. Knight was thinking.

THE COURT:  He's asking for his recollection of what he said to him.

MR. DAVIS:  That's the question I have an

objection to.

MS. SATTERFIELD:  I misspoke.

BY MS. SATTERFIELD:

Q    What did Mr. Knight, how did he communicate to you that he was rejecting the government's plea offer?  What did he say?

A    I don't have a recollection of what Mr. Knight said.  "I'm not taking" -- I don't have a recollection where he says to me, "I'm not taking that deal," and him speaking those words to me.  I'm not saying they did not happen, I just don't have a memory of that.

Q    Did he ever talk to you about the male victim in this case, Mr. Edmond Peters?

MR. DAVIS:  Objection as to the leading nature of the question.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. SATTERFIELD:

Q    And what did he say about Mr. Peters?  Did you get the impression he knew Mr. Peters?

A    He told me he knew Mr. Peters, that he had had a relationship with Mr. Peters, friendly, not an intimate relationship, but a friendly relationship.

We -- I remember that he was hopeful that Mr. Peters would not cooperate with the government or would

not testify.

Q    When you say "hopeful," what do you mean by that?

A    Well, he didn't know.  I don't know.

Q    And after the preliminary hearing, did you at any point go back to the government and retry to open up plea discussions?

A    I don't have any recollection of that.  I don't -- I don't remember doing that at all.

Q    Do you remember if you ever asked the government to unwire the plea offer?

A    I don't remember whether I did that.

Q    And after the preliminary hearing, did you begin to investigate Mr. Knight's case?

A    I was investigating his case.

What I recall, just giving you the specifics of what really.

I know I went out to the scene.  There was a neighbor who had -- I believe they made -- the neighbor made the call.

I know there was a gunshot.  The police were called.

There was a neighbor who saw or witnessed some portion of the event.  Tried to locate the neighbor because -- obviously knocking on the door trying to locate Mr. Peters.  Didn't -- I knew that he was -- I think it was

114

a garage in back. But tried to locate him, see if he was there to know -- I didn't talk to the neighbor. There was no one there.

Didn't talk to the -- never, obviously, found the victim.

And I know I went there with my investigator, I have a recollection of that, or tried to meet with her there. But I had also put my investigator -- explain the case to my investigator and tried to get my investigator involved, but I went there myself.

Q    Did you get the impression that Mr. Knight would have accepted a plea offer in this case?

A    The question is not clear. We didn't accept the plea offer.

When you say, "would have," under what -- are we talking about different circumstances? What are we talking about? If the case had gone on longer, would he have accepted a plea offer?

Q    Well --

A    It's not clear.

Q    Okay. Let me ask you: What was his sentiment about pleading or going to trial in this case?

A    I don't have a recollection of how -- whether he was strong, meaning -- I don't have a recollection of him saying to me, "There's no way I'd ever plea in this case,"

115

such that I can say he was adamant, and I don't have a recollection of him sitting there contemplating being on the edge about it.  I'd just be guessing at this point or creating a memory if I tried to reach for that.

Q    Now, at some point, did you learn Mr. Knight was indicted in Federal Court?

A    At some point, I learned that it was gone and he was going to Federal Court, yes.

Q    Did you continue to represent him?

A    No.  I wouldn't have been his lawyer at that point because I'm not admitted in Federal Court.  And once it leaves D.C. Superior Court, it's not my case anymore, and that's the end of my representation.

Q    And let me just go back to this preliminary hearing on February 19th.  At that point where the prosecutor says, "It's my understanding the defendants are both rejecting the plea offer," did Mr. Knight at any point signal to you, hey, I'm not rejecting that offer?

MR. DAVIS:  Objection; asked and answered.

THE WITNESS:  We --

THE COURT:  Overruled.

BY MS. SATTERFIELD:

Q    Did he signal to you while you're standing there and the prosecutor is making a statement?

A    Did nothing like that.  If that would have

happened, I would have stopped and said, Your Honor, we need more time or we're not prepared to go forward.  That didn't happen; we went forward.

MS. SATTERFIELD:  All right.  I have no further questions.

THE COURT:  Cross-examination.

- - -

CROSS-EXAMINATION

BY MR. DAVIS:

Q    Mr. Iverson, I'm going to show you -- I think you have it in front of you -- I'm going to show you what I've marked as Government's Exhibit 3.

A    Yes, sir.

Q    You do have it in front of you?

A    Yes, sir.

Q    Is there any reference to transfer to District Court in that email?

A    One moment, sir.  Thank you.

No, sir, there's no indication of that language.

Q    And I am going to show you Government's Exhibit 1 and direct your attention to page 4 for where the plea offer is placed on the record.  Is there any reference to District Court in the plea offer that was placed on record in Superior Court?

A    No, sir.

Q   Now, directing your attention, again, back to Government's Exhibit No. 3.  It indicates that email was sent at 4:52 p.m.?

A   Yes, sir.

Q   Do you have any independent recollection when you opened that email?

A   I do not, sir.

Q   And is that reflected on the email marked as Government's Exhibit No. 3?

A   Of when I opened it?

Q   That's correct.

A   No, sir.

Q   Now, you were on the Criminal Justice Act panel in Superior Court and have been for a number of years, correct?

A   I am.

Q   And as you testified earlier, it's fair to say the bulk of your practice is not for offenses of this nature, or did I misinterpret your response?

A   When you say, "this nature," you mean --

Q   Of the caliber that Mr. Knight and Mr. Thorpe, the charges they were facing, are those routine charges for you to be handling in Superior Court?

A   I handle matters such as that, but they are not routine.

I handle, again, when I say felony, about

118

one-third, I think, would be a fair proportion.  But of those one-third, if you start to separate those out, you have a large number of drug cases, distribution, PWID, a large number of gun cases.

Of late, in D.C., I've been getting a lot more ADW cases, but that wasn't -- back in 2013, it would have been a lot more guns and drugs, guns and drugs.

And then some of when you start to say AFDC cases or more serious felony cases, but -- and then a very, very small proportion of felony ones.

Q    Now, did you discuss the mandatory penalties associated with charges that could be lodged against Mr. Knight when you met with him at any time?

A    Meaning in Superior Court?

Q    That is correct.

At any time prior to February 19th?

A    I don't have an independent recollection of sitting down with him and stating charge by charge, this is what you're going to face, meaning going through the statute, going through the Guidelines and saying, if you get convicted of this, you would face a mandatory time.

Q    Exactly.

A    This many years, I don't have that recollection.

Q    But you met with him on January 31st, correct?

A    Yes, sir.

119

Q    And you spoke to him at the courthouse on February 1st, correct?

A    Yes, sir.

Q    And then looking at your billing records, the next time you spoke to him was at the Court on the day the plea expired on February 19th?

A    That would be it, unless it's the one day that I didn't bill for it.

But, again, I can't tell you -- I don't even know when the prosecutor informed me that there was one day that I met with him or that I was at the jail and they pulled him that I didn't bill for.  But I can't tell you, as I sit here, that I have any recollection of that day and what occurred.

Q    Being a Criminal Justice Act practitioner, you're familiar with the process that goes on at the jail when you go down to visit someone, correct?

A    Yes, sir.

Q    If you go down to visit four inmates, you fill out four sheets and hand your ID and the four sheets to the guard in the booth, correct?

A    That is exactly what happens.

Q    The guard makes the entry for each inmate, correct?

A    That is exactly what happens.

120

Q    You get your sheet back, you get your badge, and you go upstairs?

A    Yes.

Q    And then you hand the sheets to the guard in the visiting booth upstairs, correct?

A    Yes, sir.

Q    And then they call out the individuals that you wish to meet with?

A    One at a time.

And you meet -- they come up and they wait for you.  And they might all be up there, but you're meeting one at a time with the individuals, yes, you got it right.

Q    And sometimes, you don't have time to meet with all of them or do you always have time to meet with all of them?  If you call three, do you always meet with them all?

A    With very few exceptions, I actually -- I intend to meet with the people I go -- for the purpose of meeting with that person.

I know over the years, there have been occasions if you get caught in the count --

Q    And then you just leave?

A    -- and you've been waiting for an extremely long time, then I have left.

But that's an extremely rare circumstance, and I don't -- I have no recollection of that happening in this

121

case.  But I'm not saying that I have a recollection of being there and actually pulling him on a date they were talking about either.

Q    And I'm going to snow you Defendant's Exhibit No. 2.  This is the computerized jail printout.  And you're referring to the date that the prosecutor brought to your attention as February 5th, correct?

A    She told -- the prosecutor told me about it. I don't know what day we're talking about.  She told me about one day that I went there, they pulled him and I didn't pull it, and they didn't --

Q    That indicates --

A    That I --

Q    -- that you handed them a sheet with his name on it?

A    -- that didn't match my pay records.

It would have been a date that I handed them a sheet, they would have -- I'm assuming they would have checked out --

Q    Made the entry in the computer?

A    -- yes.

I've never seen this sort of document that you just handed me in Defense Exhibit 2.  That's not something that the jail shows me.

Q    Well, it indicates that the visit took place at

1331 and ended at 1511?

A    I'm sorry?

Q    It indicates that you checked into the jail at 1331 and handed them the sheet to have Mr. Knight interviewed, and it indicates you exit the jail at 1511, correct?

A    Okay.

Q    But you have no independent recollection if you met with him that day?

A    I do not.

Q    And directing your attention to Government's Exhibit No. 6, do you have that in front of you, sir, the CJA voucher?

A    I do.

Q    Looking at the first page of itemizations, there is no billing for travel or meeting with the defendant at the D.C. jail on December -- on February 5th of 2013?

A    No.  I didn't bill for -- didn't bill for meeting with him on that date, no, I did not.

Q    And as you stated earlier in your testimony, the records, the billings that you submit are accurate and true, correct?

A    When I say that they're true, I look at the documents that I have at the end of the case when I'm billing them, and if I've got a document that says -- and I

123

usually keep the bill, the slips, meaning that I hand to the jail, and when they hand them back to me, I usually keep them.

And I also try to keep notations on how many times -- I've been keeping those on my phone now.  But if I don't -- if I didn't record it, if I forget to record it, if I can't find that sheet, I won't bill for it because I don't want to guess because I might be billing for something that did not occur.

Q    Now, you gave the sheet for December [sic] 31st to the prosecutor in this case, correct?

A    I gave her my visitation sheets, yes.

Q    Did you have a sheet for February 5th to give her?

A    What I gave her is what I gave her.  I don't believe -- if we have that sheet, we have it.  But I don't believe I gave it to her, meaning I don't remember the sheets I gave her.  I gave her what I gave her.  But I didn't bill for it.

Q    And there's an electronic signature on Government No. 6, your voucher, August 16th of 2013.  It indicates that you swear and affirm to the truth of the statements in this voucher, correct?

A    Yes, sir.

Q    So that is why you were telling us that you believe that your actual voucher is accurate, correct?

124

A    Yes, sir.

Q    Because it's -- and it tallies the hours and tasks that you perform by date, correct?

A    Yes, sir.

Q    Now, directing your attention to Defendant's Exhibit No. 2, that computerized printout, and directing your attention to the bottom entry on it, January 31st, it indicates you went into the jail on January 31st, 2013, at 2156 hours, and it indicates you remained there until February 1st of 2013 at 1550 hours?

A    I'm sorry.  So the very last entries are what we're looking at, sir?

MR. DAVIS:  Yes.

Your Honor, if I may approach the witness?

THE COURT:  Yeah.

BY MR. DAVIS:

Q    It indicates visit start, date and time; and visit end, date and time?

A    Yes, sir.

Q    And then that last category, it indicates you came in on January 31st at 2156 hours, and you left the jail on February 1st, 2013, 1550 hours.  Now, that's not accurate, is it, you didn't stay for 17.8 hours?

A    No.  That would have been incorrect.

Q    And that's the day you kept the sheet when you

125

left the jail?

A    I don't know if that's one of the sheets I gave to the prosecutor.  I did have a record if I billed for that date.  I probably had a sheet or I had a notation when I was there.

MR. DAVIS:  The Court's indulgence.

BY MR. DAVIS:

Q    And you gave those to the prosecutor, the ones you had, correct?

A    I don't know if I gave them to her or just showed her.  I think I just showed her the dates.  I don't think she collected the sheets.  We sat down and I showed her --
I believe I showed her what I have.  This wasn't that long ago.  This was --

THE COURT:  We have the billing for that day.

MR. DAVIS:  I realize that.  I was talking about the sheet that was turned in to account for the 17.8 hours.
But I can move on.  The custodian has already done that.

BY MR. DAVIS:

Q    Mr. Iverson, directing your attention to your billings for January 31st, you billed that on your voucher in Government's Exhibit No. 6, correct?

A    Yes, sir.

Q    And that's reflected on Defendant's Exhibit No. 2, January 31st, correct?

A    Yes, sir.

Q    And looking at your voucher, there's no billing for February 5th, correct?

A    There is not, sir.

Q    And you have no independent recollection if you met with Mr. Knight, correct?

A    I do not, sir.

Q    And you have no sheets to indicate whether or not you met with him, correct?

A    On that date, I don't have any independent recollection.  And if I had had a sheet at the time that I did the belling, I would have done it.

The only other time I don't -- if I can't figure out the time and I'm only guessing, I don't want to -- I'll just conservatively eat the time, meaning not bill for it, rather than enter inaccurate.

Q    Now, the next billing for time in reference to having a conference with Mr. Knight is on February 19th, and you've testified that that is at court, correct?

A    Yes, sir.

Q    And the one hour of billing time that was attributed to interviews, you've indicated to us that is a compilation of all the interview time that you spent with co-counsel, with the prosecutors, everyone at the courthouse, correct?

127

A    Yes, sir.

Q    And the same with the billing in Government's Exhibit No. 6 for February 1st, that 1.2 hours is for talking to everyone at the courthouse, correct?

A    Yes, sir.

Q    Now, directing your attention to March 8th, it will be on the second page.

A    Yes, sir.

Q    You have a billing for travel to the D.C. jail and client conference of 1.2 hours, correct?

A    Yes, sir.

Q    Now, directing your attention to Defendant's Exhibit No. 2.  Do you see the jail reflecting a visit between you and Mr. Knight on March 8th of 2013?

A    I do not see a March 8th date, sir.

Q    Now, directing your attention to March 22nd.

A    Yes, sir.

Q    You have a billing for going to the jail and conferring with Mr. Knight.  Do you see an entry for March 22nd on Defendant's Exhibit No. 2?

A    There is a date for March 22.

My billing, yes.

Q    As is for April 5th, correct, going to the --

A    Yes, sir.

Q    Now, directing your attention to April 13th, 2013,

128

you billed for one hour of conference time with Mr. Knight.

Now, directing your attention --

A    I'm sorry, can you repeat that date again, sir. I'm sorry.

Q    Sure.  April 13th.

A    Okay.

Q    April 13th.  It says, "client" -- "conference call D.C. jail."

A    Yes, sir.

Q    And directing your attention to Defendant's Exhibit No. 2, the printout from the jail, do you see April 13th referenced in that compilation of visits?

A    I do not see April 13th.

Q    Now, between January 31st and February 19th, you have been provided no discovery from the United States, correct?

A    Repeat those dates again.

Q    Between January 31st of 2013 and February 19th of 2013, from when he was -- around the time he was arrested until the plea is withdrawn, you have not received discovery from the United States, correct?

A    I know we got discovery.  I don't know what date I got it.  I didn't bring -- I don't have that with me or...

Q    Well, generally, in Superior Court, you receive

discovery at the time of indictment or close thereto, correct?

A    You can get pre-indictment discovery.  It's unusual to get -- I'm just trying to --

Q    Well --

A    It's unusual to get pre-preliminary hearing discovery.  You might get *Jencks*.  But the government doesn't usually turn over extensive discovery.

You can sometimes, the government is interested in giving you, and you accepting a plea and they believe that they have strong evidence, they'll sometimes turn over evidence so you can make a better assessment of the case if they believe that you're going to ultimately accept a plea, but it's not the usual practice for them to turn over pre-preliminary discovery.

Q    Now, if the co-defendant received discovery in the latter part of March and early April, it's probably --

A    We would have probably gotten discovery at the same time.

Q    At the same time?

A    Yes, sir.

Q    Would a copy of their discovery letter refresh your recollection as to when you received discovery in this case?

A    It probably won't refresh me, but I'll accept that

130

we would have gotten discovery at the same time.
I don't think that they were giving them something that they
weren't giving me.

Q    So at the time that you are talking to Mr. Knight
on January 31st and on February 1st and on February 19th
when the plea is withdrawn, it's fair to say that you don't
have a lot of information from the United States yet?

A    No, sir.

Q    The Gerstein, I think that would be a fair
assessment.

Do you recall how many clients you saw at the D.C.
jail on January 31st of 2013?

A    Not without reviewing my billing records and
making a comparison, sir.

Q    Now, in Government's Exhibit No. 1 at page 4, the
plea was initial -- I think -- do you have that there?

A    I do have Government's Exhibit No. 1.

Q    February 1st?

A    Yes.

Q    Okay.  Can I direct your attention to page 4 of
that document?

A    Yes, sir.

Q    When the plea is put on the record on
February 1st, as was in your email, there's no mention of
U.S. District Court, correct?

131

A    No, sir.  Meaning correct, you are correct.

Q    Between February 1st of 2013 and February 19th of 2013, did you talk to the defendant on the telephone?

A    I don't think he called me on the telephone.

Q    And if you had, you would bill it, correct?  So it would be reflected in your billings, in most instances?

A    I don't -- there are lot of billings that I don't bill for.

Q    Just because it's time-consuming?

A    Because it's time-consuming.

If somebody calls me for one, two, five minutes, a lot of times, that's not captured.

But I don't have any recollection of Mr. Knight calling me.  He was in the jail.  I don't have any recollection of us talking on the phone.  And I put a -- probably told him, as I tell my -- that do not talk to me over the phone.

Q    Did you still have your file when this proceeding -- when this hearing started to come about?  Did you have your file from Melvin Knight's case?

A    I went and found the file, yes.

Q    You did find the file?

A    Yes, sir.

Q    Did you find any letters to Mr. Knight between February 1st and February 19th outlining the plea and the

132

penalties?

A    Meaning from me to him?

Q    That's correct.

A    I don't believe I -- I'm certain that I did not write him a letter explaining in written form what the plea and the penalties were.  So there was nothing -- and that I'm certain of, that I did not do that.

Q    Did you do any notations of yours outlining the maximum penalties and the Voluntary Superior Court Guidelines or essentially what the components of the plea were?

A    No.  I would have had -- I have a big printout of the Guidelines, but I don't have anything in my folder; meaning, I have my own copy that I use for every case, but I don't have anything in my file where it said, this is the penalty for this, this is the penalty for this.

My practice is to go through and look it up.  We look at the penalty right there, meaning the clients. I'm not saying it happened with Mr. Knight, but that's my practice.  I just take my Guidelines printouts with me.

Q    Is it fair to say that you did not know that his case was going to potentially be transferred to District Court until February 19th of 2013 when you were in open court when the prosecutor put what was being withdrawn from the table?

A    I found out abruptly.  I don't know when -- I found out abruptly.  It was a surprise to me that he was -- not surprised, but it was not -- I wasn't on warning, like, okay, it's over now, he's going, before it happened.

Q    And there was no need to consult with the Federal Public Defender's Office or anyone else that was doing federal work, because the plea had been withdrawn, correct, after the 19th?  I mean, it was gone?

A    When the case was gone, I had no --

Q    I'm not talking about when he gets indicted.  I'm talking about when the plea expires on February 19th, did you make efforts to consult anyone on the --

A    You mean when the case was still mine?

Q    Yes.

A    I never contacted anyone on the federal side about anything, meaning --

Q    Even after?

A    I wasn't -- meaning I wasn't -- I see what you're saying.

I wasn't contemplating him going over to Federal Court and then calling someone to say this might happen, no.

Q    Are you familiar with Federal Sentencing Guidelines?

A    I am not at all.

Q    Did you look at the federal statutes in reference

to --

A    I did not consult the federal statutes and I did not inform Mr. Knight of what exactly he would be facing if he went, if the case went federal, and I know I did not do that.

Q    In Superior Court, charges were complex, were they not?

A    They were complex.

Q    And these are very serious offenses that had mandatories associated, correct?

A    Yes, sir.

Q    High statutory, mandatory statutory penalties, correct?

A    He was facing very, very serious charges on our side.

Q    And the Voluntary Superior Court Guidelines were very complex with offenses like this, and provide for an extensive amount of time?

A    Yes, sir.

Q    But you did indicate to him that he did have a plea to ADW, correct?

A    Yes.

Q    And that you definitely recall?

A    Let me say this again:  I don't have an independent recollection of sitting down with Mr. Knight and

saying the words, ADW.  Do I believe that happened?  Yes, within the context of what we -- the preliminary hearing, where we were and being shown the documents.

But that moment that you're talking about where I say, this is ADW and this is what it faces, I don't have an independent recollection of that.

Q    Did you advise Mr. Knight at any point in time between the 1st and the 19th that he should take the plea offer that had been extended to him?

A    I can't remember telling him or giving my advice that, you better take this.  Could I have said that?  Yes.  But I'd be guessing.  I don't have a recollection of speaking those words to him.

I will give my clients the advice, like, look, man, I think this is a good deal, you know, it's in your -- I tell my clients, it's your decision; I don't do the time.

Q    But you have no specific recollection?

A    But I will tell them "yes" at times, but I don't have that recollection in this case at all.

MR. KATZOFF:  Thank you, Mr. Iverson.

THE WITNESS:  You're welcome.

THE COURT:  Redirect.

- - -

REDIRECT EXAMINATION

BY MS. SATTERFIELD:

136

Q    So, Mr. Iverson, the jail records there --

A    Yes, ma'am.

Q    -- the fact that those don't match up with your billing records, does that mean you didn't see Mr. Knight on those days?

A    No.  That -- I've never seen this document; it's not something that I control.  So I can't speak to it.

Q    But you can speak to your own billing records?

A    Yes, ma'am.

Q    And those were accurate days when you actually saw Mr. Knight?

A    I believe my records are accurate.

Q    And I want to call your attention to Government's Exhibit 3, this email --

A    Yes, ma'am.

Q    -- with the plea offer.

And one of the phrases here is, "The government will agree to not bring the greater and remaining charges, which include, but are not limited to," and then it goes on to list kidnapping, obstruction of justice, and other charges.

What does that phrase "Include, but not limited to" mean to you?

A    Just what it means in every sentence:  That this is not an exhaustive list.  So we're not saying that --

we're not holding ourselves to this list, there may be more. I think it's just a term of art within the English language. It's not exhaustive.

Q    "Not exhaustive" in terms of there can be other charges that could be brought?

A    That's my interpretation of the English language, yes.

Q    Right.  And could those charges potentially be federal charges?

A    I don't -- you're asking me whether this letter -- whether I interpret it -- would have interpreted this letter to mean that there would have been federal charges that could have been brought.

Q    Is that a fair interpretation of this?

A    If I -- in practicing in Superior Court, it's not my consideration -- if I read this letter, I wouldn't be thinking, oh, they might go -- that "not limited to" would have been referring to federal charges.

That's not, as I sit here now, any time I've seen that phraseology, that would have been used within my world, I wouldn't have said oh, that must mean they're also considering fed, fed charges or taking him over -- we call it taking someone across the street.  That's not what that would have denoted to me.

Q    What about this charge at the end, felon in

possession, are you familiar with that charge?

A    I represented that for a lot of people, yeah.

Q    And is that a charge that can be charged in Superior Court?

A    I've represented people on felony possession.

Q    And are you familiar with that charge in Federal Court as well?

A    I've never represented someone over there.  I believe it's a charge on both sides.

Have I ever given it any thought or any professional attention on this side, meaning the federal side?  No.  I've just -- because I've never dealt with a federal gun offense.

Q    But you're familiar with felon in possession being a federal charge as well?

A    Only in the sense that I'm an attorney and I know that it's over here.

I've never looked at the federal statute.  I've never -- I've just never dealt with it.  You know, never read a federal statute on felony possession, but I'm sure it is over here, meaning I've never had reason to look at it over here.

But I know --

Q    But you know about it?

A    But I accept that it's over here, yeah.

Q    You know about it.

And you had talked about getting discovery and not getting discovery.  And up to February 19th, it sounds like you're saying that you hadn't gotten any discovery from the government in this case?

A    I don't know -- as I said before, I don't know what date I got discovery.

I can remember looking at some pictures, and I referred to some of them before.  The government had pictures of the outside of what was in the parking lot.  I don't remember when I got it, if I looked at my file.  The discovery is usually a discovery letter that attaches, and that will nail that down on when you're getting discovery.  I don't have that with me right now.

I don't know what I had on that date.  It is usually sparse, very sparse, pre-preliminary hearing, and I don't have any -- while I say sometimes you do get discovery, the government turns it over when it's video, disk, or some sort of pre-preliminary hearing discovery, I don't have any recollection of receiving that in this case.  I would have had the Gerstein, and I would have been talking to Mr. Knight.

Q    But you said it's possible sometimes to get --

MR. DAVIS:  Objection.  I mean, he's indicated what the answer to the question is.

140

THE COURT:  Overruled.

BY MS. SATTERFIELD:

Q    You said it's unusual to get pre-preliminary hearing discovery?

A    Yes.

Q    But there are occasions when you want to talk about entering into a plea with the government, that the government may give it to you?

A    Yeah, it happens.

Q    Did that happen in this case?  Did you ask for more discovery?

A    I don't have any recollection of -- and I'm not saying I don't remember.  That just doesn't sound like what happened in this case; that turn over what you have or give me photographs or give me something else.

And it's not -- I don't want to speculate it wasn't that sort of case, in the sense that there was no forensics that had been developed at that point.

The only thing that I recall looking at was photographs of the scene, but there was also no -- it's not like we had a video case.  And a lot of times that's what you're going to get.  Hey, we've got a video of your client.

And there was no -- nothing where he admitted. And that's my recollection.  He didn't admit to anything in any sort of interview.  And that's, a lot of times, what

141

you'll get.  Hey, your client gave it up in an interview, and we'll give you that because we know that that's going to influence your decision on whether to take a plea or not.

So I'm 90 percent, 99 percent sure that that wasn't a concern in this case.  In fact, I'm sure that we weren't dealing with any sort of confession on his part, where he gave it up in an interview.

Q    And so sitting here today, do you recall where you asked the government for additional information in terms of, I need to consider that for purposes of talking to my client about your plea offer?

A    I don't remember asking the government for any further discovery or having a reason to believe they would have given me further discovery, pre-preliminary hearing.

I know that they did give me -- I had discovery in my possession.  At some point, I had discovery in my possession.  But when I got it, I still -- my answer is still I don't remember when it was.

Q    But before the preliminary hearing on 2/19, did Mr. Knight ask you to get further information for the government -- from the government about -- so he could consider the plea offer?

A    I don't recall Mr. Knight saying, go -- when you're saying did he tell me to go back to the government, see what else they'll show you about my case so I can think

142

about it?

Q    Yes.  Did that happen?

A    I don't have any recollection.  I don't think that that happened.  It just -- that sounds strange to me.  We were dealing with what we were dealing with.  That sounds made up.

Q    Okay.

MS. SATTERFIELD:  I have no further questions.

THE COURT:  All right.

You testified that you went over the terms of the plea offer that you were provided by Mr. McFadden with your client; is that correct?

THE WITNESS:  I would have informed him of the government's plea offer, Your Honor.

THE COURT:  Okay.  And you just acknowledged that you're not an expert on federal criminal law, right, in the feds, Federal Sentencing Guidelines?

THE WITNESS:  I don't have any knowledge.

I know that the Federal Sentencing Guidelines, whenever I talk to my clients about whether -- going across the street, I know it's a lot.  The penalties are stiffer, it's a lot more stringent.  D.C. Superior Court is lenient by comparison.

THE COURT:  Okay.  So I'm looking at this letter you've got in front of you, Exhibit 3.

143

THE WITNESS:  Yes, sir.

THE COURT:  And Ms. Satterfield just asked you about this language:  "The government will also agree to not bring the greater and remaining charges."

THE WITNESS:  Yes, sir.

THE COURT:  "Which include, but are not limited to," okay?

So you would have gone over that language with your client, right?

THE WITNESS:  I would have given him the exact language that the government had offered.  I would have just basically delivered the letter to make sure he was aware of the plea offer.

THE COURT:  And then it lists a number of charges here.

THE WITNESS:  Yes, sir.

THE COURT:  First one is kidnapping while armed, two counts.

THE WITNESS:  Yes, sir.

THE COURT:  So that's a D.C. Code offense, right?

THE WITNESS:  Yes.

THE COURT:  And it's also a federal crime?

THE WITNESS:  When counsel was asking me about felony possession, I am very aware that kidnapping is a federal offense, yes.

144

THE COURT:  So at least you knew that was a federal offense, right --

THE WITNESS:  Yes.  But...

THE COURT:  -- kidnapping while armed?

THE WITNESS:  Yes.

THE COURT:  I mean, you also know it's a D.C. Code offense, too, right?

THE WITNESS:  Yes.  It's both.  I knew kidnapping -- by extension, kidnapping while armed would be federal.

THE COURT:  Well, let's --

THE WITNESS:  Go ahead, sir.  I'll let you -- please.

THE COURT:  The next thing says "PFCOV."  I don't even know what that means.  What does that mean?

THE WITNESS:  Possession of a firearm during a crime of violence.

THE COURT:  Okay.  That's a D.C. Code offense?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  And you've had experience with that offense?

THE WITNESS:  I represented individuals charged with that, yes, sir.

THE COURT:  It says two counts?

THE WITNESS:  Yes, sir.

145

THE COURT:  Did you have any reason to believe that was also a federal offense?

THE WITNESS:  If you would have asked me back in 2013 whether I thought that that charge could be brought on the federal side, I would have answered you, while I don't have experience with it, yes, I would have guessed that that could have also been a federal offense.

THE COURT:  Okay.  The next one is obstruction of justice, two counts.  That's a D.C. Code offense?

THE WITNESS:  Yes.

And the same answer.

THE COURT:  Do you have reason to believe that that's also a federal offense?

THE WITNESS:  Much like kidnapping, that is an offense that stands out because I read the paper, I have general experience, I've seen enough on the federal side where I'm not representing people, but it's just in general knowledge to know that obstruction of justice, conspiracy, kidnapping, these are charges that you normally see brought on.

THE COURT:  They're also federal crimes.

THE WITNESS:  Yeah.  Normally brought in Federal Court, Your Honor.

THE COURT:  Then the next one, of course is ADW, gun.

THE WITNESS:  Yes, sir.

THE COURT:  Second count.  And that's the one they wanted to plea to, right?

THE WITNESS:  Yes, sir.

THE COURT:  That's a D.C. Code offense?

THE WITNESS:  It is.

THE COURT:  Did you have any reason to believe that was also a federal offense?

THE WITNESS:  I've never thought of it in that fashion, but I'm sure there's an ADW gun statute, assault with a dangerous weapon, gun, on the federal side.

THE COURT:  Then last but not least, felony in possession.  Now, you've already said you knew that was a D.C. Code offense, but you also knew that was a federal offense, correct?

THE WITNESS:  I would have -- if I had a Bar Exam, Your Honor, I would say that's a federal offense for all of these, the statutes.

We're just talking about different Guidelines penalties, how the penalties are structured.  I would have counted all of these to be probable.  Not probable, I would have just said, yes, they were, without looking in the statute book.

THE COURT:  So the fact that there's nothing in the letter indicating a threat by the government to bring

the case over in Federal Court at some point doesn't necessarily remove the possibility that they could do that, did it?

THE WITNESS:  There was nothing.  The government never said that this excludes the possibility of us bringing a federal case.

THE COURT:  So your focus on it was on these offenses as D.C. Code offenses and the relative merits of accepting the plea ADW versus going to trial on these charges, which are greater, as D.C. Code offenses, right?

THE WITNESS:  That would have been my focus.

What was -- as I was preparing our case to go to trial in D.C. Superior Court, I knew I wasn't focused on the possibility of him going over to Federal Court and weighing those options with him.

I know you're asking me questions with them being my representation.  If I did anything different in this case, Your Honor, I probably would have consulted at the point that there was any threat of going to Federal Court, consulted with someone who knew more about what he might be facing, and just instructed him on that.  That would have been it.  But there was nothing in this letter to make me focus on the federal side.

THE COURT:  Are you aware that in May of 2013, Mr. Knight sent a letter to the Office of Bar Counsel

complaining about you?

THE WITNESS:  I was not.  I didn't --

THE COURT:  Did you ever get a communication from Bar Counsel?

THE WITNESS:  I've never had to address Bar Counsel about Mr. Knight, nobody.

THE COURT:  And anyone ever contact you from the Bar Counsel's office?

THE WITNESS:  I have no recollection of Mr. Knight, unless it's something that I've forgotten.

But I've never had to go to Bar Counsel about Mr. Knight.  To my recollection, and certainly there's never been any action taken against me, I'm in good standing, and I've had my record checked.

THE COURT:  Good.

Did he ever send you a copy of any letter that he sent to Bar Counsel about you, complaining about you?

THE WITNESS:  I don't have any recollection about that, Your Honor.

THE COURT:  Is that the kind of thing you'd have a recollection of?

THE WITNESS:  As I've told counsel, Your Honor -- and I think I might have expressed this to the other side -- I think that would have stuck out in my head, but...

THE COURT:  It's not exactly an everyday

149

occurrence, is it?

THE WITNESS:  No.  I've only had one Bar Counsel -- I had an admonition for something that my ex -- my current wife, who I'm separated from, had a Bar Counsel referral in Maryland for a reference I gave her for a job, and they decided that I should have disclosed our marital relationship.  I was inviting her to work as a law student after she graduated with the law practice and said she could earn $54,000 working through CJA with my supervision.  They said because I did not disclose our marital relationship in that letter, that somehow that wasn't being forthright about this.

THE COURT:  But the letter complaining about your performance and representing a criminal defendant is certainly something that would stand out in your mind, would it not?

THE WITNESS:  Absolutely.

THE COURT:  Has it ever happened, to your knowledge?

THE WITNESS:  In this case?

THE COURT:  No, no.  In any case, a complaint about your representing people in criminal cases, where they're filing complaints against you?

THE WITNESS:  I had a complaint because I didn't turn --

150

THE COURT:  You don't have to give us all the details.

It never happened?

THE WITNESS:  No.  I've had a case where one time where I had to turn over -- didn't turn over a file quick enough.

I've never had to address, to my memory, any shortcomings in my representation before Bar Counsel.

THE COURT:  So he never sent you a copy of this letter, Mr. Knight, that is?

THE WITNESS:  I'm not saying he didn't. I don't have any recollection of it.  If I did, I would say, yes, I remember Mr. Knight's representation, but I...

THE COURT:  And no one from Bar Counsel ever contacted you about this letter?

THE WITNESS:  Not to my recollection, Your Honor.

Let me be sure.

And I'm not making excuses because I've told counsel this and nobody has asked me about this -- I think I told defense counsel -- I had a head trauma in 2004 and I had a motorcycle accident, I was in ICU, in the hospital for -- received major surgeries, had a brain injury.

I told counsel I just received an independent medical examination.  And I know subjectively and objectively, my memory is affected.  I'm not saying that

151

that's what happened here, but I do often have doubts, when I can't remember things, about whether that is associated with the head trauma, while I did suffer a bout of amnesia, I don't remember parts of the accident, or if it's just me being 50 and don't remember, I don't have any recollection of the letter that you're referring to, whether that's the accident that happened in 2014 or whether I forgot or whether --

THE COURT:  2014?

THE WITNESS:  June 22nd, 2014.

THE COURT:  This letter was in '13.

THE WITNESS:  That's what I'm saying.
I don't know.  I don't have any recollection of it.

THE COURT:  You're excused.

THE WITNESS:  Thank you very much, Your Honor.

THE COURT:  All right, Counsel.  We'll reconvene tomorrow at 11:30.  You can reflect overnight on what you've heard, make whatever arguments you want to make tomorrow; I'll be glad to hear them.

What's the latest with your client's situation, Mr. Katzoff?  Have you talked to that gentleman who's supposed to be helpful to him?

MR. KATZOFF:  I have not been able to talk to him. So I'm not sure about...

THE COURT:  Well, can you give me an update

152

tomorrow at 11:30?

MR. KATZOFF:  Yes.  I had it down for 2:00.

THE COURT:  Oh.  I was just moving it back to make it earlier.  But we can do it at 2:00 if 2:00 is easier for counsel.

MR. KATZOFF:  11:30 is fine.  I just was trying to make sure that we're on the same page.  I couldn't remember.

THE COURT:  If 2:00 works better for counsel, we can do it at 2:00.  I don't care.

What works better for you?

MS. SATTERFIELD:  Either for the government.

MR. DAVIS:  I wasn't listening.  I apologize.

THE COURT:  Let's do it at 2:00 then.  Just give me more time.

MR. DAVIS:  Well, I have a conference call at 2:00 with about 14 lawyers.  I hate to put a monkey wrench in it, and I kind of need to participate.

THE COURT:  That's fine.

MR. DAVIS:  But other than 2:00, between 2:00 and 3:00 with that many lawyers, it probably is going to take us 45 minutes.

THE COURT:  That's generous.

MR. DAVIS:  And it's just defense lawyers.

MS. SATTERFIELD:  But, Your Honor, what are we doing?

THE COURT:  He's giving me an update on his client's health situation, and we're going to set a date for his hearing.

And you and you are going to give me whatever argument you want to give me based on what you've heard today.

MR. DAVIS:  Certainly.

MS. SATTERFIELD:  The Court doesn't want to wait for argument after the whole case is done?

THE COURT:  Well, I want to get kind of an update on what we've heard today --

MS. SATTERFIELD:  Okay.

THE COURT:  -- because this relates to one defendant.  There's going to be other documents and arguments that are going to relate to the other defendant, I assume.

MS. SATTERFIELD:  Right.  But I think they're all going to be tied up.  I guess that's why I'm saying it.

THE COURT:  As of right now, I don't see the interrelationship on that.

There's been no evidence today of communications between Thorpe and Knight's counsel at the time, not these counsel, Thorpe and Knight's counsel at the time with regard to the wired arrangement, whether or not one would take and the other wouldn't.  I've heard no evidence.  I have no

154

evidence indicating that that ever happened.

I have no evidence indicating that the defendant -- excuse me, at least this defendant, who testified today, was witting of any kind of communications of that nature or participated in them or asked his lawyer to do something in that, along those lines.  So the most I know is what I've just heard from Mr. Iverson, which was pretty darn limited.

MR. DAVIS:  We do have -- the Bar Counsel indicates that Mr. Knight didn't see him between February 1st and February 19th, and we have the absence of a billing for February 5th on his voucher, which he's indicated --

THE COURT:  What's this Bar Counsel thing you're just referring to?

MR. DAVIS:  Oh.  The Bar Counsel letter that was sent out.  That's Defendant's Exhibit No. 1.

THE COURT:  All I have there is an excerpt of that letter.  Someone is supposed to get me the complete letter.

MR. DAVIS:  Your Honor, would you like to hang on to the exhibits?

THE COURT:  Yeah.  Well, the exhibits that are introduced into evidence, I should have.

MR. DAVIS:  Well, that's 1 and 2.

And from the defense, you should have 4, which is

the stipulation on the jail records.

MS. SATTERFIELD:  I have 1, 3, and 6.  Does the Court have 2?

THE COURT:  I have 2.

MS. SATTERFIELD:  He has 2.

THE COURT:  I have 2.

MS. SATTERFIELD:  No.  I've got 1, 2, 3.  The Court must have 4 and 5.  And then I've got 6.

THE COURT:  I have 3 right here.

MS. SATTERFIELD:  Those are -- mine are the official.

THE COURT:  Let's put all the ones with stickers in a folder.  Let's put them in a folder.  The others are copies.

And, by the way, Ms. Satterfield, that's not to suggest that there won't be an opportunity for further argument once we hear the additional evidence later, whenever we do, regarding Mr. Thorpe.  I mean...

MS. SATTERFIELD:  Okay.

THE COURT:  I'm not suggesting you all get one chance to address.  You'll get two bites at the apple.

MS. SATTERFIELD:  All right.  That's fine.

And I think we already sort of picked a preliminary date; we will probably run it by the Court.  We were looking at June 15th for another date for Mr. Thorpe.

THE COURT:  Well, it's health related, you mean for his testimony?

MS. SATTERFIELD:  Right.  We're hoping --

THE COURT:  Well, that's going to be health related.  I want him to be seen by a doctor; I want him to be taken care of.

MR. KATZOFF:  I agree.

THE COURT:  And then I want Mr. Katzoff to represent to the Court, hopefully, that he's now in a physical and mental condition to go forward.

MR. KATZOFF:  Obviously.

THE COURT:  I'm not going to set a hearing until I know that occurred.

MR. KATZOFF:  Very well.

THE COURT:  Any additional questions?

MR. KATZOFF:  11:30 tomorrow.

THE COURT:  11:30.  I'm not anticipating it taking more than maybe a half hour, 45 minutes.

MR. KATZOFF:  I agree.

THE COURT:  15, 20 minutes each, if that.

MR. DAVIS:  If that.

THE COURT:  This will be brief.

Yeah.  See you tomorrow.

DEPUTY CLERK:  All rise.

This Honorable Court will stand in recess until

the return of court.

(Proceedings concluded at 5:22 p.m.)

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: June 5, 2017_____    /S/__William P. Zaremba_____

                                William P. Zaremba, RMR, CRR