IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )     CR No. 13-131-1, 2
                                   )
                                   )     Washington, D.C.
      vs.                          )     May 25, 2017
                                   )     11:50 a.m.
AARON THORPE,                      )
MELVIN KNIGHT,                     )
                                   )
          Defendants.              )
_____)

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Government:        Pamela Stever Satterfield
                           U.S. ATTORNEYS OFFICE
                           FOR THE DISTRICT OF COLUMBIA
                           Special Proceedings Division
                           555 4th Street, NW
                           Washington, D.C. 20530
                           (202) 252-7578
                           pamela.satterfield@usdoj.gov


For Defendant Thorpe:      Howard B. Katzoff
                           LAW OFFICES OF HOWARD KATZOFF
                           717 D Street, NW
                           Suite 310
                           Washington, D.C. 20004
                           (202) 783-6414
                           katzoffh@aol.com


For Defendant Knight:      Christopher Michael Davis
                           DAVIS & DAVIS
                           1350 Connecticut Avenue, NW
                           Suite 202
                           Washington, D.C. 20036
                           (202) 234-7300
                           cmdavisdc@gmail.com

APPEARANCES CONTINUED

Court Reporter:                William P. Zaremba
                              Registered Merit Reporter
                              Certified Realtime Reporter
                              Official Court Reporter
                              U.S. Courthouse
                              333 Constitution Avenue, NW
                              Room 6511
                              Washington, D.C. 20001
                              (202) 354-3249

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

3

P R O C E E D I N G S

DEPUTY CLERK:  All rise.  The United States District Court for the District of Columbia is now in session, the Honorable Richard J. Leon presiding.  God save the United States and this Honorable Court.  Please be seated and come to order.

(Defendants entered.)

DEPUTY CLERK:  Your Honor, we have Criminal Action 13-131-1 and 2, United States of America versus Aaron Thorpe and Melvin Knight.

Counsel, please approach the lectern and identify yourselves for the record.

MS. SATTERFIELD:  Good morning.  Pamela Satterfield on behalf of the government.

THE COURT:  Welcome back.

MR. DAVIS:  Good morning, Your Honor.  Christopher Davis on behalf of Melvin Knight.

THE COURT:  Welcome back.

MR. KATZOFF:  Good morning, Your Honor.  Howard Katzoff on behalf of Aaron Thorpe.

THE COURT:  Mr. Katzoff, what have you learned?

MR. KATZOFF:  I've learned that Mr. Shelton is going to help us out and he's going to have Mr. Thorpe moved to the D.C. jail, where I can better monitor and ensure that he gets to be seen by doctors and, perhaps, have a better

4

ability to speak to them and find out what's going on and make sure that between now and the next time we come back -- unfortunately, because of the holiday weekend, he says it's not going to happen until next week, but he will be moved very soon.  I'm sure that's quicker than he would get seen by probably less competent folks down at that facility. So I think that's a really good positive step, but that's what's going to happen.

THE COURT:  Is his issues physical or mental or both?  As far as you understand it.

MR. KATZOFF:  I'm really talking about mental issues.  The physical is because of lack of sleep and anxiety and other things that have come from not getting mental health counseling, not seeing anybody, not figuring out if he should be on medication.  Six months of that has also affected him a little bit physically.  But his main -- I'm mainly concerned now that I've, over the past couple weeks had more contact with him, I'm seeing that he just needs to be seen, and I want to make sure that happens.

THE COURT:  Okay.  Thank you.

All right.  Mr. Davis.

MR. DAVIS:  You're ready to hear argument, Your Honor?

THE COURT:  Yeah.

MR. DAVIS:  Certainly.

THE COURT:  It's your motion.

MR. DAVIS:  Certainly.

Your Honor, the issue in the case is whether the plea offer was rejected due to failure of Mr. Knight's Superior Court attorney to provide proper guidance to him as to whether or not he should accept the plea.

I would think, notably, we should recognize that Mr. Knight was never advised to or not to take the plea by his attorney.  If you recall, Mr. Iverson said he never had that discussion with him.  And I think there's some case law -- actually, I think there's some Supreme Court case law in the face of overwhelming evidence that it's ineffective to not advise your client to take an offer.  I know there is Fourth Circuit case law on that.

And I am not stating the evidence was overwhelming, but I don't think we had --

THE COURT:  I'm not sure he said what you just said, that, Mr. Iverson -- I don't have a transcript, obviously, but...

MR. DAVIS:  My recollection --

THE COURT:  That's not 100 percent consistent with my recollection.

MR. DAVIS:  Would Your Honor -- what do you recall?

THE COURT:  I don't remember him saying he never

6

discussed with him the benefits of taking a plea.

MR. DAVIS:  Oh, no, no.  Then you misinterpreted what I said.

I don't believe he advised him to take the plea or to not take the plea.  That's what I don't think he did.

I'm not talking about the details at this point.

THE COURT:  I mean, I'll look at the transcript, but I don't think he went that far.

MR. DAVIS:  Well, I mean the transcripts will reflect what he said.

That's my recollection, that he did not say, take it, he did not say, don't take it.

THE COURT:  I know he said it's his decision.

MR. DAVIS:  I do remember that.

THE COURT:  It's the client's decision in the final analysis.

He said he went through the terms of the plea agreement with him, I remember him saying that.

He discussed the terms of the plea agreement with him.  He said it was his decision -- as I recall it, it was his decision to make.  It wasn't -- excuse me, it was his client's decision to make, not his decision to make.

I think he said he answered questions.

I'd have to have the transcript.

MR. DAVIS:  My recollection is he didn't recall

what he did, but his general practice is to go over these things.  I think his repeated testimony was he doesn't recall.

And with reference to the two hours he spent at the jail on January 31st, his testimony was, that begins from the point he enters the jail to when he leaves the jail; and, therefore, if he's waiting on the client, that's included in that testimony.  I think Mr. Knight's testimony was that he saw him for 20 minutes, and the bulk of the discussion --

THE COURT:  What day was that?

MR. DAVIS:  That was January 31st.

So I don't -- I didn't hear -- I don't think --

THE COURT:  According to his billing records, he has six hours for the 31st, and he says two of the six hours were interview time.

MR. DAVIS:  That's correct, Your Honor.

And within that two hours, he explained that that two hours encompasses from when he walks in the door to when he walks out the door.  And if he has to wait on the defendant, that two hours encompasses that.  And so he could not pinpoint how much time he spent with him.

He said he had no recollection -- my memory of the transcript -- and, again, I can be wrong too, I make mistakes.  But my recollection is that he had no

recollection of anything, and that -- and I objected several times because he started talking about what his general practice was.  And then --

But at any rate --

THE COURT:  No, that's not -- you're overstating it, I believe, Mr. Davis, I really do.

He said -- again, I'll defer to the transcript, but he did say that he -- it was clear his client rejected the plea agreement.  When he met with his client, he said, we want to go -- I want to go forward.  He said his client himself, your client now, testified that, I told him, in no uncertain terms, I've been in jail for three days, I'm not going to go to jail for 10 years, let's go forward, let's move.

MR. DAVIS:  That was in the courtroom, he said that.

THE COURT:  Well, I don't know whether it was in the jail cell or the courtroom, off the top of my head.

But he, Mr. Iverson, was clear, I thought, that your client rejected the plea agreement, and that it's his decision to accept or reject it.

MR. DAVIS:  Mr. Knight -- in the courtroom, according to Mr. Knight's testimony, because I believe that Mr. Iverson had no recollection of these events specifically.  But according to Mr. Knight's testimony,

there was no discussion of a plea at the jail. He met with Mr. Iverson for about 20 minutes. He was pushing Iverson to get him out because he was pressured because his wife was getting ready to deliver, and he wanted out. And it was -- I gathered from Mr. Knight's testimony and I gathered from Mr. Iverson's testimony that there was some friction in the attorney-client relationship as a result of this.

And I agree, Your Honor, in open court at the bench -- and if you look at the transcript of February 1st, Government's Exhibit No. 1, on the first page, it indicates that Mr. Thorpe's attorney asked for the husher. And what that means in Superior Court, where your clerk and the court reporter are sitting, the prosecutor's on the right, the defense is on the left, and it's what they call the table. And there's a defense table there. And the prosecutor is standing over there.

And when the attorneys want to speak to their clients -- and I spoke to the Public Defender about this -- they request that the Court put the husher on. And if you look at that transcript on page 1 -- or 2, Government's Exhibit No. 1 --

THE COURT: I don't have it. Would you get the exhibits, please.

MR. DAVIS: Mr. Thorpe's attorney requests that the husher be put on. The husher is put on, it doesn't

indicate for how long. I listened -- well, I guess -- I can't really represent because it's not evidence. I heard the tape, though.

But at any rate, Mr. Knight says it lasts for maybe two minutes, a few minutes, at most. And he says that he's telling Mr. Iverson to push on him, because the -- he's asking him if he'll agree to a continuance. Mr. Iverson tells him that he has a plea for him, he has a plea for him, ADW. And Mr. Knight goes, what's that? And Mr. Iverson says -- and then he says, how much time does that carry? Mr. Iverson tells him 10 years.

That was the --

THE COURT: Yeah, let me stop you there. I have the memo of the plea offer here from Trevor McFadden.

MR. DAVIS: Yes.

THE COURT: There's no mention of 10 years in there at all.

MR. DAVIS: That's correct.

THE COURT: There's no -- there's nothing about punishment, except it says that the parties -- "The parties must allocute within Guidelines."

I don't know how that relates to the 10-year number.

MR. DAVIS: Well, notably, there was no discussion of Guidelines.

11

See, the very core of Mr. Knight's argument about ineffective assistance is not that Mr. Iverson is a horrible lawyer or terrible person.  It's that he was out of his league with this case.  He did not properly advise Mr. Knight by explaining the mandatory penalties he may face, the potential maximum penalties he would face, the possibility of being transferred to the harsher court, District Court versus the Superior Court, which Mr. Iverson testified is much more lenient.  That is the core argument of Mr. Knight.

The email --

THE COURT:  Well, let's go back to this transfer-to-the-harsher-court thing.

Where is the evidence that that was even being raised as a possibility here by McFadden or anyone else from the government?  There's no evidence of that.

MR. DAVIS:  Of which?

THE COURT:  Where is the evidence on the record that the government was threatening to bring the case to Federal Court?

MR. DAVIS:  Oh, they weren't.

THE COURT:  There's no indication in here.

MR. DAVIS:  There isn't.

There is no representation in the email, which is, I believe, Government's Exhibit No. 3.

THE COURT:  So it's your position that a defense counsel in this situation, in the absence -- even in the absence of threats of that kind, nonetheless has to give advice as to the possibility that the case might end up in Federal Court?  Is that your position?

MR. DAVIS:  Our position is that -- well, you haven't heard the rest of the testimony.

Mr. Thorpe's attorney is going to testify that he met with his client and explained to him the case was going to be transferred to Federal Court.  And this is prior --

THE COURT:  Where did he get that from?

MR. DAVIS:  Well, I suspect, from the United States.

And see, the problem -- the core problem here is Mr. Knight was not provided the information that was relevant to making a decision.

It's our position that in order to reject a plea, you have to know what's involved in the plea, you have to know what the penalties are associated with the plea, you would have to know what the Guidelines are.

Your Honor, when we do Rule 11 inquiries, you routinely ask --

THE COURT:  But if you have a client, in a hypothetical situation, which this case seems to mirror, who rejects the opportunity of a plea right from the start,

13

says, I don't want to have anything to do with the plea,
let's move forward --

MR. DAVIS:  How can you reject it if you don't
know what you're rejecting?

THE COURT:  Well, I mean, what's your position as
to what a lawyer's obligation is in a situation -- let me
finish the question.

MR. DAVIS:  I don't think --

THE COURT:  -- when a client says to the lawyer at
the outset, no, I'm not pleading here, I'm not going 10
years anywhere, let's move forward, what's a lawyer supposed
to say oh, no, no, you can't say that to me, sir, until I've
gone through all this with you.  That's not your position,
is it?

MR. DAVIS:  No.  No, it isn't.

And actually my position is as the evidence
reflects in this case, the lawyer leaned down and said, I'll
come down and explain it to you, to the jail.  And the
evidence shows that he never came to the jail after that
February 1st appearance.  And the plea was open from
February 1st until February 19th, and he never came to the
jail.

And he testified that the document Your Honor's
holding, Government's Exhibit No. 6, which is the CJA
voucher, I believe that's it, unless you're looking at the

14

jail record.

THE COURT:  I'm looking at his time sheets.

MR. DAVIS:  Yes, his time sheets.  There is no entry between February 1st and February 19th.

And I think, more important --

THE COURT:  Well, there was a record of him being there on February 5th.  The jail record shows him being there on February 5th, from 1331 to 1511.

MR. DAVIS:  Yes.

THE COURT:  So the jail record shows that he visited the jail and his client.

MR. DAVIS:  No.  I disagree.

As Ms. Postell testified, that in instances where an attorney comes in to see two or three or four clients at a time, they will fill a sheet out for each person, the entry is made in the computer.  And then if the attorney doesn't visit the client when he exits the jail, the entry is made that he's exited the jail.  That does not reflect that he met with a client.

And as Mr. Iverson testified, his jail records are -- I mean, his CJA voucher is the accurate record of his time that he spent with his client.

THE COURT:  So the fact that this is a Melvin Knight inmate printout for February 5th doesn't mean he saw Melvin Knight on the 5th?

15

MR. DAVIS:  That's correct.  And that is supported by Ms. Postell's testimony.

And, actually, it's supported by Mr. Knight's testimony -- I mean, by Mr. Iverson's testimony.  I believe I asked him those questions about protocol.  If he didn't see them, does he still turn the sheet in.

And, notably, if you think back, Your Honor, he indicates that when he goes back to see clients, he keeps the sheets, because he writes the time down so he can put it on his voucher.  And that's the reason that it's not on the voucher, because he didn't keep that sheet, because he didn't see Mr. Knight, and he turned it in when he left the jail.

And I think further corroboration of this point is that Mr. Iverson has no independent recollection that he saw him between February 1st and February 19th.  And he indicated that his CJA voucher, which was a sworn statement, is accurate.

Mr. Knight writes a letter to Bar Counsel in May of 2013.

THE COURT:  Yeah, let's take a look at that letter.

MR. DAVIS:  Before --

THE COURT:  Where is there, in the letter, the complaint that he wasn't being told more about the

plea agreement?

MR. DAVIS:  Your Honor has my exhibits, but if you bear with me, I will find a copy.

THE COURT:  It's Defendant's Exhibit 1.

MR. DAVIS:  I have to find a copy.

I'm going to borrow the government's, Your Honor.

THE COURT:  Uh-huh.

MR. DAVIS:  The complaint that he sent to Bar Counsel, as it relates to the plea agreement, is in paragraph 2 at page 1 of his letter.  And where he addresses the plea --

And, again, Your Honor, I can't emphasize enough how important this is.  It's not that he rejected the plea, it's that it was never explained to him, and, therefore, there's no way he can reject something that he does not understand.

In paragraph 2, it indicates, on February 1st, Iverson speed talked me in open court.  And keep in mind, Mr. Knight wrote this in 2013 before anything was an issue, before anyone -- before he had any idea this would ever be an issue, he writes, just as he testified, "On February 1st, Iverson speed talked to me in open court about a plea deal to 10 years.  I refused."  Well, he did refuse.  But being told you can take a plea for 10 years is not what the Constitution requires for effective assistance of counsel.

17

THE COURT:  Hold on, Mr. Davis.  Hold on.  I think we are now at the nub of your issue.

What is a lawyer's responsibility under circumstances of this kind to reject his client's refusal to take a plea agreement, on the hope that he will then be able to more fully explain it to him so that he makes the same or a different decision later?

MR. DAVIS:  I --

THE COURT:  You're saying to me, you're arguing, in essence, that a defense counsel, in a situation of this kind, where their client hears that the government wants 10 years, and he says, I'm not doing 10 years, that's it, let's go forward, that you have a further obligation to say, no, stop, I'm going to explain it more fully to you, here's the reason why you should take the 10 years, and then go through that.  That's what you're saying.

MR. DAVIS:  Of course.

THE COURT:  He has an affirmative duty to try to change the mind of his client?

MR. DAVIS:  Of course.

Not change the mind.

My point is that the client does not have a mind to be changed until he has the facts to understand what is offered.

THE COURT:  Well, wait a minute.

18

In the situation we have here, the client, apparently, by even his own admission, told his lawyer, I'm not doing 10 years.  I'm not doing 10 years.  The government wants 10 years.  Here's the deal.  What's the government want?  10 years.  I'm not doing 10 years.

MR. DAVIS:  First of all --

THE COURT:  End of discussion.

MR. DAVIS:  Well, Your Honor, the Supreme Court disagrees with you.  And as we all know --

THE COURT:  Has the Supreme Court --

MR. DAVIS:  How many times do you --

THE COURT:  Help me, Mr. Davis.

Mr. Davis --

MR. DAVIS:  Yes.

THE COURT:  -- listen when I ask you questions.  Don't talk over this Court.

MR. DAVIS:  I won't.

THE COURT:  You speak way too fast as it is.

MR. DAVIS:  I apologize.  It takes a lot of time to put this together.

THE COURT:  Mr. Davis, no one questions, no one questions the sincerity and effort you put into your work.  But listen to help the decider make the decision.

MR. DAVIS:  Certainly.

THE COURT:  Right?

19

Are you telling me the Supreme Court has addressed this issue?  The U.S. Supreme Court has addressed the issue of a defendant rejecting a plea because of what the government's demanding they get?  And the Supreme Court then said, you have an affirmative duty, Counsel, to try to persuade him that that deal is in his best interest, or words to that effect.  Has the Supreme Court ever addressed that?

MR. DAVIS:  No.

THE COURT:  Okay.  I didn't think so.  So don't give me the misimpression that they have.

MR. DAVIS:  No.

THE COURT:  Don't give this Court and this record that impression --

MR. DAVIS:  I won't.

THE COURT:  -- because they have never addressed it.

And you know what?  The D.C. Circuit hasn't either.

MR. DAVIS:  But how many time --

THE COURT:  No Circuit Court, I don't believe, has.

MR. DAVIS:  How many times has Your Honor made inquiry at the request of the prosecution -- at the request of the prosecution that a plea offer has been made and that

20

these are the terms of the plea offer?  And it's a *Lafler* hearing.

THE COURT:  Mr. Davis.

Mr. Davis.

MR. DAVIS:  How many times do we do this?

THE COURT:  Mr. Davis, I don't do that.

I don't believe it's the Court's job to get in the middle of plea negotiations.  In fact, we have judicial precedent that says it isn't.

MR. DAVIS:  It's not for Your Honor to get involved in.  It is for the facts to reflect that the defendant has been properly advised.

THE COURT:  Mr. Davis, I was a criminal defense lawyer myself for 13 years.  The issue you're raising, in essence, goes to -- look.  You're accusing this man of malpractice --

MR. DAVIS:  No.

THE COURT:  -- in essence.

MR. DAVIS:  No.

THE COURT:  For lack of a better way of putting it, you're accusing him of malpractice.

MR. DAVIS:  Let me, if I may --

THE COURT:  I'm speaking.  You will not speak over me.

MR. DAVIS:  Sorry.

THE COURT:  Because my court reporter, who's fantastic, cannot take both of us down at once.  You must stop --

MR. DAVIS:  I will.

THE COURT:  -- when I start speaking.

I know you're very enthused about this case, but you've got to slow down.

You'll get your chance to speak.

MR. DAVIS:  Thank you.

THE COURT:  I'm trying to get your help.  I'm not trying to get you to filibuster me.

What you're contending here, in essence, is that a criminal defense counsel, in a situation of this kind, has an obligation to try to change the mind of his client as it relates to the amount of time the government is demanding.

That may end up being the decision of this Court, the Supreme Court, and the Court of Appeals in the middle.  But I'm not aware of any court that's ever taken that position, where a defense counsel is held to that obligation to try to persuade their client that their decision to not want to take 10 years, in this case, is not in their best interest.

Can you point to any case where any court or any Bar Counsel decision or any Bar Counsel has said a defense counsel, in that situation, has an obligation to try to

22

persuade their client that the amount of time that they're rejecting out of hand is not in their best interest? Is there anything that you can point me to?

MR. DAVIS:  Your Honor, I missed -- could you repeat that question?

THE COURT:  It's too long.

If you weren't listening, you were writing notes.

MR. DAVIS:  I was.

THE COURT:  If you're not going to listen to the Court, what can I tell you, Mr. Davis?  You'll get a chance to read the transcript.

MR. DAVIS:  Yeah.

THE COURT:  You should listen to the Court. That's fundamental for being a good advocate, and you know that.  You've been in this business 25, 30 years.

MR. DAVIS:  33.

THE COURT:  33.  Okay.  You know better.

MR. DAVIS:  I know better.

I would like to address, if I may, at this time, I'd like to address what the obligations of a defense attorney is for my understanding, and what my --

THE COURT:  In this situation.

MR. DAVIS:  Yes.

THE COURT:  Do you have any case or Bar Counsel opinion that says a criminal defense counsel, in this

situation, has an obligation to try to dissuade his client from rejecting out of hand the amount of time the government's demanding?  Can you point me to anything?

MR. DAVIS:  I think as a practical -- I can't point to a case or a Bar decision, but I think it's the duty of any good defense attorney to convince their client to look at the facts as they really exist and to look at the law and the Sentencing Guidelines and the mandatory minimums and the potential penalties they're exposed to if they're convicted at trial, versus the potential penalties they're exposed to if they accept a plea.  And that's not a clean job, that's a very difficult job, particularly for individuals --

THE COURT:  Trust me, I know, I've done it.

MR. DAVIS:  Particularly -- we deal with a very broad spectrum of the population.  Some people -- people uneducated, educated, brilliant, intellectually disabled.

But it's my firm belief --

THE COURT:  But you're not suggesting, I trust, that a defendant doesn't have the right -- the right to reject out of hand an amount of time the government's demanding at a minimum that they get under a plea deal?  You are not suggesting that, I trust?

MR. DAVIS:  No.

THE COURT:  No.  Thank you.

24

MR. DAVIS:  But I would note that there's nothing in this record to indicate, other than Mr. Knight's comment that Iverson -- within a one- to two-minute period, said, what's that carry, 10 years, that's the only thing --

THE COURT:  That wasn't the way it was said, no.

What does he want, what does the government want?

MR. DAVIS:  We don't see that in the email.

THE COURT:  That was in the --

MR. DAVIS:  We don't hear that.

THE COURT:  -- in the testimony of your client, who said -- your client testified, I can remember this specifically, I said to him, what does the government want? And he said, 10 years.  And he said, I've just done three days here, or words to that effect, I'm not going to do 10 years.

MR. DAVIS:  That's correct.

But I do note that the email has nothing about 10 years.  The plea offer that the United States extended on record in open court made no reference to any penalties or any deals on any time.

THE COURT:  Well, let's call McFadden.

MR. DAVIS:  And nor does -- and nor did -- well, the record speaks for itself.  Nor did the transcript from February 19th reference any time.  And that is the problem. There are no specifics to reject.

Your obligation as a criminal defense attorney is to advise your client of the relevant specifics of the pros of accepting a plea and the cons of rejecting it.  And in order to do that, in order for a man to actually make a reasoned, knowing decision, he needs to know the penalties, the mandatories, the Guidelines.  He needs to know what is what.  So if he rejects something, what is he rejecting?  He doesn't know.  It's not fair.

He is not the lawyer.  It is the lawyer's job to do that.

THE COURT:  Let me give you a hypothetical, Mr. Davis.

MR. DAVIS:  Certainly.

THE COURT:  A different kind of case.

There's been a shooting.  A person's accused of shooting someone and killing them.  The government is going to charge this person with murder.  Defense counsel goes to see his client and says, they'll let you plead to manslaughter, but you have to do 30 years, okay?

MR. DAVIS:  (Nodding head.)

THE COURT:  All right?

Of course, if they're going to try him for murder, he could face life, right?

MR. DAVIS:  That's an additional fact we don't have in our scenario, but yes.

26

THE COURT: In my hypothetical. I'm giving you a hypothetical here.

You're not suggesting, by your own admission, that a defendant, upon learning that if he pleads to manslaughter, but has to do life, cannot reject it out of hand. I'm not doing 30 -- excuse me -- but has to do 30 years, cannot reject it out of hand and say, I'm not doing 30 years.

MR. DAVIS: In your hypothetical, which is infinitely simpler than what Mr. Knight was looking at with the number of charges that he had, that individual knows the pros of entering the plea, he's going to get 30 years, and he knows the cons, he's going to get life if he doesn't take it. It's a big difference.

It's a very, very simple situation. We have multiple offenses with multiple mandatory minimums, multiple complicated Sentencing Guidelines that this man was never told about at all.

What he got was ADW, and, according to his testimony and what he wrote to Bar, Iverson told him 10 years. That isn't even what the record reflects the plea offer was.

You have the --

THE COURT: Did you ask Iverson where he got the 10-year number from?

27

MR. DAVIS:  He doesn't remember anything.  If Your Honor recalls, he has no independent recollection of any of this.

THE COURT:  Well, that's actually a way overstatement, Mr. Davis.

MR. DAVIS:  Well, I mean in terms --

THE COURT:  He did not say that.

MR. DAVIS:  He had no --

THE COURT:  Come on.

MR. DAVIS:  Well --

THE COURT:  There were certain things he didn't have an independent recollection on, certain exchanges.  But there were things he did have an independent recollection on.

MR. DAVIS:  One thing he did say was that he recalled was District Court was the furthest thing from his mind, and it was abrupt when he heard about it.

And he is aware that -- Your Honor hasn't -- and I don't practice in Superior Court, I practiced in the mid-'80s there for a couple of years and occasionally --

THE COURT:  Were you surprised to learn yesterday that a Superior Court practitioner who was sitting in that stand under oath, who was essentially accused of malpractice, who's being accused of malpractice, did it surprise you to learn that he admitted, under oath, that,

I'm not admitted to Federal Court, I'm not familiar with all the federal statutes.

I specifically walked him through the various charges here in the plea agreement to see if he knew that there was possible federal exposure, just to see if he had any understanding, generally, of that, as you may recall.

Did it surprise you to learn that that he's a Superior Court practitioner of many, many years, court appointed, on the list, apparently been doing it for 19 years, and he did not have any, by his own admission, knowledge of the federal statutes, per se, never practiced in Federal Court, not even admitted in the Federal Court? Did that surprise you?

MR. DAVIS:  Well, no --

THE COURT:  It didn't surprise you?

MR. DAVIS:  -- because I did my homework before I came.  I spoke to him several weeks ago.  I knew he was going to say that.

I mean, Your Honor, the stuff that --

THE COURT:  In fact, I learned just myself recently that there are lots of practitioners who are court appointed in the Superior Court who never come to Federal Court, who don't have any experience in Federal Court, who aren't even admitted here.

MR. DAVIS:  If Your Honor recalls, that was

29

something I characterized as an institutional problem. And I think it's unfortunate Mr. Iverson's been caught up in it, but I think it's an institutional problem.

I think that there should be something set up that when this situation arises -- as Mr. Iverson testified in retrospect, I wish I had consulted a federal attorney. In retrospect, if the situation had come about again, I would do that.

I think it's an unfortunate situation. And given the unique nature of the District of Columbia, how our city court has Assistant United States Attorneys in it and they work hand in hand, I think it's something that needs to be addressed.

THE COURT: That's a bigger question than this Court has to face in this case. That's a much bigger question.

MR. DAVIS: But I want to take away from the broad stroke that I'm chastising and belittling Mr. Iverson, because I'm not, and I appreciate his candidness and his honesty.

THE COURT: No. Let's not make any -- have any doubts about what's going on here. You are accusing him, on behalf of your client, of malpractice. It's as simple as that. There's no question you're doing that.

Now, we have to -- I have to keep straight in my

30

mind, with your assistance or without it, frankly, we'll see what the government's got to say, the difference between the ideal, which you've painted the picture of, the ideal.

Here's how it works ideally.  I used to do criminal defense work.  You sit down with your client.  You go through all the statutes at length.  You do an in-depth analysis of the Sentencing Guidelines.  You go through a lengthy, lengthy this, that, and the other thing.  You have the discussions of the pros and cons.  You go back and forth.  To the extent you can weigh the evidence, you try to weigh it.  All he had at this point is a Gerstein.  That's all he had, apparently, at that point, right, on the 19th?

MR. DAVIS:  Certainly.

THE COURT:  That's all he had was a Gerstein, okay.

And so you've got the pros, the cons of the limited knowledge you have of the evidence that the Guidelines or whatever.

In your case, you're going one step further and say, you've got to give him the whole federal picture, because this is a unique jurisdiction, they could take this to the Federal Court.

This is the ideal, and I don't think anyone would quarrel with you that that's the ideal way to do it. I certainly wouldn't quarrel with you in that regard.

That's the way I used to do it myself whenever I could.

But now we have to go from the ideal to what is the minimum required of a counsel under these circumstances, where a client, upon learning that he would have to do 10 years, rejects it out of hand, says, I'm not doing 10 years, and that's the end of the discussion.

And you're saying, apparently, you have an affirmatively duty to dissuade him --

MR. DAVIS:  No.

THE COURT:  -- and to educate -- well, this is what you're telling me.

MR. DAVIS:  No, I am not.  I am not arguing --

THE COURT:  You have an affirmative duty to dissuade him and trying to convince him that that is not in his best interest for all of the following reasons.

That's what, in essence, you're arguing to me.

MR. DAVIS:  Your Honor, may I speak?

THE COURT:  You may.

MR. DAVIS:  My position is you have to educate him to what he is being offered and what he's rejecting.  That's what my position is.

THE COURT:  Well, upon learning he's being offered a deal that he has to do 10 years --

MR. DAVIS:  And what happens --

THE COURT:  -- he rejects it out of hand.

32

MR. DAVIS:  And is he --

THE COURT:  Rejects it.

MR. DAVIS:  Is he entitled to know if he reject -- what if they were going to execute him if he rejects it, could we keep that quiet?

THE COURT:  That's not even a hypothetically equivalent discussion.

MR. DAVIS:  Well, he had a plea offer of Guidelines under 10 years in Superior Court, and he got over 20 years here.  You don't think that that may have influenced his decision had he been provided the information, the specifics of what may happen if he rejects this plea?  Do we know if he knew that he was subjected to several mandatory minimums?  He didn't know that.

These are -- this isn't dissuading him.  This is educating -- this is what a counselor is for, to counsel him in the law.

THE COURT:  Excuse me.  What were the mandatory minimums he was exposed to?

MR. DAVIS:  Well, for one, the guns over there.  And over here, the weapons involved in a crime of violence, possession of a firearm in a crime of violence.

THE COURT:  Remind me, how many of his 20-plus-year sentence were mandatory minimums?

MR. DAVIS:  I think the armed --

33

THE COURT:  It's pretty complicated.

MR. DAVIS:  It's extremely complicated.

THE COURT:  Go ahead.

MR. DAVIS:  I didn't prepare --

THE COURT:  Do you even know off the top of your head?

MR. DAVIS:  Not off the top of my head.

THE COURT:  Yeah.

MR. DAVIS:  But if it were my client and I went down to see him, I would be sitting there with the books, I'd write a letter so that he understood it.

THE COURT:  That's the ideal.  No one's questioning the ideal.

MR. DAVIS:  It's not the ideal.  It's what the Constitution requires of an attorney.

THE COURT:  Now, stop.  Look it.  Stop.  Stop.

MR. DAVIS:  Well, we disagree.

THE COURT:  That's grand language, Mr. Davis.

MR. DAVIS:  Well, I'll delete --

THE COURT:  But the Constitution does not address the obligations of an attorney.

There's nowhere in the Constitution where they spell out what an attorney is supposed to do in a situation like this.

Don't make grand statements like that.  Come on.

34

Come on.  The Constitution doesn't address that.

MR. DAVIS:  You're entitled to effective assistance under the Sixth Amendment.

THE COURT:  Exactly.

And the question becomes, then, for judges to decide what equals effective assistance of counsel.  And that's for judges.

And you yourself have admitted, as you should have, that there is no case in the Supreme Court, D.C. Circuit, there is no Bar Counsel opinion in our circuit, that we know of, that addresses what constitutes effective assistance of counsel in this type of situation. We are on virgin territory here, my friend.

MR. DAVIS:  Your Honor, we've gone over what my expectations --

THE COURT:  Do you have anything else?

MR. DAVIS:  -- were -- well, we just disagree on what an attorney's role is.  I mean, I view my role --

THE COURT:  Mr. Davis, I haven't made an opinion; I haven't reaped a conclusion.  So we don't even have a disagreement yet.  I'm trying to flesh out what your thinking is.

MR. DAVIS:  We've done several pleas together over the years, and Your Honor knows when my client comes in, they know what the Guidelines are, they know what the

mandatories are, they know what the exposure is.

THE COURT:  Mr. Davis, no one is questioning you and your competence and the way you do business.

MR. DAVIS:  But this man is doing over 20 years when he could be doing less than ten.

THE COURT:  What do you mean, "he could be doing"?

Whoa, whoa.  There's a built-in assumption in there.  There's a huge built-in assumption in there, Mr. Davis.  I mean, it's huge:  That he would have taken the deal.

MR. DAVIS:  Yes.  He told you.  That's the evidence.

THE COURT:  That's not the evidence.

MR. DAVIS:  He testified to it.

THE COURT:  Oh, come on.  That's not the evidence.

MR. DAVIS:  Well, I mean, it's the evidence I presented.  I have the burden.  That's my evidence. Your Honor can reject it.

THE COURT:  I don't believe he even said that.

MR. DAVIS:  Well, he did.  I asked him.  The last question.

THE COURT:  There's no question --

MR. DAVIS:  I sat down, Mr. Katzoff said -- slipped me a note, and I stood up and I said, Your Honor, Mr. Katzoff reminded me, I need to ask a question.  I was

going to ask it after the government crossed him.  But I asked him, would you have taken the plea knowing what you know about the plea bargain now?  And his answer was: "Yes."

I mean, you can reject it, but that's the evidence.

THE COURT:  It's knowing what he knows today after what happened in the Federal Court.

MR. DAVIS:  But you know what he knew back during the relevant time period of February 1st through February 19th, which was nothing.  He knew that he had ADW, 10 years, which, coincidentally, 10 years isn't even mentioned anywhere by the United States.  So that may or may not even be the plea.  We don't even know what the plea was, much less him.

THE COURT:  I pointed that out myself:  Let's call McFadden.

MR. DAVIS:  I doubt very serious -- I don't even --

THE COURT:  Well, he's the one who made the deal.

MR. DAVIS:  Well, Your Honor, that still doesn't --

THE COURT:  We'll get him in here; let's see what he's got to say.

MR. DAVIS:  Well, here's my position on

37

Mr. Knight.

My position is that this all deals with Mr. Knight's understanding of what's offered. That's what -- and my position is that he, according to his testimony, he saw Mr. Iverson on the 31st and had a very heated discussion about getting out. He saw him and he spoke to him for about two minutes at the bench, and that's when he was advised of a plea, as he stated four years ago in writing. And then Mr. Iverson, according to Mr. Knight, said, "I'll be down to see you." And Mr. Iverson never went to see him. Never. So he never knew. And he goes in to court and the plea is taken back. Now, of course, he could stand up and say, wait a minute. But that's not -- in the real world, that's not the way it happens. He doesn't know. It's the attorney's job; we are the ones that navigate through the system with individuals that are caught up in it.

And I'm not -- and you're right. I mean, I don't like bringing it -- I should have sent my wife in, she does these 2255s. I don't like doing them. I don't like attacking fellow members of the Bar.

My personal feeling? If it's relevant, everybody makes mistakes, everybody makes mistakes. It's just the way it is.

This bothers me because I think it goes beyond

38

Mr. Iverson. I think this is an institutional problem. I think individuals, whenever there's any chance they're going to be transferred to Federal Court, there should be something in place so that they are able to be provided proper legal advice as to what the situation is; otherwise, I think the discussion about whether they accept or reject a plea is just not worth engaging in, because I don't think they really had a chance to accept or reject.

The first time --

THE COURT: Mr. Davis, in a situation of this kind, any counsel, if he or she engaged in such a discussion, would have been engaging in such a discussion that would have had built within it a lot of if this happened, if this happened, if this happened, if this happened, then you would be exposed to this, this, this, this, this possibly under the circumstances.

It would take a crystal ball to know whether a defendant in that situation would be willing to take a 10-year-certain sentence.

MR. DAVIS: We don't know that that's the plea.

THE COURT: Mr. Davis, let me finish.

A 10-year-certain sentence, which your client has testified was what he was told, versus a hypothetical possible sentence much longer, if a whole list of "ifs" came to fruition.

39

You need a crystal ball to know the answer to that question, Mr. Davis.  No one knows the answer to that question for certain.

MR. DAVIS:  May I respond, Your Honor?

One, I wouldn't need a crystal ball, I'd need the code, I'd need the Guidelines, both Federal and Superior Court, and I'd need to generate a list, as I did at sentencing, and I would lay out what the penalties are, the Guidelines are, the mandatory minimums.

THE COURT:  You wouldn't --

MR. DAVIS:  And I would do that without a crystal ball.

THE COURT:  Mr. Davis, the most you could tell your client in a situation like that -- you, by your own admission, don't do Superior Court work.

MR. KATZOFF:  Well, I --

THE COURT:  You don't.  You just said a minute ago you don't do Superior Court work.

MR. DAVIS:  I calculated his Guidelines.

THE COURT:  Huh?  You don't do Superior Court work, right?

MR. DAVIS:  I'm not on the panel.

THE COURT:  Why are you fighting your own statement?

MR. DAVIS:  I'm not on the panel there.

THE COURT:  Fine.

So the point is, even if you did do Superior Court work and even if you did hypothetically say to your client in a situation like your client now was in, this could go to Federal Court, but I don't know if it will or it won't because the government hasn't said that it will.  So -- or might possibly go there.

So the most I can say is it's hypothetically possible you could go to the Federal Court.  You might not, but you might, right?

MR. DAVIS:  And the next question would be, what difference does that make?

THE COURT:  Exactly.

MR. DAVIS:  And what would the answer be?

THE COURT:  Right.

The answer would be whatever the answer would be.

MR. DAVIS:  It's much harsher.

THE COURT:  If it goes to Federal Court, here are the Guidelines that apply here, here are the offenses that could apply there, and then you go through that analysis at that point.

But that's still a whole series of "ifs."  It may go, it may not go.  You don't know.

MR. DAVIS:  Well, the problem here is that there was no discussion about anything along those lines.

The first time the record reflects, because Mr. Iverson does not recall -- the first time the record reflects that there's -- is a potential transfer to Federal Court was on February 19th when the plea was pulled back.

And as Mr. Iverson said, he found out abruptly. Maybe he didn't communicate with the prosecutor, I don't know. I do know -- and Your Honor will find out when the other evidence comes in -- I do know that the Public Defender Service lawyer was aware the case was going to Federal Court and he had conversations with his client.

The furthest thing from Mr. Iverson's mind was a transfer to Federal Court. At the time he represented Mr. Knight in this complicated, violent offense, he was primarily a misdemeanor practitioner in Superior Court. The bulk of his practice was misdemeanor. He was not at all familiar with the Federal Court, other than there were harsher sentences over there. And as he said, it's very lenient in Superior Court.

And, honestly, a case like this in Superior Court, six years, that's what you would expect on it. Anybody could tell you. If we swore in the prosecutor and put her on the stand right now, she'd probably tell you six to eight years.

If Mr. Iverson could do it over again, he told you that he would have consulted a federal practitioner had he

42

known this was going to Federal Court.

On January 31st in the email, there's no mention of Federal Court.  On January 31st in the email -- which we don't even know when it was opened -- and Mr. Iverson has no independent recollection, he was testifying based on general practice -- there's no mention of penalties, there's no mention of mandatories, there's no mention of Voluntary Guidelines.

Mr. Knight says there's no discussion of the plea on January 31st.  He's asking Mr. Iverson to get him out.  He's obviously off to a bad start with him.  Mr. Iverson has no memory, really, of the specifics of what was discussed.

THE COURT:  All right.  I got your point.

MR. DAVIS:  On February 1st --

THE COURT:  Mr. Davis, I've heard all I need to hear.

Let's hear from the government.

MS. SATTERFIELD:  Your Honor, I want to begin by reminding the Court that *Strickland* has two prongs, and the first prong is deficiency, and the second prong is prejudice.  And Mr. Davis spent 99 percent of his time talking about the first prong, which is deficiency.

But in a case like this, the second prong, I submit, is the more important prong, and he has failed to prove prejudice.

43

In a situation like this where it's a plea, where I -- had I gotten the advice, I would have taken the plea, the defendant has to show that there's a reasonable probability that he would have taken the plea in the first place.  And so I submit that the record doesn't -- that he hasn't met his burden on either one.

So first I want to talk about the performance issue, the deficiency.  And we both agree, I think the parties both agree that the relevant time period is really a short period.  It's January 31st, the time that that plea offer's communicated by an email, up until January -- I'm sorry, February 19th when the plea offer expires.  So we're looking at that limited time period.  And was Mr. Iverson's performance deficient?  And I submit that the record shows that it was not.

The defendant says --

THE COURT:  Do you agree with Mr. Davis or disagree with him that the defense counsel, Mr. Iverson, did not meet between the 19th of -- excuse me, between the 31st of January and February 19th, with his client, the defendant, Mr. Knight, to review the terms of the plea offer?  Do you agree with him or disagree with him?

MS. SATTERFIELD:  I disagree.

THE COURT:  Okay.  So when did they meet, where did they meet?

44

MS. SATTERFIELD:  So defendant says, I met with Mr. Iverson on January 31st for about 20 minutes, and we didn't talk about the plea.

Mr. Iverson says -- he testifies that he got that email on the 31st.  It got sent at 4:52.  And we know that evening he's at the jail meeting with Mr. Knight.  And he testified -- and his billing records support that and the jail records support that.  On the 31st, he's there, and he testified that he met with him for approximately two hours.

THE COURT:  Right.

MS. SATTERFIELD:  And while he --

MR. DAVIS:  Objection.  I think that mischaracterizes his statements, Your Honor.

THE COURT:  Well, I'm looking at the billing records and it has a two-hour interview time.

MR. DAVIS:  It does, but he testified --

THE COURT:  Well, we're going to get the transcript and it's going to address Mr. Davis's recollection that he said that the two hours included the waiting time -- the travel time and the waiting time, I think he said.

MR. DAVIS:  I don't think the travel.  I think the waiting time.

THE COURT:  The waiting time.

MS. SATTERFIELD:  Right.  But I think he

testified -- and, again, I think we need to get the transcript -- I think he testified that, generally, when he bills for two hours, that time could include waiting time. He didn't have any specific recollection as to whether he needed to wait for Mr. Knight in this case or not.  So he may have met with him for two hours, he may be met with him for an hour and a half, because half an hour was waiting, but he had no independent recollection.

Which kind of goes to my next point, is that he had no independent recollection of the specifics of talking to Mr. Knight about the plea deal.  But he did testify that, generally, that he would -- that when he advised a client about a plea offer, he would talk about the maximum penalties, the Sentencing Guidelines, what charges the government's giving up.

And the evidence that Mr. Iverson talked to Mr. Knight about the plea offer is corroborated, the fact that they actually had a discussion, because of the fact that Mr. Iverson got that email, and then he went straight away to the jail to talk to Mr. Knight.  And I think that corroborates the fact that the reason he's going is because he just got this email and he needs to talk to Mr. Knight about the plea deal.

THE COURT:  So the email he got was on the 31st.

MS. SATTERFIELD:  Correct.

THE COURT: Right.

MS. SATTERFIELD: He goes that night --

THE COURT: He goes that night.

MS. SATTERFIELD: -- to talk to Mr. Knight.

THE COURT: Okay.

MS. SATTERFIELD: And the jail records confirm it, his billing records confirm it.

And although he couldn't remember the specifics, I would submit that he, generally -- he had the email. And Mr. Knight kind of dismisses it. Oh, yeah, we just met for 20 minutes and we just talked about me getting out.

THE COURT: Is there any precedent, of our Circuit Court, anyway, or even my colleagues in the District Court, in a situation like this where the Court says, it's not enough that the lawyer, in this kind of situation, has a general recollection -- no specific recollection, but just a general recollection of, here's how I normally do things, he has to have, or she has to have, a specific recollection of saying certain such things and going over certain things, under the circumstances. Is that required by our Circuit Court?

MS. SATTERFIELD: I would say no.

And just based on my experience, I've done these types of hearings in Superior Court, and oftentimes, I think it's more credible when a lawyer says, "Gosh, I don't

47

remember, this happened four years ago, I have no idea what I said to him, what he said to me."  I think it's more credible for him to just have a general recollection.

THE COURT:  Right.

MS. SATTERFIELD:  And I've, in fact, had lawyers testify just based on their practice, because they do this all the time.

THE COURT:  Exactly.

MS. SATTERFIELD:  So practice evidence is accepted, I will say, and courts will credit it.  I don't know if there's a case that says that --

THE COURT:  Right.

MS. SATTERFIELD:  -- but often --

THE COURT:  Well, it makes common sense.

MS. SATTERFIELD:  Oftentimes, we just have to rely on, well, what's your normal practice?  My normal practice would have been, I would have talked to him about it.

And I think the facts show -- so we get the email and then -- the email itself doesn't reflect possible federal charges.  But remember, Mr. --

THE COURT:  It doesn't even reflect the 10 years.

MS. SATTERFIELD:  No.  And I think I can talk -- I think that 10 years --

THE COURT:  Where's that coming from?

MS. SATTERFIELD:  Well, because ADW, the maximum

48

sentence for an ADW is 10 years.  I think the Court could just take judicial note.  No one testified to that.  But I think that's where that -- that's Mr. Knight's number.  Mr. Iverson never said anything about 10 years.

Remember, Mr. Knight said, yeah, I was standing at the table and he said 10 years.  But Mr. Iverson never said anything about that.  So the 10 years is coming from Mr. Knight, and it's not corroborated.  But it makes sense.  I mean, I understand where that's coming from, because that's the maximum for ADW.

So Mr. Iverson acknowledged that he -- that all those different charges in the plea offer, it doesn't mean that -- remember he said, oh, the government can take it across the street, that's the lingo they use.  You know, they could take it across the street.

And he admitted he's not a Federal Court practitioner, but he understood that some of those charges -- and the Court actually -- I asked him about one charge, the felon-in-possession charge, but the Court asked him about all the other charges, and he admitted to just having a general knowledge --

THE COURT:  Yeah.

MS. SATTERFIELD:  -- that these charges could go either way.

And so, in addition, the Superior Court charges

WilliamPZaremba@gmail.com

49

alone are pretty serious.

THE COURT:  Yeah.  I obviously haven't run the Guidelines on the Superior Court Guidelines on kidnapping while armed, obstruction of justice, ADW, and felon in possession, but they've got to total way more than 10 years.

MS. SATTERFIELD:  Right.

And the Court actually sent -- his 23-year sentence, I believe 110 months is the federal charge.  The rest of it's all Superior Court charges.  So what's 110 months?  I can't even do the math.

THE COURT:  It's less than 10 years, because 10 years is 120.

MS. SATTERFIELD:  Less than 10 years.  So 13 more years is all devoted to the Superior Court charges.

In this case, the lead charge -- there's only one federal charge, and the rest are Superior Court charges.

THE COURT:  Right.

MS. SATTERFIELD:  So I think there's further evidence that Mr. Iverson talked to Mr. Knight about that plea offer, because the next day they go to court, February 1st, and there's this very quick status hearing. The government puts the plea offer on the record.  And it's clear, from the context, that everybody needs more time. They need more time.  The plea offer just came through the night before, and everyone says, okay, let's just continue

it until the 19th. And so that goes on.

And I think from that, then we're sort of done with Mr. Iverson and his performance issues, because I think the next thing -- the next step is, would this defendant have taken this plea offer anyway? And I submit to you that there's just no way.

He sat here yesterday, as we expected he would, and said, well, yes, I'm doing 23 years now. Of course I would have taken that sweet deal. It was a sweet deal. But he didn't take it.

And the evidence --

THE COURT: I can assure you, having seen the evidence, in a two-plus-week trial, that was a sweet deal.

MS. SATTERFIELD: It was incredibly sweet --

THE COURT: Incredibly sweet.

MS. SATTERFIELD: -- because, actually, under the Guidelines at the time, the Superior Court Guidelines, he would have only done three or four years, three to five years or so.

THE COURT: What was McFadden thinking?

MS. SATTERFIELD: Well, I don't know about that.

THE COURT: Well, we might have to have McFadden come and talk to us.

MS. SATTERFIELD: So I think, though, the evidence shows, in fact, that this defendant was not inclined to take

51

any deal.

And so -- and *Strickland*, you know, getting back to the case law, warns about the distorting effects of hindsight.  I mean, it's easy to sit here now and say, of course I would have done that.

But I think the relevant time period is, would this defendant, between January 31st and February 19th, have taken that deal?  And I would say emphatically not, because remember at the February 1st status hearing, the defendant says he told Mr. Iverson, you know, what are they asking for?  ADW, 10 years.  And then remember he says, "I told him I'm not copping to that shit."  I mean, he was like, "Let's go forward, I want to get out."

THE COURT:  Now, Mr. Davis is arguing to this Court, at least I think he is, I don't think he's willing to concede this, that a defense counsel has an obligation in a situation of that kind to try to educate and dissuade his client from rejecting a plea agreement that, in his judgment, is favorable.

MS. SATTERFIELD:  I mean, I don't think --

THE COURT:  Is there any case anywhere or any Bar Counsel opinion --

MS. SATTERFIELD:  I don't think so.

THE COURT:  -- that says that?

MS. SATTERFIELD:  I would say no.

52

I mean, this client is like, I am -- let's just move.  My wife just had a baby.

His main concern at both of these status hearings is, "I want to get out."  Even talked about, he says, he had ideas, halfway house, ankle bracelet.  He said something -- bond.  He wanted to get out.  He wasn't thinking about plea deals.  And so I think that goes to the fact that he wasn't inclined to accept it anyway.

And then we get to the 19th, where the government puts the plea offer on the record and then says, "but I understand both defendants are rejecting it."

Then we have Thorpe's attorney getting up and saying, "Well, they're wired, and the other guy is not going to take it."

And then we have Mr. Iverson silent.

And then we did have Mr. Iverson explain that his silence meant he was acquiescing to the fact that the plea offer was being rejected at that time.

Mr. Knight -- and I asked him a question, I said, "Well, you heard the prosecutor say the plea offer is being rejected by you, and you didn't nudge Mr. Iverson or you didn't say, hey, what's going on here."  And Mr. Iverson confirmed that.  He said, you know, "He never interrupted," he never said, "I need more time."

And then Mr. Iverson was very confident, and he

53

did say, "If my client had said, 'hey, hold the phone, I need more time, I didn't reject that offer, I don't know what she's talking about,'" because that's where federal charges start getting mentioned, that didn't happen.

And so I think it goes back -- now we go back to the crime itself. And one of the things I was trying to show here was that the defendant picked his victim Edmond Peters, a known drug dealer. He admitted he was going to go rob him because he knew he probably had drugs and money, and Mr. Knight needed both.

So then Mr. Knight says -- and I submit this just isn't credible -- he says, "I know Mr. Peters." I forget what he said. He said he was like a good guy or something, and I think he would cooperate with the government. And I submit that that just doesn't make sense.

THE COURT: I thought he said that he wouldn't cooperate with the government.

MS. SATTERFIELD: I thought he said that he would cooperate.

Because I asked him, well, you picked a drug dealer, because you knew a drug dealer is not going to go to the police and say, hey, someone just robbed me of my drugs and money.

I mean, that's common sense. Pick a drug dealer because they're not going to report it. But he said -- and

I think this is just -- I thought he said, "oh, no, he --"

THE COURT:  We'll check the transcript, don't worry.

MR. DAVIS:  That's my recollection also, Your Honor, the he did say that.

MS. SATTERFIELD:  I think that he said that he was a good guy, something like that.

MR. DAVIS:  No.  He said that he knew what type of person he was.  So he'd figure he'd cut a deal, which is what he did.

MS. SATTERFIELD:  Well, no, he didn't say that. He would cooperate, meaning he would testify against him.

THE COURT:  No.  You're right.  I'm looking at my notes.  I knew he, Peters, would cooperate with the government.  That's what my notes are.

MS. SATTERFIELD:  Right.

And I'd say that that just doesn't make sense.

I mean, I think what really is going on here is that he never believed that Peters would come in and testify against him.  And even Mr. Iverson corroborated that, and he said, "Mr. Knight was hopeful" -- I think he used that word "hopeful" -- "that Peters would not testify."

And so the main concern, you know, was that he wanted to get out.  He was upset with Mr. Iverson for not pushing that.  He wasn't in the frame of mind where he

55

wanted to even think about a plea offer.

And then I think there's some other facts that are critical to the fact that he wasn't interested in taking a plea.  And I know these happen after February 19th.

But there are a couple of things, and I think they corroborate.  Mr. Iverson never asked for any pre-preliminary hearing discovery.  And I think -- remember he explained, that's very unusual.  But sometimes when you want to get more information to talk to your client about a plea, you might go to the government and say, hey, all I've got is a Gerstein, which is what he had here, can you give me something more so I can go to my client and talk about it.

THE COURT:  Exactly.

MS. SATTERFIELD:  And he said, you know, I didn't do that because my client wasn't interested.

And then -- let's see.

And then the other thing that, after the plea offer expired on the 19th, Mr. Iverson also said that, "I never went back to the government to see if they would open it up again, because I knew my client wasn't interested."  I mean, he certainly could have made a phone call the next day, saying, hey, can we just talk about this again?  I haven't had enough time with my client, or he's being a little stubborn or whatever.

I mean, that -- I mean, I've been a defense attorney for five years as well, and I understand that sometimes clients need a little bit more time.  And sometimes you can go to the government and say, hey, if I could just have a little bit more time, you know, I think he could come around.

But that never happened.  And Mr. Iverson wasn't getting the signal from his client that he should even bother with things like that.

And then this is sort of a fine point.  And even when he comes to Federal Court, both clients reject a plea offer over here.

THE COURT:  Yeah.  He got a plea offer in Federal Court.  I don't remember what the terms of it were, but I know he got one and I know he rejected it.

MS. SATTERFIELD:  Right.

And it's stated on the record at one of those status hearings, and I can point the Court to that at some point.

So all in all, I think the defendant has not met his burden of proving that he would have taken the plea offer in that time period, because -- and just my three main points is -- his main concern during that time period is, "Get me out of jail," his own statement saying, "I'm not copping to shit," and then the fact that the complainant was

a drug dealer and he was hopeful that he would not cooperate with the government.  And so those are my main points.

THE COURT:  All right.

MR. KATZOFF:  Your Honor, may I just address the legal point without getting into the facts?

THE COURT:  No.  You're going to get a chance to make all your arguments --

MR. KATZOFF:  Okay.

THE COURT:  -- when we get your evidence.  So we've already beat this horse for a long time here --

MR. DAVIS:  I have a --

THE COURT:  -- an hour and a half.

MR. DAVIS:  Since I have the burden, Your Honor, can I put a case on record and just say why I think it applies?

THE COURT:  You can file a supplemental memorandum in support of your position, if you want, put it on the record that way.  I'm not hearing any more argument today. We've been at this a long time.

Plus, there's going to be more argument later on. You're going to get to argue again once we get the evidence relating to Mr. Thorpe.  So save your ammunition.

MR. DAVIS:  Should I order the transcript of these proceedings in advance of that hearing?  I hate to do it. It's $556, I think.

58

THE COURT:  Well, you're court appointed, you're not paying for it.

MR. DAVIS:  I was also a budget attorney for defender services for eight years, all I did was crunch numbers for them.  I'm always hesitant to spend money.

THE COURT:  Don't worry, you're not spending your money, trust me, or your client's.

MR. DAVIS:  I'll order it expedited.

THE COURT:  So just go ahead.

MR. DAVIS:  Thank you, Your Honor.

THE COURT:  So I need to know from you, after your client's situation gets stabilized, medically speaking --

MR. KATZOFF:  Yes, sir.

THE COURT:  -- what dates will work for you.

So I'll wait to hear.  Make sure whatever communication you send, a copy goes to the government, a copy goes to Mr. Knight's counsel, Mr. Davis.  And then we'll pick a date that works for everyone's schedule and we'll have a hearing of -- who's the defense counsel again?

MR. KATZOFF:  David Knight.

THE COURT:  Oh, yeah, that's right.

MS. SATTERFIELD:  The attorney.

MR. DAVIS:  And he talks more than I do, Your Honor.

THE COURT:  So we'll have Knight.

59

And then, Ms. Satterfield, you should talk to this McFadden person, and we might need to have him to find out where this 10-year thing is coming from, to see if he's the one who raised it.  So give him a heads-up that he might be called.

MS. SATTERFIELD:  I don't think he's in our office anymore.

THE COURT:  Oh, he's at Main Justice.  He's a Deputy Assistant Attorney General, you can reach him.

MS. SATTERFIELD:  Okay.

THE COURT:  You know how to find him.

MS. SATTERFIELD:  I can find him.

THE COURT:  He's not hiding.

MR. KATZOFF:  Your Honor, I'm out of town on a business trip --

THE COURT:  I couldn't her you.

MR. KATZOFF:  I'm out of town on a business trip from May 31st to June 7th.

THE COURT:  That's a good trip.

MR. KATZOFF:  Yeah.

THE COURT:  I hope it's a nice place.

MR. KATZOFF:  It's actually way too much travel in way too little time.

THE COURT:  Well, we're not going to do it by then.  So wait till you get back.

60

MR. KATZOFF:  I'll check then and then at that point I'll talk to the parties.

THE COURT:  Yeah.  I mean, we'll just do it later in June.

MR. KATZOFF:  Exactly.  But I wanted to alert the Court that I'm going to be out of the mix for a little bit.

THE COURT:  Not a problem.

MR. KATZOFF:  Thank you.

THE COURT:  Take care of your back.

MR. KATZOFF:  Appreciate it.  It's feeling it today from stepping up the pace.

DEPUTY CLERK:  All rise.

THE COURT:  Have a good day, Counsel.

DEPUTY CLERK:  This Honorable Court will stand in recess until the return of court.

(Proceedings concluded at 12:55 p.m.)

61

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: June 6, 2017_____        /S/__William P. Zaremba_____

                              William P. Zaremba, RMR, CRR

WilliamPZaremba@gmail.com