**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | )  **Case No. 1:13-cr-00131-RJL** |
| | ) |
| **MELVIN KNIGHT** | ) |
| **AARON THORPE** | ) |

### GOVERNMENT'S RESPONSE TO THE DEFENDANTS' CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Response to the defendants' claims of ineffective assistance of counsel.  This matter is before the Court on remand from the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") for resolution of the defendants' claims of ineffective assistance of counsel that they raised for the first time on appeal.  Specifically, the defendants allege that their attorneys, in a prior and separate proceeding in the Superior Court of the District of Columbia ("Superior Court"), provided ineffective assistance during plea negotiations.  This Court conducted an evidentiary hearing on May 24 and 25, and September 20, 2017.  For the reasons set forth below, the defendants have not carried their burden of proving that they are entitled to relief in this matter.  Therefore, the Court should summarily deny their claims.

### I.    PROCEDURAL BACKGROUND

On January 28, 2013, the defendants were arrested in the District of Columbia.  The next day, January 29, 2013, both defendants were presented in Superior Court and charged with one count of armed kidnapping, in violation of D.C. Code §§ 22-2001, -4502.  Defendant Knight was represented by Frederick Iverson, Esquire ("Attorney Iverson"), while defendant Thorpe was

represented by David Knight, Esquire ("Attorney Knight"). The Superior Court held a status hearing on February 1, 2013, and conducted a preliminary hearing on February 19, 2013.

Less than three months later, on May 7, 2013, a federal grand jury charged both defendants with the federal offense of unlawful possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). The remaining charges in the indictment were D.C. Code offenses: one count of conspiracy, in violation of D.C. Code § 22-1805a; one count of assault with a dangerous weapon ("ADW"), in violation of D.C. Code § 22-402; two counts of armed kidnapping, in violation of D.C. Code §§ 22-2001, -4502; one count of first-degree burglary while armed, in violation of D.C. Code §§ 22-801(a), -4502; two counts of possession of a firearm during a crime of violence or dangerous crime, in violation of D.C. Code § 22-4504(b); and one count of obstruction of justice, in violation of D.C. Code § 22-722(a)(3)(B). The defendants were arraigned in federal court on May 9, 2013.

Trial by jury began before this Court on July 22, 2013. On July 31, 2013, the jury convicted the defendants of all counts. On March 10, 2014, the Court sentenced defendant Thorpe to a total of 300 months' incarceration, with five years of supervised release; and sentenced defendant Knight to 268 months' incarceration, with five years of supervised release. The defendants filed timely notices of appeal.

On appeal, the D.C. Circuit affirmed the defendants' convictions in all respects, but remanded the case to this Court for resolution of the defendants' claims of ineffective assistance of counsel. United States v. Melvin Knight, 824 F.3d 1105 (D.C. Cir. 2016). The D.C. Circuit concluded that the defendants' constitutional claims were "colorable," but "not that they have demonstrated ineffective assistance." Id. at 1113. Consequently, this Court conducted an evidentiary hearing.

## II.    **FACTUAL BACKGROUND**

### A.    **Superior Court Proceedings**

On January 29, 2013, the defendants were each charged in Superior Court with one count of armed kidnapping, in violation of D.C. Code §§ 22-2001, -4502. United States v. Melvin Knight, 2013-CF3-1476; United States v. Aaron Thorpe, 2013-CF3-1473. Attorney Frederick Iverson was appointed to represent defendant Knight, while Attorney David Knight was appointed to represent defendant Thorpe. Both defendants were held without bond pending a preliminary hearing scheduled for February 1, 2013.

At the February 1, 2013 hearing, the Honorable Robert Richter continued the preliminary hearing until February 19, 2013, at the request of the parties. 2/1/13 Transcript, Government's Motions Hearing Exhibit 1. During that hearing, Assistant United States Attorney ("AUSA") Trevor McFadden put the terms of the government's pre-indictment plea offer on the record, stating that the government had "extended a plea offer to one count of Assault With A Deadly [sic] Weapon to both defendants. They face two counts of Armed Kidnapping, two counts of Possession of a Firearm During a Crime Of [V]iolence, a second count of Assault With A Deadly [sic] Weapon, and Obstruction counts" (Id.). This plea offer had been communicated by AUSA McFadden via email to Attorneys Iverson and Knight on the previous day. January 31, 2013 Email, Government's Motions Hearing Exhibit 3.

Before the preliminary hearing commenced before Magistrate Judge Frederick Sullivan on February 19, 2013, AUSA Britten Shaw put on the record that the defendants had rejected the government's pre-indictment plea offer:

> Your Honor, before we get started, I just wanted to place on the record that we had extended a pre-indictment plea offer in this case to each defendant of the charge of assault with a dangerous weapon, gun. In exchange for that, we would not indict or pursue the

greater charges which included but are not limited to kidnapping while armed, possession of a firearm during a crime of violence, obstruction of justice, felony [sic] possession, as well as potential District Court charges in this case. It's my understanding that both defendants have rejected that plea offer. And I would say that there will be no further plea offers at this time.

2/19/13 Transcript, Government's Motions Hearing Exhibit 2, at 2-3.

The following exchange then transpired between the Court and Attorney Knight, counsel for defendant Thorpe:

> THE COURT: Mr. Knight, is that correct?
>
> MR. KNIGHT: It is correct that a plea offer –
>
> THE COURT: Was made.
>
> MR. KNIGHT: -- was extended.
>
> THE COURT: All right.
>
> MR. KNIGHT: The plea offer was offered. Mr. Thorpe neither said he was taking it nor not taking me [sic]. I believe the codefendant spoke first and said he was not. And they're wired.
>
> THE COURT: Mr. Thorpe and Mr. Melvin Knight, [the] Court doesn't get involved in this business, all right? We don't single you out in any way. This happens in every case. And however it works out, it's none of my business, none of the Court's business. No one's trying to put any pressure on anybody, I'll tell you that. You just do what's best for you, all right? Make your decisions based on that. Okay, let's have a hearing.

Id., at 3. The preliminary hearing commenced and, at the conclusion, the Court found probable cause and held the defendants without bond pending trial. Id. at 96-98.[1]

---

[1] At a March 27, 2013, status hearing, the Superior Court cases were set for trial on May 15, 2013.

On May 7, 2013, a federal grand jury returned the indictment in the instant case. As a result, the defendants' Superior Court cases were dismissed on May 10, 2013. The defendants were arraigned on the federal charges on May 9, 2013, and new counsel were appointed to represent them.[2] At a June 4, 2013, status hearing before this Court, AUSA Emory Cole represented that he had "talked to defense counsel in this case. It appears that the defendants are not amenable to even discussing a non[-]trial disposition. . . . the defendants have indicated they want to go to trial" (6/4/13 Tr. 4). Neither defense counsel said anything to refute this.

**B.    Trial in Federal Court**

Trial in this case began before this Court on July 22, 2013. The government's evidence established that around midnight on January 28, 2013, Tamika Yourse was in the front bedroom of her home at 6413 Kansas Avenue, N.E., when she heard a gunshot (7/23/13 Tr. 96, 97, 103-04). Yourse looked out her front window, did not see anything, then looked out her back window and saw two men, one of whom had a gun and was wearing a sweatshirt with the word "POLICE" written across the front, fighting with her neighbor, Edmund Peters (7/23/13 Tr. 105-06). The men appeared to be trying to drag Peters into Peters' apartment, which was located in a garage at the rear of Yourse's property (7/23/13 Tr. 101-03, 107). Concerned for Peters' safety, Yourse called 911 (7/23/13 Tr. 106).

Initially, the police dispatcher issued a call for a robbery in progress, which was then upgraded to a call for an officer in distress (7/23/13 Tr. 133). At least seven Metropolitan Police Department ("MPD") officers immediately responded to the location and surrounded the garage while a sergeant banged on the apartment's door and yelled, "police" (7/24/13 Tr. 74). When the

---

[2]    Shawn Moore, Esquire, was appointed to represent defendant Knight, while Joseph Conte, Esquire, was appointed to represent defendant Thorpe.

dispatcher's call was changed to officer in distress, Lieutenant Shane Lamond—who was MPD's highest-ranking official in that police district on duty at the time—went to the scene (7/23/13 Tr. 133). Lt. Lamond ordered Peters' apartment to be barricaded, so that no one could enter or leave; closed off the 6400 block of Kansas Avenue; and called for the Emergency Response Team (7/23/13 Tr. 135-36). Eventually, at least twenty MPD officers arrived at the location (7/23/13 Tr. 112).

After several hours, as members of the Emergency Response Team were still gathering (7/23/13 Tr. 137), Peters and defendant Thorpe left the apartment together (7/24/13 Tr. 76-77, 137). They were immediately taken into custody (7/24/13 Tr. 76-77). Officers then announced themselves and entered the apartment (7/24/13 Tr. 77). In response to defendant Knight calling out, "we are upstairs," the officers went up the stairs, where they found defendant Knight and Lutitia Fortune (the other kidnapping victim), who were also taken into custody (7/24/13 Tr. 77, 79, 137).

At the police station, Fortune told the police what had happened that night: that she and Peters had been attacked by two men (one of whom she recognized as defendant Knight, her niece's godfather), tied up, taken into Peters' apartment, threatened, held for several hours, and instructed to lie to the police (7/24/13 Tr. 8-11, 16-17, 21-25, 27-28).

In addition to the testimony from Yourse, Fortune, and several MPD officers, the government also introduced testimony from Peters, the other kidnapping victim. Among other things, Peters testified that, on January 28, 2013, he was with Fortune outside his apartment when they were approached by two men wearing masks and t-shirts that said "POLICE" (7/24/13 Tr. 94-95). The men told Peters and Fortune to face the wall, then put plastic zip ties on their wrists (7/24/13 Tr. 95-97). Peters' hands were not entirely tied, and he started struggling with one of the

men—defendant Knight—at which point a gun went off (7/24/13 Tr. 97, 120).  Defendant Thorpe came over and hit Peters in the face, once with his hand and another time with a gun (7/24/13 Tr. 97-98, 122).  The defendants then took Peters' keys, opened the door to his apartment, and took him and Fortune inside (7/24/13 Tr. 102).

Once inside, the defendants used duct tape to bind Peters' and Fortune's ankles and mouths (7/24/13 Tr. 104-05).  Defendant Knight assaulted Peters again when he attempted to reach for defendant Knight's gun (7/24/13 Tr. 105-06), then asked Peters "where the shit was . . . and then he said something about we leave no witnesses" (7/24/13 Tr. 111).  At some point during this time, Peters heard the police knock on the door, and defendant Thorpe put a pillow case over Peters' head (7/24/13 Tr. 106, 112, 114).  The defendants began rummaging through Peters' apartment, going through cabinets and opening doors (7/24/13 Tr. 118).  After some time, the defendants removed the pillow case from Peters' head and spoke to him with their masks off, at which point Peters recognized defendant Knight, whom he had known since he was a child (7/24/13 Tr. 120-21).  The defendants then cut the tape off Peters' ankles, took the tape off his mouth, and told him "a story to tell [the police] and then . . . told me to go upstairs and clean my face off" (7/24/13 Tr. 123-24).  Approximately 30 to 40 minutes later, Peters and defendant Thorpe left the apartment and were detained by the police (7/24/13 Tr. 130-31).

Peters refused to allow the police to search his apartment because he had drugs and two guns inside (7/24/13 Tr. 140-41).[3]  MPD officers therefore obtained a search warrant and subsequently searched the house (7/23/13 Tr. 140).  Among other things, officers recovered a cartridge casing from outside the apartment, a bullet from the frame of the apartment's first floor

---

3    Mr. Peters ultimately entered a cooperation plea agreement in which he pled guilty to several federal gun and drug charges (7/24/13 Tr. 186-94).

bathroom, numerous rolls of duct tape, cable ties and broken cable ties, and four handguns (7/25/13 Tr. 121, 129-130, 140, 149, 153, 157).

The defendants presented no evidence.

### C.      The Post-Conviction Evidentiary Hearing

#### 1.      The Testimony of Defendant Melvin Knight

Defendant Knight testified that after he was arrested on January 28, 2013, he appeared in Superior Court where Attorney Iverson was appointed to represent him (5/24/17 Tr. 15-17, 51). Attorney Iverson visited him at the D.C. Jail on the evening of January 31, 2013, "late that evening, around 11:00 or a little bit after" for "close to 20 minutes" (5/24/17 Tr. 16, 53). They discussed the preliminary hearing scheduled for the next day and the possibility of defendant Knight "getting some type release" (5/24/17 Tr. 17). Because getting released was defendant Knight's "whole focus," he asked Attorney Iverson "about a halfway house, some type of bond or ankle bracelet, even PR possibly on the charges that [he] was facing" (id.). According to defendant Knight, "[t]hat's all [they] talked about" (id.). On cross-examination, defendant Knight admitted that he also spoke to Attorney Iverson about the fact that he was on supervised release in a federal case and he voiced his concern that his supervision could be revoked (5/24/17 Tr. 53-54).

The next day, defendant Knight saw Attorney Iverson in Superior Court (5/24/17 Tr. 54)). Attorney Iverson told him "the case was going to be postponed" (5/24/17 Tr. 18). Defendant Knight was "upset" because he was "trying to get released," his wife was "about to have [his] son," and he was "trying to get home" (id.). Defendant Knight told him to "push forward," but "[Attorney Iverson] didn't" (id.). As they were standing at the table in the courtroom, according to defendant Knight, Attorney Iverson told him, "just hold up, calm down" and "I got a plea to ADW," which Attorney Iverson explained was a charge of assault with a dangerous or deadly weapon (5/24/17 Tr. 18-19). Defendant Knight asked, "how much time do they want for that?," to which Attorney Iverson responded, "Ten years" (5/24/17 Tr. 19, 56). Defendant Knight told Attorney Iverson, "I've been locked up for three days, I'm not copping to that shit," Iverson told

9

him that he would come to the jail to discuss it further, and that was the "end of the discussion" (5/24/17 Tr. 19, 56-57).  This discussion took place at the defense table in the courtroom and "wasn't the whole time" of the time devoted to the hearing (5/24/17 Tr. 21).  Attorney Iverson did not discuss with defendant Knight the maximum or minimum penalties, the Superior Court Sentencing Guidelines or other potential charges during that brief status hearing (5/24/17 Tr. 19-20).  According to defendant Knight, the prosecutor mentioned other offenses that were "different from what [his] attorney told him" (5/24/17 Tr. 22-24).

The next time defendant Knight saw Attorney Iverson was on February 19, 2013, in Superior Court (5/24/17 Tr. 24).  Attorney Iverson "came into the back. . . right behind the courtroom in holding cell" and asked whether defendant Knight would "agree to another postponement" (5/24/17 Tr. 25).  Defendant Knight told Attorney Iverson that he "didn't agree to the first one and that he didn't come up to the jail to see [him] during the last postponement," that he would not agree to it and wanted to "move forward" (id.).  Defendant Knight was "upset" because the "only thing [he] wanted to do was see [his] wife have [his] son" (id.).  During this hearing, defendant Knight understood that "the plea was taken off the table" because he heard the prosecutor state on the record that the defendants had rejected the plea offer (5/24/17 Tr. 27, 58-59).  According to defendant Knight, this was the first time he heard that there were potential federal court charges (5/24/17 Tr. 27).  He explained that he did not tell Attorney Iverson that he wanted to accept the deal because he "[didn't] know if the lady [was] telling the truth" and because "Mr. Iverson never brought plea deal to [him] of that magnitude" (5/24/17 Tr. 58-59).  He admitted that he did not ask Attorney Iverson to get more time to think about the plea offer (5/24/17 Tr. 59).

After that, the preliminary hearing took place (id.).  Defendant Knight testified that again, at this point, he just wanted to be released so that he could see his son (5/24/17 Tr. 60).  He also wanted Attorney Iverson to "move forward" to "see where the case was going" (id.).

In May of 2013, defendant Knight wrote a letter to D.C. Bar Counsel complaining that Attorney Iverson "tried to fast-talk [him] on a plea deal in D.C. Superior Court, in open court" and that he only saw Attorney Iverson in court on February 1 and 19, 2013, and not between those dates (5/24/17 Tr. 30-31).  Defendant Knight's Motions Hearing Exhibit 1, May 2013 Letter to Bar Counsel.  Defendant Knight explained that he wrote the letter because he wanted Attorney Iverson to interview the female complainant and Peters (5/24/17 Tr. 62-63).  He further explained that he "wanted [Attorney Iverson] to do things" and that he "want[ed] to know things about [his] case" (5/24/17 Tr. 63).  Defendant Knight was unsure whether he wrote the letter before or after he was indicted in federal court (5/14/17 Tr. 64).[4]

In the letter, which was introduced into evidence at the post-trial hearing, defendant Knight reported to Bar Counsel, among other things, that Attorney Iverson: 1) did not "push forward" at the February 1, 2013, court hearing; 2) he did not speak to defendant Knight  until they went to court again on February 19, 2013; 3) he had not interviewed the female complainant mentioned in the Gerstein; 4) he had not filed anything in defendant Knight's prior district court case;  5) he dropped off discovery on April 5, 2013, but only stayed for five minutes and did not answer any of defendant Knight's questions; and, 6) he did not "say a single word on [his] behalf or did not "open his mouth" in court.  See Defendant Knight's Motions Hearing Exhibit 1, May 2013 Letter to Bar Counsel.

---

[4]   In fact, the letter is dated May 15, 2013, which is after the federal court indictment was returned on May 9, 2013.  Attorney Iverson testified at the evidentiary hearing that he was unaware that defendant Knight had sent a letter to Bar Counsel and that he had never seen a copy of the letter (5/24/17 Tr. 148).

At the conclusion of his direct examination, defendant Knight testified that he would have taken the plea offer extended to him in Superior Court (5/24/17 Tr. 40).

On cross-examination, defendant Knight testified that he and defendant Thorpe "did time together" in federal prison (5/24/17 Tr. 43-44). Before he was arrested in Washington, D.C., defendant Knight was living in Illinois and was on supervised release in a D.C. federal case (5/24/17 Tr. 41-42). He did not get permission from his supervision officer to travel to Washington, D.C. (5/24/17 Tr. 42).

On January 28, 2013, while in Washington, D.C., defendant Knight got together with defendant Thorpe and they went to see Edmond Peters (5/24/17 Tr. 45). Defendant Knight had known Peters "for a while" and was "aware" that he sold drugs (5/24/17 Tr. 46). He admitted that he and defendant Thorpe went to Peters' house on that night to rob Peters of drugs and money (5/24/17 Tr. 50). While defendant Knight agreed that he was shocked when he was indicted in federal court, he had known Peters "for a while," he knew "what type of man he is," and he knew Peters would "cooperate with the government" (5/24/17 Tr. 65). Defendant Knight also testified that he rejected another government plea offer extended to him in the federal court case (5/24/17 Tr. 65-66).

### 2.      The Testimony of the D.C. Jail's Custodian of Records

Jennifer Postell, Custodian of Records at the D.C. Jail, testified about defendant Knight's legal visit logs. Defendant Knight's Motions Hearing Exhibit 2. Postell explained, "when the attorney enters the facility, they fill out a legal visit form" to visit an inmate (5/24/17 Tr. 73). That information is "entered into [the] system with the date and time in which they came in" (id.). When the legal visit ends, the attorney "will give the form back to the officer at [the] staff entrance when they're leaving so that they can log the visit out" (id.). According to the records relating to

12

Attorney Iverson, his entry time was 21:56 on January 31, 2013, but the visit did not end until February 1, 2013 at 15:50 (5/24/17 Tr. 74). Postell explained that if the attorney does not hand back the sheet, the "computer will automatically kick the visit out after 24 hours" (5/24/17 Tr. 74). Finally, the D.C. Jail's computerized records do not show whether an attorney was unable to visit an inmate who the attorney had signed up to see (5/24/17 Tr. 75).

### 3. The Testimony of Attorney Frederick Iverson

After becoming a barred attorney in 1994, Attorney Frederick Iverson began his law practice as a criminal defense attorney in Washington, D.C. in 1998 (5/24/17 Tr. 80). His practice was "exclusively" court-appointed cases in Superior Court (5/24/17 Tr. 81). He handled a "mixture" of felony and misdemeanor cases, including homicides (id.). He estimated that he handled "between 80 to 100-plus" cases a year, between three and five jury trials a year, and "hundreds" of guilty pleas (5/24/17 Tr. 82).

Attorney Iverson recalled representing defendant Knight in his Superior Court case (5/24/17 Tr. 83). They first met at defendant Knight's presentment in Courtroom C-10 in Superior Court (id.). Attorney Iverson testified that a presentment hearing usually lasts "five minutes, six minutes" (5/24/17 Tr. 84). Attorney Iverson explained that before Courtroom C-10 begins, a defense attorney is able to:

> Talk to [his client] briefly. Tell them what they have been charged with. You're basically introducing yourself, telling them about the process, you're going to try to get them out, whether you believe, based on the charges, they'll probably be held, what the next stop will be as far as them coming to court for a preliminary hearing, things of that nature, find out if they have any family in the audience, or who you're going to be contacting. But that's pretty much what goes on at that point.

(5/24/17 Tr. 85).

After defendant Knight's presentment, Attorney Iverson met with defendant Knight "several times" at the D.C. Jail (5/24/17 Tr. 88).[5]  While Attorney Iverson had a recollection of "the facts of the case," he did not have any particular recollection "from meeting to meeting, this is what we talked about on this date, this is what we talked about on this date" (5/24/17 Tr. 91).[6] "From the beginning, [he and defendant Knight] were discussing the evidence," which came, in part, from the government in the form of "a sworn affidavit, which is a Gerstein" (id.).

On January 31, 2013, Attorney Iverson visited defendant Knight at the D.C. Jail and discussed the government's plea offer that had been sent to him via email by AUSA McFadden earlier that day (5/24/17 Tr. 91-92, 100).  While Attorney Iverson could not recall exactly what he discussed with defendant Knight, he testified that his general practice, when discussing a plea offer with a client, was to discuss the charge, the "possible" and "maximum" penalties, "whether the government has indicated its allocution, placed any limits on itself, the Voluntary Sentencing Guidelines and to "give the client a sense of if they accept this plea, this is what you can expect" (5/24/17 Tr. 101-02, 132).  While Attorney Iverson did not have "an independent recollection from 2013 of sitting down with [defendant Knight]," he had "some recollection of some conversations with him about the case as – what he told [him] about the case, going over some of the strengths and weaknesses about the evidence what [they] expected the evidence to be at trial, talking to [him] about some of the weaknesses in defenses, what [he] thought would be the strength of the

---

[5]  Attorney Iverson's billing records showed that he met with defendant Knight at the D.C. Jail on January 31, 2013, and that he met with him at the courthouse on February 1 and 19, 2013 (5/24/17 Tr. 97-98).  He also met with defendant Knight on several other occasions at the D.C. Jail and the courthouse, including March 22 and 26, 2013, April 5, 13 and 22, 2013, and May 7, 2013 (5/24/17 Tr. 98-99).  Attorney Iverson testified that his billing records were accurate (5/24/17 Tr. 100).

[6]  Attorney Iverson explained that he suffered a brain injury in 2004 as a result of a motorcycle accident and that there were instances when his memory was "affected" (5/24/17 Tr. 150-51).

government's case, why [he] thought [they] wouldn't prevail on certain issues" (5/24/17 Tr. 100-01).  Attorney Iverson also recalled that the government's plea offer in the Superior Court case was wired and he "seem[ed] to have a recollection. . . [about] whether the co-defendant will cooperate with the government" (5/24/17 Tr. 103).  In cases like defendant Knight's, it was "always [Attorney Iverson's] fear. . . [that the co-defendant] is going to end up a witness for the government if we're going to trial" (5/24/17 Tr. 103-04).  Attorney Iverson testified that the government had "damming [sic] evidence" in this case, that is, a jacket "that was a very large size, double, double XL or something of that nature," and defendant Knight was "a very large individual" (5/24/17 Tr. 104-05).

After reviewing the transcript of the February 19, 2013, preliminary hearing where the prosecutor stated on the record that the defendants were rejecting the government's plea offer, Attorney Iverson explained that "we were not accepting the plea offer" that day, and that "[i]f we were to accept it, I would have spoken up and said, we don't want to go forward with a preliminary hearing, we want the plea offer.  We had decided not to, obviously because we went on" (5/24/17 Tr. 110).  He went on to explain that his silence at that hearing "was not silence with no meaning" (id.).  Defendant Knight did not signal to him to say anything and, "[i]f that would have happened, [he] would have stopped and said, Your Honor, we need more time or we're not prepared to go forward" (5/24/17 Tr. 115-16).  According to Attorney Iverson, "[t]hat didn't happen; we went forward" (5/24/17 Tr. 116).

Attorney Iverson also explained that the decision to reject a plea offer is made by the client and that he "[doesn't] make the decision" (5/24/17 Tr. 110).  According to Attorney Iverson, he knew that he and defendant Knight "would have discussed the plea offer and that '[his] client

15

decided not to take it" (5/24/17 Tr. 111).[7]  Attorney Iverson recalled that defendant Knight was "hopeful that Mr. Peters would not cooperate with the government or would not testify" (5/24/17 Tr. 112-13).

After the preliminary hearing took place on February 19, 2013, Attorney Iverson investigated defendant Knight's case by, among other things, going to the scene, trying to locate a neighbor and engaging the services of an investigator (5/24/17 Tr. 113-14).  While it was "not clear" to him whether defendant Knight would have accepted the plea offer extended in this case, Attorney Iverson explained, "We didn't accept the plea offer" (5/24/17 Tr. 114).  Attorney Iverson also explained that in his experience, discovery provided by the government prior to the preliminary hearing is "usually sparse, very sparse" (5/24/17 Tr. 139).  He further explained that it was possible to get more discovery if a client was interested in pleading guilty where, for example, a defendant had given an interview to police, which "may influence [a client's] decision on whether to take a plea or not" (5/24/17 Tr. 140-41).  Here, defendant Knight had not spoken to police and Attorney Iverson did not remember asking the government for additional discovery, nor did he have "reason to believe they would have given [him] further discovery, pre-preliminary hearing" (5/24/17 Tr. 141).

On cross-examination, Attorney Iverson testified that while he was representing defendant Knight in Superior Court he "wasn't contemplating [defendant Knight] going over to Federal Court" and he "found out abruptly" about the federal court indictment (5/24/17 Tr. 132-33).  He was not familiar with the Federal Sentencing Guidelines, did not contact anyone "on the federal side," and did not "consult the federal statutes and [he] did not inform Mr. Knight of what exactly

---

7    Attorney Iverson did not remember telling defendant Knight, "you better take this [plea deal]," but generally he would give his clients advice if he thought it was a "good deal," and he would tell his clients, "it's your decision; I don't do the time" (5/24/17 Tr. 135).

16

he would be facing if he went, if the case went federal" (5/24/17 Tr. 133-34).  The charges defendant Knight was facing in Superior Court were "very, very serious charges," with high statutory and mandatory minimums (5/24/17 Tr. 134).

On re-direct, Attorney Iverson testified that when he did talk to clients about the Federal Sentencing Guidelines, or "going across the street," he knew that the penalties are "stiffer" and that Superior Court penalties are "lenient by comparison" (5/24/17 Tr. 142).  When questioned by the Court, Attorney Iverson agreed that many of the Superior Court charges defendant Knight faced were also federal crimes, such as kidnapping (5/24/17 Tr. 143-46).

**4.** **The Testimony of Defendant Aaron Thorpe**

Defendant Thorpe met his attorney, Attorney David Knight, in Courtroom C-10 in Superior Court after his arrest for armed kidnapping (9/20/17 Tr. 12, 30).  Defendant Thorpe learned in court about the government's plea offer when they were "supposed to have a preliminary hearing, but it was rescheduled" and, later, when his attorney came to visit him at the D.C. Jail (9/20/17 Tr. 13-14).   Defendant Thorpe testified that Attorney Knight explained to him "that the government had emailed him a plea bargain offer, and it was for one count ADW, gun, [and] that it was wired" (9/20/17 Tr. 14).  Attorney Knight further explained to defendant Thorpe that "wired" meant that "both co-defendants had to take it or no could take it at the time" (9/20/17 Tr. 14, 22, 35).  Attorney Knight also explained to defendant Thorpe that under the Sentencing Guidelines, defendant Thorpe's sentence may be "in a category from 30 to 70 something months" and that he would be facing other charges of kidnapping while armed "and a few other charges that was listed on the plea bargain" (9/20/17 Tr. 15).  Defendant Thorpe testified that he told Attorney Knight that he "wanted to take it," but that he "also wanted to talk to [his]family and let them now at the time that this decision I was getting ready to make, because [he] had just came home from prison and [he]

17

was basically about to let them know that it was a possibility that [he] was about to do some more time" (9/20/17 Tr. 15-16).  Defendant Thorpe thought the ADW plea offer was fair "[c]ompared to what they was trying to charge [him] with" (9/20/17 Tr. 16).  If he had been able to accept the plea offer in February 2013, he would have accepted it (9/20/17 Tr. 16, 21-22).

On February 19, 2013, at the preliminary hearing, defendant Thorpe learned from Attorney Knight, who "whispered in his ear," that the government had withdrawn the plea offer (9/20/17 Tr. 17-19).  He understood that the government "was taking the plea bargain off the table and they was [sic] seeking District Court charges" (9/20/17 Tr. 20).  According to defendant Thorpe, the withdrawal by the government of its plea offer put him "in a worst predicament than [he] already was [in]" (9/20/17 Tr. 20-21).  Although he did not "know what was going on with [defendant] Knight at the time" or whether he was going to plead guilty," defendant Thorpe understood that "both of the co-defendants have to accept [the plea offer] or neither one can accept it" (9/20/17 Tr. 22).

On cross-examination, defendant Thorpe testified that he was released from federal prison on December 31, 2011, and that he met up with, and was arrested with defendant Knight on January 28, 2012, only 21 days later (9/20/17 Tr. 26-27).  Defendant Thorpe was aware that defendant Knight knew one of the complainants, Edmund Peters, and that they were going to "get some money" from him (9/20/17 Tr. 28-29).  Other than that, he "didn't have a clue about that situation" (9/20/17 Tr. 28).

### 5.    The Testimony of Attorney David Knight

Attorney David Knight graduated from law school in 2009 and, at the time he testified, had been working as a trial attorney at the Public Defender Service ("PDS") since then (9/20/17 Tr. 50-51).  In early 2013, Attorney Knight had been at PDS for about four years and he was handling

18

"serious felonies," such as "armed robberies, armed burglaries, armed kidnappings" (9/20/17 Tr. 51-52).  At that point in his career, he had participated in about 14 trials, including both bench and jury trials, and he had handled "between 50 and 75" guilty pleas (9/20/17 Tr. 52).

Attorney Knight was appointed to represent defendant Thorpe in Superior Court on January 29, 2013 (9/20/17 Tr. 53-54).  He met him in the cellblock, introduced himself, and "t[old] him about how that day would go" (9/20/17 Tr. 54).  Defendant Thorpe had his initial appearance and was "held for what we call a three-day hold" prior to his preliminary hearing (id.).  During that three-day period, Attorney Knight met defendant Thorpe at the D.C. Jail because "it's hard to have really productive conversations in the cell block at the courthouse" (9/20/17 Tr. 54-55).  They went over the Gerstein, the "allegations of what happened," "what a preliminary hearing would look like, and his potential chances of getting released at the preliminary hearing" (9/20/17 Tr. 55). They did not discuss the plea offer that had been extended by AUSA McFadden at 4:52 p.m. on January 31, 2013, because "by the time it came, [he] didn't have a chance to go see [defendant Thorpe]" (9/20/17 Tr. 55-56).

On the day the preliminary hearing was scheduled, February 1, 2013, Attorney Knight discussed with defendant Thorpe "the fact that a plea offer had been made and discuss[ed] with him that the government was offering to continue the preliminary hearing so he could consider the plea offer" (9/20/17 Tr. 57).  Defendant Thorpe "agreed that it was okay to continue the preliminary hearing so [they] could have a fuller conversation about the plea offer" (id.).  Attorney Knight recalled that the plea offer was wired, "meaning one could not take the plea unless the other one also took the plea," and that the terms were that both defendants plead guilty to one count of assault with a dangerous weapon and the government would agree not to prosecute on any greater or related charges (9/20/17 Tr. 58).

19

The next court date was February 19, 2013.  Before that date, Attorney Knight met with defendant Thorpe at the D.C. Jail at least twice (9/20/17 Tr. 58, 76).  They discussed the terms of the government's plea offer, although he "d[idn't] remember the exact words," and they discussed the potential range under the Superior Court Sentencing Guidelines, the charges that defendant Thorpe "could potentially be indicted on and how much time those charges and offense would carry" (9/20/17 Tr. 59-60, 76-77).  Attorney Knight testified that defendant Thorpe "would have gotten substantially less time on the plea than if convicted at trial on those charges" (9/20/17 Tr. 82).[8]  They also talked about the fact that the plea was wired and "what that means" (9/20/17 Tr. 60-62).  Specifically, he explained to defendant Thorpe that "if Mr. Knight did not agree to take the plea, [defendant Thorpe] would not be able to take a plea unless the government unwired the plea" (9/20/17 Tr. 62).  Attorney Knight also discussed the possibility of federal charges with defendant Thorpe, although Attorney Knight "was not in a position to really tell him what exactly those charges would look like or how much time they would carry" (id.).  It was Attorney Knight's "general practice" to communicate the plea offer to his client, tell his client, "don't make a decision right now," and then return "to follow up on the first conversation (9/20/17 Tr. 58-59, 105).

Prior to the preliminary hearing, Attorney Knight had a conversation with Attorney Iverson in the courthouse and it was his "understanding from [Attorney Iverson] . . . that he did not expect Mr. Knight to take the plea" (9/20/17 Tr. 63-64).[9]  Attorney Knight also had a separate

---

8    Attorney Knight testified that he believed that defendant Thorpe faced a sentence of 24 to 66 months (Category B) or 30 to 72 months (Category C) under the Superior Court Sentencing Guidelines, if he had accepted the ADW plea (9/20/17 Tr. 79-80).

9    In dealing with wired plea offers, Attorney Knight "generally" did not schedule a meeting to discuss the "pros and cons" with co-counsel (9/20/17 Tr. 84).  Here, he took Attorney Iverson "at his word," and when Attorney Iverson told him that "he doesn't think his client is going to take a plea," he did not "schedule a meeting to try to convince him about how to counsel his client" (9/20/17 Tr. 107).

conversation with AUSA Shaw in the courthouse "asking her if she would unwire the plea, and she said no" (9/20/17 Tr. 63-64, 67). As a result, Attorney Knight visited defendant Thorpe at the D.C. Jail to "let him know, [he] didn't know for certain but the indication [he] was getting from Mr. Iverson was that he didn't expect Mr. Knight to accept the plea" (9/20/17 Tr. 64, 68). He recalled that "part of the calculus" was that defendant Knight "may have had. . . time hanging over his head in another jurisdiction, and [defendant Knight] was concerned about getting that additional time" (9/20/17 Tr. 68).

Defendant Thorpe was "open to the plea," but was concerned about what defendant Knight's "reaction" would be to him "truly considering taking the plea" (9/20/17 Tr. 64-65, 83). Attorney Knight explained that it was his impression that defendant Thorpe "was concerned about appearing. . . 'hot'," that is, cooperating with the government (9/20/17 Tr. 66, 89-90). Therefore, they discussed that Attorney Knight "would represent in court that [defendant Thorpe] wasn't rejecting the plea, he wasn't saying he was accepting the plea" (9/20/17 Tr. 65-67).

Attorney Knight testified that although he did not recall whether defendant Thorpe told him, it was "definitely [his] impression" that based upon the police paperwork, defendant Knight "was the one giving a lot of the orders" (9/20/17 Tr. 71). During his conversation with Attorney Iverson, they "were both under the impression that Mr. Knight was running the show" (id.). Attorney Knight "never got the impression that Mr. Thorpe wanted to take the case to trial" and believed that "he would have taken the plea" if defendant Knight had (9/20/17 Tr. 86-87).

## III.    LEGAL ARGUMENT

The defendants argue that their appointed counsel, in a prior and separate proceeding in Superior Court, performed deficiently during plea negotiations, and that they suffered prejudice as a result. However, neither defendant Knight nor defendant Thorpe have met their burden of

proving either prong of ineffective assistance of counsel articulated in Strickland v. Washington, 466 U.S. 687 (1984). Accordingly, their claims should be denied.

**A.      Legal Standard for Assessing Ineffective Assistance of Counsel Claims**

It is well-settled that defendants are entitled to "the effective assistance of competent counsel" during plea negotiations. McMann v. Richardson, 397 U.S. 759, 771 (1970). In general, to succeed on an ineffective-assistance-of-counsel claim, a defendant must prove that: (1) his counsel's performance was deficient, and (2) his counsel's deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). A defendant first must show that his attorney's errors were so "serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. To meet this standard, the defendant must show that, in light of all the circumstances as they appeared at the time of the conduct, "counsel's representations fell below an objective standard of reasonableness," or "prevailing professional norms." Id. at 688, 690; Nix v. Whiteside, 475 U.S. 157, 165 (1986).

In Strickland v. Washington, 466 U.S. 668, 686 (1984), the Supreme Court held that the benchmark for evaluating claims of ineffective assistance of counsel "must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Under Strickland, defendant must satisfy a two-part standard: defendant must prove both that: (1) counsel's performance was deficient, and (2) counsel's deficient performance prejudiced the defense. Id. at 687. "'Surmounting [this] high bar is never an easy task.'" United States v. Brinson-Scott, 714 F.3d 616, 623 (D.C. Cir. 2014) (quoting Padilla v. Kentucky, 559 U.S. 356, 371 (2010)).

To establish "deficient performance," defendant must show that his or her attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth

Amendment." Strickland, 466 U.S. at 687. In other words, the defendant must establish that his "counsel's representation fell below an objective standard of reasonableness," i.e., "prevailing professional norms." Id. at 688, 690; see also Hinton v. Alabama, 134 S. Ct. 1081, 1088 (2014); Nix v. Whiteside, 475 U.S. 157, 165 (1986); United States v. McDade, 699 F.3d 499, 506 (D.C. Cir. 2012). "As a general matter, the bar of objective reasonableness is set rather low." United States v. Hurt, 527 F.3d 1347, 1356 (D.C. Cir. 2008); see also Yarborough v. Gentry, 540 U.S. 1, 8 (2003) (per curiam) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."). The Sixth Amendment does not require perfection. Hurt, 527 F.3d at 1357.

Because "it is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence," courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland at 689 (quoting Michael v. Louisiana, 350 U.S. 91, 101 (1955)); accord Bell v. Cone, 535 U.S. 685, 698 (2002); United States v. Vyner, 846 F.3d 1224, 1227 (D.C. Cir. 2017). Indeed,

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

Strickland, 466 U.S. at 689; Vyner, 846 F.3d at 1227; United States v. Curry, 494 F.3d 1124, 1130 (D.C. Cir. 2007).

"Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689 (citations omitted). Thus, there are ultimately "countless ways to provide effective assistance in any given case," and as a result, "strategic choices made after a thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable." United States v. Morrison, 98 F.3d 619, 623 (D.C. Cir. 1996) (citing Strickland, 466 U.S. at 689-90). Ultimately, "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" Cullen v. Pinholster, 563 U.S. 170, 189 (2011) (quoting Strickland at 690). Furthermore, the Court must evaluate the asserted errors of counsel in the context of the attorney's overall performance to determine whether the defendant's claims overcome this presumption of competence. See Kimmelman v. Morrison, 477 U.S. 365, 386 (1986). In the context of a plea offer that lapsed or was rejected, the Supreme Court pointed to some of the inherent difficulties in determining deficient performance because no formal court proceedings are involved, there is no judicial supervision of the discussions between the prosecution and defense, the discussions between the client and defense counsel are privileged, and the prosecution "has little or no notice if something may be amiss and perhaps no capacity to intervene in any event." Missouri v. Frye, 566 U.S. at 143.

In addition to proving "deficient performance," defendant must also affirmatively satisfy the second prong of Strickland, and prove that this deficiency caused prejudice "so serious as to deprive the defendant of fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687, 693; see also Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993) (defendant must demonstrate that counsel's deficient performance rendered the proceeding "fundamentally unfair or unreliable").

24

To meet this standard, the defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." United States v. Udo, 795 F.3d 24, 30 (D.C. Cir. 2015) (quoting Strickland, 466 U.S. at 694); see also United States v. Cassell, 530 F.3d 1009, 1011 (D.C. Cir. 2008); United States v. Eli, 379 F.3d 1016, 1019 (D.C. Cir. 2004); United States v. Weaver, 234 F.3d 42, 46 (D.C. Cir. 2000).

Notably, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. Rather, establishing a "reasonable probability" requires that "the likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011); see also Brinson-Scott, 714 F.3d at 624. Moreover, it must be remembered that "a [defendant] is entitled to a fair trial, but not a perfect one, for there are no perfect trials." McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 553 (1984).

"Failure to make the required showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim." Strickland, 466 U.S. at 700 (emphasis added). Consequently, the reviewing court need not even "address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697. "If it is easier to dispose of an effective assistance claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.; see also Brinson-Scott, 714 F.3d at 623.

Even if counsel's representation was deficient, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Hockman v. United States, 517 A.2d 44, 51 (D.C. 1986) (quoting Strickland, 466 U.S. at 693-94); Young v. United States, 515 A.2d 1090, 1094 (D.C. 1986);

25

Townsend v. United States, 512 A.2d 994, 1001 (D.C. 1986).  In the context of advice given with respect to guilty pleas, a defendant must show a reasonable probability that the outcome of the plea process would have been different with competent advice.  Lafler v. Cooper, 566 U.S. 156, 163 (2012); Missouri v. Frye, 566 U.S. 133, 148 (2012) (Strickland, as applied to as defense counsel's advice with respect to plea offers, turns on whether the result of the plea process would have been different); Hill v. Lockhart, 474 U.S. 52, 59 (1985) (prejudice "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process").

Where, as here, counsel's advice led to the defendants' rejection of a plea offer, the defendants must show that "but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendants would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed."  Lafler, 566 U.S. at 164.  This showing is important because a defendant has no right be offered a plea, nor does he have a right that the judge accept it.  Missouri v. Frye, 566 U.S. at 148.  Additionally, where the plea offer was wired, each defendant must "show a reasonable probability that either the government would have waived that condition or his co-defendant [s] would have been willing to plead guilty on the government's terms."  Benitez v. United States, 60 A.3d 1230, 1237 (D.C. Cir. 2013).

**B.      The Defendants Have Not Established Deficient Performance.**

      **1.      Attorney Iverson's Representation of Defendant Knight was not Deficient.**

Defendant Knight asserts that Attorney Iverson's performance was deficient because he failed to communicate the government's plea offer to him, but for a "brief mention" of the offer "in the midst of open court proceedings." Defendant Knight's Motion, at 7. Defendant Knight goes on to claim that Attorney Iverson did not meet with him at the D.C. Jail between February 1, 2013, the day after the plea offer was tendered, and February 19, 2013, when the plea offer expired. He also claims that Attorney Iverson did not discuss with him the maximum or minimum penalties, the Superior Court Sentencing Guidelines, or potential additional charges, including federal charges. Id. at 7-8. The record, for the most part, shows otherwise.

At the time Attorney Iverson was appointed to represent defendant Knight, he was an experienced criminal defense practitioner who had handled hundreds of guilty pleas in Superior Court. Attorney Iverson first met defendant Knight at his presentment in Courtroom C-10 in Superior Court on January 29, 2013 (5/24/17 Tr. 83). Attorney Iverson explained that a presentment usually lasts five or six minutes and that, before that, he usually spoke "briefly" with his clients and told them about the charges, whether he thought they would be held, the upcoming preliminary hearing and he asked his client whether he had family members in the audience (5/24/17 Tr. 85).

Defendant Knight's preliminary hearing was scheduled for three days later, on February 1, 2013. The night before, on January 31, 2013, Attorney Iverson received the government's pre-indictment plea offer via email from AUSA McFadden. Attorney Iverson's billing records and the D.C. Jail records corroborated his testimony that he went to the D.C. Jail to visit defendant Knight the same day he received the government's plea offer. While Attorney Iverson could not recall his exact conversation with defendant Knight about the plea offer, he testified that his general

27

practice, when discussing a plea offer with a client, was to discuss the charge, the "possible" and "maximum" penalties, "whether the government has indicated its allocution, placed any limits on itself, the Voluntary Sentencing Guidelines and to "give the client a sense of if they accept this plea, this is what you can expect" (5/24/17 Tr. 101-02, 132). There was no reason to believe that Attorney Iverson departed from his general practice in advising defendant Knight of the government's plea offer and its consequences in this case when he spoke to him at the D.C. Jail on January 31, 2013.[10] Attorney Iverson did recall that the ADW plea offer in this case was wired (5/24/17 Tr. 103).

Attorney Iverson testified, "[f]rom the beginning, [he and defendant Knight] were discussing the evidence" (5/24/17 Tr. 91). He explained that they had conversations with defendant Knight "about the case as – what he told [him] about the case, going over some of the strengths and weaknesses about the evidence what [they] expected the evidence to be at trial, talking to [him] about some of the weaknesses in defenses, what [he] thought would be the strength of the government's case, why [he] thought [they] wouldn't prevail on certain issues" (5/24/17 Tr. 100-01). Thus, in the context of Attorney Iverson's overall performance, defendant Knight has not overcome the presumption that Attorney Iverson was competent in advising him of the government's plea offer.

### 2.    Attorney Knight's Representation of Defendant Thorpe was not Deficient.

At the time Attorney Knight was appointed to represent defendant Thorpe, Attorney Knight had been at PDS for about four years and was handling "serious felonies," such as "armed

---

10    Defendant Knight confirmed that Attorney Iverson had advised him that ADW carries a 10-year maximum penalty, although he claimed that conversation took place the next day, on February 1, 2013.

robberies, armed burglaries, armed kidnappings" (9/20/17 Tr. 51-52). He had handled "between 50 and 75" guilty pleas (9/20/17 Tr. 52). On January 29, 2013, Attorney Knight met defendant Thorpe in the Superior Court cellblock, introduced himself, and "t[old] him about how that day would go" (9/20/17 Tr. 54). Attorney Knight acknowledged that he had received the government's pre-indictment plea offer via email by AUSA McFadden on January 31, 2013, but it came too late for him to go see defendant Thorpe at the D.C. Jail (9/20/17 Tr. 55-56).

On February 1, 2013, Attorney Knight did discuss the plea offer in the context of continuing the preliminary hearing because defendant Thorpe "agreed that it was okay to continue the preliminary hearing so [they] could have a fuller conversation about the plea offer" (9/20/17 Tr. 57). Before the next court date of February 19, 2013, Attorney Knight met with defendant Thorpe at the D.C. Jail at least twice (9/20/17 Tr. 58, 76). They discussed the terms of the government's plea offer, which included the potential range under the Superior Court Sentencing Guidelines, the charges that defendant Thorpe "could potentially be indicted on and how much time those charges and offense would carry," although Attorney Knight did not remember  his "exact words" (9/20/17 Tr. 59-60, 76-77). They also talked about the fact that the plea was wired and "what that means" (9/20/17 Tr. 60-62). Specifically, Attorney Knight explained to defendant Thorpe that "if Mr. Knight did not agree to take the plea, [defendant Thorpe] would not be able to take a plea unless the government unwired the plea" (9/20/17 Tr. 62). Attorney Knight also discussed the possibility of federal charges with defendant Thorpe although Attorney Knight "was not in a position to really tell him what exactly those charges would look like or how much time they would carry" (9/20/17 Tr. 62). It was Attorney Knight's "general practice" to communicate the plea offer to his client, tell his client, "don't make a decision right now," and then return "to

29

follow up on the first conversation" (9/20/17 Tr. 58-59, 105). There is no indication that Attorney Knight departed from his general practice of allowing his clients time to think about the plea offer before making a decision whether to accept it.

Prior to the preliminary hearing, Attorney Knight learned from Attorney Iverson that he "did not expect [defendant] Knight to take the plea" (9/20/17 Tr. 63-64). Attorney Knight also had a separate conversation with AUSA Shaw "asking her if she would unwire the plea, and she said no" (9/20/17 Tr. 63-64, 67). After these conversations, Attorney Knight visited defendant Thorpe at the D.C. Jail to "let him know, [he] didn't know for certain but the indication [he] was getting from Mr. Iverson was that he didn't expect Mr. Knight to accept the plea" (9/20/17 Tr. 64, 68).

While defendant Thorpe was "open to the plea," he was concerned that defendant Knight might think that he was cooperating with the government (9/20/17 Tr. 64-66, 83, 89-90). For this reason, Attorney Knight stated, somewhat cryptically, at the hearing on February 19, 2013: "The plea offer was offered. Mr. Thorpe neither said he was taking it nor not taking me [sic]. I believe the codefendant spoke first and said he was not. And they're wired." Attorney Knight testified at the evidentiary hearing that it was his impression that defendant Knight was "running the show" (9/20/17 Tr. 71). Attorney Knight "never got the impression that Mr. Thorpe wanted to take the case to trial" and believed that "he would have taken the plea" if defendant Knight had (9/20/17 Tr. 86-87).

## C. The Defendants Have Not Established Prejudice.

The government does not dispute that the sentences the defendants received after being convicted at trial in this case -- 268 months for defendant Knight and 300 months for defendant

30

Thorpe -- were more severe than the sentences each would have received for an ADW conviction in Superior Court. See D.C. Code § 22-402 (statutory maximum for ADW is ten years, or 120 months). Four years into serving their lengthy federal sentences, both defendants now assert that they would have accepted the government's ADW plea offer willingly when it was available to them in March of 2013. The defendants' "bald, post hoc and unsupported statements" do not end the inquiry. See, e.g., Heard v. Addison, 728 F.3d 1170, 1182 (10th Cir. 2103) (favoring a "holistic inquiry" into the factual circumstances surround the plea, but noting that a defendant's "mere allegation" that he would have proceeded to trial but for counsel's alleged errors was insufficient to entitle him to relief) (internal citation omitted); see also Hopper v. Garraghty, 845 F.2d 471, 475 (4th Cir. 1988) (defendant's statement that he would have gone to trial "carries some probative value," but admonishing that "such  statement suffers from obvious credibility problems and must be evaluated in light of the circumstances"); compare with Pilla v. United States, 668 F.3d 368, 373 (6th Cir. 2012) ("the [prejudice] test is objective not subjective."). The record from the Superior Court proceedings, as well as the record developed during the post-trial evidentiary hearing, paints a different picture. That is, the record plainly demonstrates that defendant Knight was never going to "cop" to a plea. In addition, because the plea offer was wired, defendant Thorpe never would have been able to accept the plea offer, without defendant Knight accepting it.

When Attorney Iverson visited him at the D.C. Jail on January 31, 2013, defendant Knight's "whole focus" was getting released (5/24/17 Tr. 17). In court the next day, defendant Knight was "upset" with Attorney Iverson when the preliminary hearing got postponed because he wanted to "get home" because his wife had just had his son ((5/24/17 Tr. 18). In fact, according to defendant Knight, he expressed his frustration to Attorney Iverson, "I've been locked up for

31

three days, I'm not copping to that shit" (5/24/17 Tr. 19).  At the February 19, 2013, preliminary hearing, defendant Knight wanted Attorney Iverson to "move forward" to "see where the case was going" (5/24/17 Tr. 60).  Therefore, defendant Knight's testimony at the evidentiary hearing revealed that he was not interested Attorney Iverson talking to him about pleading guilty.  Rather, his sole interest was getting released.

When the prosecutor put on the record at the preliminary hearing that the defendants were rejecting the government's plea offer, Attorney Knight confirmed that by stating:  "The plea offer was offered.  Mr. Thorpe neither said he was taking it nor not taking me [sic]. I believe the codefendant spoke first and said he was not. And they're wired."  Attorney Iverson said nothing, but at the evidentiary hearing, he explained that his silence "was not silence with no meaning" (5/24/17 Tr. 110).  Attorney Iverson went on to explain that if defendant Knight had wanted to accept the plea offer, he "would have spoken up and said, we don't want to go forward with a preliminary hearing, we want the plea offer.  We had decided not to, obviously because we went on" (5/24/17 Tr. 110).  Further, at this hearing, defendant Knight acknowledged that he heard what he prosecutor stated and that he did not signal to, or say anything to Attorney Iverson to the contrary.  Attorney Iverson testified that, "[i]f that would have happened, [he] would have stopped and said, Your Honor, we need more time or we're not prepared to go forward" (5/24/17 Tr. 115-16).  Attorney Iverson was well aware, as an experienced criminal defense practitioner, that the decision to reject a plea offer is made by the client and that the attorney does not make that decision (5/24/17 Tr. 110).   In fact, he generally told his clients, "it's your decision; I don't do the time" (5/24/17 Tr. 135).

Attorney Iverson's conduct at the preliminary hearing comported with what Attorney Knight's impression of the dynamics between the two defendants was – that defendant Knight was "running the show." Indeed, Attorney Knight testified that it was "definitely [his] impression" that based upon the police paperwork, defendant Knight "was the one giving a lot of the orders" and that during his conversation with Attorney Iverson, they "were both under the impression that Mr. Knight was running the show" ((9/20/17 Tr. 71). When Attorney Knight learned from Attorney Iverson that Attorney Iverson did not expect defendant Knight to take the plea, Attorney Knight sought out the prosecutor to ask whether she would unwire it, but she said no (9/20/17 Tr. 63-64, 67). After these conversations, Attorney Knight visited defendant Thorpe at the D.C. Jail to "let him know, [he] didn't know for certain but the indication [he] was getting from Mr. Iverson was that he didn't expect Mr. Knight to accept the plea" (9/20/17 Tr. 64, 68). Thus, because of the wired nature of the plea offer and the fact that the government would not unwire it, defendant Thorpe was not in a position to accept the plea offer, even if he had wanted to.

Later, after both defendants had been indicted in federal court, defendant Knight complained to Bar Counsel that Attorney Iverson had "tried to fast-talk [him] on a plea deal in D.C. Superior Court, in open court," but that he had "refused." Defendant Knight's Exhibit 1. While defendant Knight complained about Attorney Iverson's performance, or lack of performance in many respects, he said nothing about the lapsed ADW plea offer. He did not complain, as he does now, that Attorney Iverson did not advise him of the terms of the plea offer or that he had wanted to accept it. Instead, he told Bar Counsel unequivocally that he had "refused" the plea offer.

33

Moreover, the record establishes that during the pendency of the Superior Court case, defendant Knight was "hopeful" that the victim in this case, Edmund Peters, would not testify against him (5/24/17 Tr. 112-13).    Therefore, he had no interest in pleading guilty.    Indeed, defendant Knight admitted at the evidentiary hearing that he had known the complainant, Peters, for a while and knew Peters sold drugs.    He also admitted that he and defendant Thorpe went to Peters' home to rob him of drugs and money:

Q:  So, Mr. Knight, you had told me that you knew Mr. Peters from way back?

A:  I knew him for a while yes.

Q:  And you knew that he sold drugs, right?

A:  I was aware of that.

Q:  Right.  And you thought, on January 28th, that he might have some drugs at his place, right?

A: Yes.

Q:  And you also thought, being a drug dealer, he might have some money over at his place, right?

A;  It's possible, yes.

Q:  And so you went over there, with Mr. Thorpe, armed with guns, and went over to Mr. Pets to rob him of drugs and money?

A;  Okay.  Yes.

Q:  You agree?

A.  Okay. Yeah, I agree.

(5/24/17 Tr. 50).  Thus, defendant Knight's testimony at the evidentiary hearing that he knew "what type of man" Peters was, and knew he would "cooperate with the government" rings hollow

and is not credible (5/24/17 Tr. 65). What is more credible is that Knight picked a drug dealer as his victim because it was unlikely that a drug dealer would report the theft of drugs and money to the authorities and, ultimately, testify at a trial. Indeed, at the crime scene, Peters refused to allow police to enter his apartment, thereby requiring them to obtain a search warrant.

Finally, the defendants did not accept a plea offer that was available to them once the case was indicted in federal court, nor were they amenable to negotiating any kind of guilty plea. See Transcript, 6/4/13 at 4 (AUSA Emory Cole informed the Court that he had "talked to defense counsel in this case. It appears that the defendants are not amenable to even discussing a nontrial disposition. . . . the defendants have indicated they want to go to trial"). Thus, there is no indication in the record in this case that the defendants were interested in pleading guilty at a later point in time, nor was there any indication that they were dissatisfied with their Superior Court counsel for allowing the government's generous ADW plea offer to lapse.

As for defendant Thorpe, because the plea offer was wired, it is not enough for him to simply assert that he would have accepted the government's plea offer. In this instance, the D.C. Circuit has held that each defendant must "show a reasonable probability that either the government would have waived that condition or his co-defendant [s] would have been willing to plead guilty on the government's terms." See Benitez, 60 A.3d at 1237. For the reasons stated above, defendant Knight failed to prove that there was a reasonable probability that he would have accepted the ADW plea offer when it was available in March of 2013. Therefore, defendant Thorpe, by extension, has failed to prove there was a reasonable probability that he would have accepted the plea offer.

### III.    CONCLUSION

Accordingly, the Court should deny the defendants' ineffective assistance of counsel claims.

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845

MARGARET J. CHRISS
Chief, Special Proceedings Division
D.C. Bar No. 452403

_____/S/_____
PAMELA S. SATTERFIELD
Assistant United States Attorney
D.C. Bar No. 421247
United States Attorney's Office
Special Proceedings Division
555 Fourth Street, NW
Washington, D.C. 20530
202-252-7578

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a copy of the foregoing to be served via ECF on counsel for the defendants, Mary Davis, Esquire, and Howard Katzoff, Esquire, on this 2nd day of April, 2017.

_____/S/_____
PAMELA S. SATTERFIELD
Assistant United States Attorney